# EXHIBIT "A"

JAMES E. WHITMIRE, ESQ.
Nevada Bar No, 6533
jwhitmire@santoronevada.com
NICHOLAS J. SANTORO, ESQ.
Nevada Bar No. 532
nsantoro@santoronevad.com
SANTORO WHITMIRE
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone:    702/948-8771
Facsimile:    702/948-8773
*Attorneys for Defendants/Counterclaimants*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

THE PHOENIX INSURANCE COMPANY, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Plaintiff.

v.

YOUR VITAMINS, INC., d/b/a PROCAPS LABORATORIES, and ANDREW LESSMAN,

Defendants,

—————————————————

YOUR VITAMINS, INC., d/b/a PROCAPS LABORATORIES, and ANDREW LESSMAN,

Counterclaimants,

v.

THE PHOENIX INSURANCE COMPANY, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Counterdefendants.

No.: 2:12-cv-00564-MMD-RJJ

**LR 26-7 CERTIFICATION OF COUNSEL IN SUPPORT OF MOTION TO COMPEL**

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

0002

I, JAMES E. WHITMIRE, certify, depose and say:

1.     I am one of the attorneys for Defendants/Counterclaimants (collectively referred to as "ProCaps") in the above-captioned lawsuit.  I am over the age of eighteen years and competent to testify to the matters set forth herein.  I make the statements herein based on my personal knowledge of the facts and matters of this action.

2.     Pursuant to LR 26-7 and FRCP 37(a)(1) and (d)(1), I submit this Certification in Support of ProCaps' Motion to Compel against Plaitniffs/Counterdefendants ("Travelers")

3.     ProCaps propounded their First Set of Document Production Requests and First Set of Interrogatories upon Travelers' counsel on July 5, 2012.

4.     Travelers' served their Objections and Response to Defendant's First Set of Document Production Requests and Interrogatories on August 16, 2012, after a ten (10) day extension of time had been granted.  True and correct copies of Travelers' responses are attached to the Motion to Compel as Exs. F and G, respectively.

5.     No documents were produced or otherwise included in Travelers' responses that were served on August 15, 2012.

6.     Following receipt of Travelers' responses, I contacted Travelers' counsel based in Chicago, Illinois to inquire about the status of production of documents and the objections asserted by Travelers.

7.     Several telephonic conferences occurred concerning Travelers' responses, or lack thereof, in order to resolve the parties' disputes without Court intervention.  Summaries of the multiple extensive communications that occurred are set forth in the subsections below:

> A.     On August 24, 2012, a two hour telephonic meet and confer occurred between Travelers' counsel Nicholas Butovich and the undersigned.  We extensively discussed Travelers' lack of production.  Representations were made by counsel that the claims file was being produced and that ProCaps should defer issues pending review of the file.  Other issues were taken under consideration by Travelers' counsel to allow the matters to be further "vetted" with their client.  The 8/30/12 e-mail attached hereto

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

- 2 -

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

outlines the multiple issues discussed during the two hour meet and confer.

B.   On September 6, 2012, counsel for the parties had another telephonic meet and confer.[1]  Counsel for Travelers, Mr. Butovich, confirmed that the production was not complete as to the claims file, and that another wave of production would occur the following week.[2]  He further advised that Travelers was still vetting and taking certain matters under advisement. At this point, the scope of the parties' dispute was still uncertain, and further good faith attempts were being made by ProCaps to narrow the disputes.

C.   On September 11, 2012, the parties had yet another telephonic meet and confer.  The conference occurred between Mr. Butovich and the undersigned.  During this conference, Travelers' counsel advised that they were almost done with their redactions, that the remainder of the claims file was about to be produced and that that production may overlap with other discovery requests in dispute.  As for the remaining items being vetted and/or taken under advisement, Travelers' counsel recommended that ProCaps review the next wave of production and go from there.

D.   On September 17, 2012, Mr. Butovich and the undersigned spoke again after the undersigned had an opportunity to review the nearly 2,000 pages of documents Travelers had produced on September 12th.  Mr. Butovich confirmed that no other documents were going to be voluntarily produced.

8.   In addition to telephonic conferences, e-mails were sent in an attempt to resolve the matter and/or narrow the disputes in a sincere good faith attempt to avoid Court intervention.

---

[1] Several attempts had to be made to cause the 9/6/12 conference to occur as illustrated in the e-mails dated 9/5 and 9/6 that are attached hereto.

[2] On 9/12/12, Travelers produced documents bates numbered 375-2409 to supplement the production of its "claims" file, which his still incomplete.

- 3 -

0004

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

Examples of the e-mails are attached to this Certification.

- 8/16-17/12 e-mail inquiring whether documents are "en route" and attempts to set up telephonic meet and confer.

- 8/22/12 e-mail in advance of meet and confer inquiring about status of production of documents and outlining issues for discussion.

- 8/30/12 outlining remaining issues to be discussed after failed attempt to resume telephonic meet and confer.[3]

- 9/5-6/12 e-mails attempting to resume meet and confer.

- 9/14/12 e-mail inquiring whether additional documents were going to be produced by Travelers with response by Travelers counsel that no additional documents were going to be produced.

9. Travelers' production has been sporadic and incomplete as detailed more fully in the Motion to Compel filed herewith.

10. As discussed in this Motion, numerous deficiencies remain in Travelers' production.

11. Given the impasse that exists, Court intervention is necessary.

12. Pursuant to LR 26-7, I hereby certify that all of my personal consultations with Travelers' counsel were good faith and sincere efforts to resolve the instant dispute without resort to court action. Unfortunately, the parties were unable to resolve the dispute without court action.

Dated this __28th__ day of September, 2012.

_____
JAMES E. WHITMIRE, ESQ.

---

[3] Travelers was unable to participate in an additional meet and confer on August 30, 2012 before the long holiday weekend, yet was able to file its Motion for Partial Summary Judgment the Tuesday following Labor Day on September 4, 2012. Following the filing of Travelers' Motion, ProCaps engaged in further telephonic meet and confer sessions.

- 4 -

8/16-17/12 e-mail

## Jim Whitmire

**From:**    Jim Whitmire
**Sent:**    Friday, August 17, 2012 1:08 PM
**To:**    Jim Whitmire
**Cc:**    Butovich, Nicholas; Craig R. Delk
**Subject:** Re: Procaps v. Travelers

Nick, please advise regarding inquiry/request below. Also, please let me know you're availability early next week so we can start the meet and confer process that is obviously warranted. Thanks.

Sent from my iPhone

On Aug 16, 2012, at 3:24 PM, "Jim Whitmire" <JWhitmire@santoronevada.com> wrote:

> Nick, are documents en route (i.e. claims file, etc.)? When we granted more time (which I routinely do), I expected that we'd get something of substance back. Please e-mail me the claims file materials as soon as you can (i.e. by tomorrow close of business). There are other areas that we'll need to meet and confer about, but let's get the claims file issue out of the way for now. Thank you.

**From:** Butovich, Nicholas [mailto:Butovich@litchfieldcavo.com]
**Sent:** Thursday, August 16, 2012 12:38 PM
**To:** Jim Whitmire
**Cc:** Craig R. Delk; Litchfield, Daniel; Rice, Hayley
**Subject:** RE: Procaps v. Travelers

Jim,

Please see attached, also by mail.

Sincerely,
Nick

**From:** Jim Whitmire [mailto:JWhitmire@santoronevada.com]
**Sent:** Thursday, August 16, 2012 12:40 PM
**To:** Butovich, Nicholas
**Cc:** Craig R. Delk
**Subject:** Procaps v. Travelers

Nick,

Can you send me your clients' responses to the discovery requests today via e-mail (both responses and actual documents)? Thanks.

Jim

JAMES E. WHITMIRE, ESQ.
**SANTORO WHITMIRE**
10001 Park Run Drive
Las Vegas, Nevada 89145
P: 702.948.8771 | F: 702.948.8773
jwhitmire@santoronevada.com

NOTICE: This electronic mail transmission, and any attachments hereto, may contain an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at 702.948.8771 and e-mail the sender that you have received this communication in error. Thank you.

**0008**

9/28/2012

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally
privileged and confidential. If you are not an intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
e-mail is strictly prohibited. If you have received this e-mail in error,
please notify the sender and permanently delete the e-mail and any
attachments immediately. You should not retain, copy or use this e-mail
or any attachment for any purpose, nor disclose all or any part of the
contents to any other person. Thank you.

Chicago      Hartford      Boston      New York      New Jersey      Pittsburgh
Philadelphia      Houston      Los Angeles      Fort Lauderdale      Tampa      Wisconsin

9/28/2012

8/22/12 e-mAil

## Jim Whitmire

**From:**      Jim Whitmire
**Sent:**      Wednesday, August 22, 2012 4:00 PM
**To:**        Butovich, Nicholas
**Subject:**   NevadaDiscoveryDecision -- Meet and Confer Issues

**Attachments:**   Microsoft Word - NevadaDiscoveryDecision.pdf



Microsoft Word -
NevadaDiscove...

Nick,

In advance of our telephonic conference on Friday to meet and confer regarding various discovery issues, I'm attaching a recent Nevada decision that is relevant to insurance coverage discovery disputes.

As discussed, please send to me the additional claims file materials that you have as soon as you can.  While the claims file is not the only issue we have, it's certainly an easy issue to discuss for purposes of illustrating our concerns.

As noted, I'm accommodating about extensions of time as a professional courtesy, but having this drag out approximately 45-60 days is concerning.  As I inquired about the claims file issue last week, we'd appreciate, at a minimum, some further rolling production this week (with particular emphasis on the computer logs/diaries (or similar entries) that your client kept).

We'll talk more on Friday.  Thank you.

Jim Whitmire

1



1 of 1 DOCUMENT

**LaQUAN PHILLIPS, Plaintiff, vs. CLARK COUNTY SCHOOL DISTRICT; et al., Defendant.**

**Case No. 2:10-cv-02068-GMN-GWF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*2012 U.S. Dist. LEXIS 5309*

**January 18, 2012, Decided**
**January 18, 2012, Filed**

**CORE TERMS:** interrogatory, discovery, rider, coverage, insured's, responsive, summary judgment, documents relating, lawsuit, disability, insurance policy, school districts, paralysis, ambiguous, objected, policyholder, handling, partial, manuals, policy provision, insurer, times, production of documents, unambiguous, burdensome, relevancy, ambiguity, insurance contract, similar claims, extrinsic

**COUNSEL:** [*1] For LaQuan Phillips, Plaintiff: Robert M. Adams, LEAD ATTORNEY, Bradley J. Myers, Robert T Eglet, Mainor Eglet Cottle, Las Vegas, NV.

**JUDGES:** GEORGE FOLEY, JR., United States Magistrate Judge.

**OPINION BY:** GEORGE FOLEY, JR.

**OPINION**

**ORDER**

**Motions to Compel - #39, #55**

This matter is before the Court on Plaintiff's Motion to Compel Responsive Answers to Plaintiff's Written Discovery and Request for Leave of Court to Propound Additional Interrogatories to Defendant National Union Fire Insurance Company (#39), filed on November 17, 2011; Defendant's Opposition to the Motion to Compel (#54), filed on December 12, 2011; and Plaintiff's Reply to Defendant's Opposition to Motion to Compel (#59), filed on December 23, 2011.

Also before the Court is Plaintiff's Second Motion to Compel Responsive Answers to Plaintiff's Written Discovery and Request for Leave of Court to Propound Additional Interrogatories to Defendant National Union Fire Insurance Company (#55), filed on December 15, 2011; Defendant's Opposition to Plaintiff's Second Motion to Compel (#58), filed on December 23, 2011; and Plaintiff's Reply to Defendant's Opposition to Plaintiff's Second Motion to Compel (#60), filed on December 28, 2011. The Court conducted a hearing [*2] on these motions on December 29, 2011.

**BACKGROUND**

This case involves claims for breach of contract, violation of the Nevada Unfair Claims Practices Act, *NRS 686A.310(2)*, breach of the covenant of good faith and fair dealing, and unconscionability arising out of Defendant National Union Fire Insurance Company's ("National Union") denial of Plaintiff's claim for a $500,000.00 "Catastrophe Cash Benefit" under a rider to a "Blanket Accident Insurance Policy" issued to the Clark County School District.

On September 5, 2008, Plaintiff LaQuan Phillips suffered a fracture of his cervical spine and resulting spinal cord damage while playing football for Centennial High School in Las Vegas, Nevada. The policy issued by Defendant National Union provides medical expense coverage for accidental injuries suffered by Clark County School District student-athletes such as Mr. Phillips. Pursuant to the policy, Defendant paid medical expenses on behalf of Mr. Phillips. The policy also contained a "Catastrophe Cash Benefit Rider," also referred to as the "CAT Rider," which states in pertinent part as follows:

Case 2:12-cv-00564-MMD-NJK    Document 38-2    Filed 09/28/12    Page 13 of 161

Page 2
2012 U.S. Dist. LEXIS 5309, *

**Catastrophe Cash Benefit.** If injury to the insured results, within 180 days of the date of the accident [*3] that caused the injury, in Paralysis or Coma, the Company will pay a benefit under the conditions described in this Rider. In order for a benefit to be payable under this Rider, the Paralysis or Coma must continue for a Waiting Period of 6 consecutive months, must be determined by a Physician to be permanent and irreversible at the end of the Waiting Period and must result in Disability. The benefit payable is based on the percentage of the Initial Lump Sum and Monthly Maximum Amount(s) shown below for the causes of Disability shown below.

*Plaintiff's Motion for Partial Summary Judgment (#27), Exhibit 3.*

The CAT Rider contains express definitions of the terms Disabled/Disability and Paralysis as follows:

**Disabled/Disability** - as used in this Rider, means that the insured is unable while under the regular care of a Physician, to engage in any of the usual activities of a person of like age and sex whose health is comparable to that of the insured immediately prior to the accident.

**Paralysis** - as used in this Rider, means the complete loss of function in a part of the body as a result of neurological damage, as determined by a Physician.

*Id.*

The general Definitions section of the Blanket Accident [*4] Insurance Policy also defines the word Physician as follows:

**Physician** - means a licensed practitioner of the healing arts acting within the scope of his or her license who is not: 1) the Insured; 2) an Immediate Family Member; or 3) retained by the Policyholder.

*Motion (#27), Exhibit 2, pg. 3.*

On May 13, 2009, a claim representative for National Union sent a letter to Mr. Phillips' physician, Robert Voy, M.D., informing him of the coverage provisions under the CAT Rider. *Plaintiff's Motion for Partial Summary Judgment (#27), Exhibit 5.* The letter stated that in order to evaluate for the Catastrophe Cash Benefit under the policy, the claim representative would need additional medical records. The representative requested that Dr. Voy provide a copy of the history and physical, admission and discharge summaries, and most recent progress notes from the rehabilitation facility where Mr. Phillips was a patient. The letter further stated that "[a] *physician* must determine if the paralysis is complete, permanent and irreversible. Once this information is received the file will be sent to an independent medical consultant for review." *Id.*

On May 28, 2009, Dr. Voy sent a letter to National Union's [*5] claim representative stating that Mr. Phillips "is presently quadriplegic from the neck down including total paralysis of both upper and lower extremities." *Plaintiff's Motion for Partial Summary Judgment (#27), Exhibit 6.* Dr. Voy's letter went on to summarize the limited extent of Plaintiff's reflexes and ranges of motion in the upper and lower extremities. In regard to Mr. Phillips' "Overall Physical Status," Dr. Voy stated:

Small objects can be fixed in his contracted hand. His elbow lacks 20 degrees extension. Eating and drinking are spastic at best. All of these movements are limited because of dysreflexia. He needs assistance dressing himself. Bowel movements need regular laxative stimulation. Bladder function is slow and he also has incontinence at times.

*Id.*

Dr. Voy concluded that "with a reasonable degree of medical certainty after nine months of continued therapy LaQuan's disability is permanent. He will need lifetime therapy to prevent any further contractures and more permanent disability." *Id.*

National Union's claim representative obtained a neurological review of Mr. Phillips' medical records by Leonard Topper, M.D. to determine whether Mr. Phillips qualified for the Catastrophe [*6] Cash Benefit under the language of the policy. Based on his review of Mr. Phillips' records, which included Dr. Voy's May 28, 2009 letter, Dr. Topper concluded that Plaintiff's impairments and capabilities do not meet the definition of paralysis as stated in the CAT Rider. *Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment (#33),*

2012 U.S. Dist. LEXIS 5309, *

*Exhibit 19, Dr. Topper's June 19, 2009 Report, pg. 3.* Dr. Topper stated that Mr. Phillips "suffers from cervical myelopathy, with incomplete recovery." He further stated:

> The claimant can get up from sitting position, can take a glass of water, and can walk with a walker or 2 canes. This indicates that, although the claimant does suffer from a significant degree of cervical myelopathy, his loss of motor strength and extremities use is incomplete. Therefore, this condition doesn't meet the definition of Paralysis, "the complete loss of function in a part of the body", and doesn't meet the definition of Disability where "the insured is unable ... to engage in any of the usual activities of a person of like age and sex..." Although the claimant's range of activities is severely limited, he regains his ability to ambulate (with assistive [*7] devices), and therefore doesn't meet criteria for disability.

*Id. pgs 3-4.*

Based on Dr. Topper's opinions, the Defendant denied Plaintiff's claim for the Catastrophe Cash Benefit. *Plaintiff's Motion for Partial Summary Judgment (#33), Exhibit 7, June 23, 2009 denial letter.*

Plaintiff argues in his motion for partial summary judgment filed on September 12, 2011 that the language of the CAT Rider is unambiguous and that he has met all the conditions required for payment of the Catastrophe Cash Benefit based on his paralysis and disability. He therefore argues that he is entitled to judgment as a matter of law on his breach of contract claim. Defendant National Union filed its cross-motion for summary judgment on October 14, 2011 in which it argues that Plaintiff is not entitled to the Catastrophe Cash Benefit under the plain and unambiguous language of the policy and Defendant is therefore entitled to judgment as a matter of law on all claims.

Plaintiff served interrogatories and requests for production of documents on Defendant on June 24, 2011. Defendant served its objections and responses on or about August 3, 2011. Plaintiff's counsel sent a letter to Defendant's counsel on September [*8] 15, 2011 disputing the validity of the objections and the sufficiency of the discovery responses. Plaintiff's counsel followed up with a letter on October 18, 2011 requesting that National Union provide its policies and procedures manuals which Plaintiff stated it needed for the upcoming deposi-

tions. *Motion to Compel (#39), Exhibit 7.* Defendant's counsel responded by letter dated October 21, 2011 that National Union has no policies and procedures manuals. *Id. Exhibit 8.* The parties met and conferred on November 10, 2011, but could not resolve their dispute regarding Defendant's objections and discovery responses. Plaintiff therefore filed his initial motion to compel on November 17, 2011.

## DISCUSSION

### 1.Timeliness of Plaintiff's Motion to Compel.

A motion to compel filed during the discovery period will rarely be considered untimely. Absent unusual circumstances, however, it should be filed before the scheduled date for dispositive motions. *Gault v. Nabisco Biscuit Co., 184 F.R.D. 620, 622 (D.Nev. 1999). See also Thurston v. City of North Las Vegas, 2011 U.S. Dist. LEXIS 96619, 2011 WL 3841110, *1 (D.Nev. 2011)* and *Hall v. Schumacher, 2011 U.S. Dist. LEXIS 108896, 2011 WL 4458845 (D.Nev. 2011).* In this case, the Court, on August 3, 2011, extended [*9] the deadline for completing discovery to February 24, 2012 and extended the dispositive motion deadline to March 26, 2012. *Order (#26).* Without waiting for the completion of discovery, however, Plaintiff filed his motion for partial summary judgment on September 12, 2011 and Defendant filed its crossmotion for summary judgment on October 14, 2011. Although Plaintiff's motion to compel is not untimely under *Gault,* the District Judge's decision on the summary judgment motions could render moot the discovery sought by Plaintiff in the instant motion to compel. Discovery obtained pursuant to this order could also result in the parties requesting further leave to supplement their briefs on the motions for summary judgment. In the interest of judicial economy, therefore, the parties should decide whether they wish to proceed with the pending motions for summary judgment or request that they be withdrawn or stayed until discovery potentially relevant to the policy's interpretation is completed.

### 2.Scope of Relevant Discovery.

*Rule 26(b)(1) of the Federal Rules of Civil Procedure,* as amended in 2000, provides that a party may obtain discovery regarding any nonprivileged matter that is relevant [*10] to any party's claim or defense. Relevancy under *Rule 26(b)(1)* remains broad and is liberally construed. *EEOC v. Caesars Entertainment, Inc., 237 F.R.D. 428, 431-32 (D.Nev.2006).* Pursuant to *Rule 26(b)(2)(C),* the court may preclude or limit discovery on the grounds that the burden or expense of the proposed discovery outweighs its likely benefit. In deciding whether to prohibit or limit discovery, the court should consider the totality of the circumstances, weighing the

value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truth seeking function in the particular case before the court. *Id.*

The party opposing discovery has the burden of showing that the discovery is overly broad, unduly burdensome or not relevant. *Graham v. Casey's General Stores, 206 F.R.D. 251, 253-4 (S.D.Ind. 2000).* To meet this burden, the objecting party must specifically detail the reasons why each request is irrelevant. *Id., citing Schaap v. Executive Indus., Inc., 130 F.R.D. 384, 387 (N.D.Ill.1990); Walker v. Lakewood Condominium Owners Assoc., 186 F.R.D. 584, 587 (C.D.Cal.1999).* When a request for discovery is overly broad on its face or [*11] when relevancy is not readily apparent, however, the party seeking the discovery has the burden to show the relevancy of the request. *Rezaq v. Nalley, 264 F.R.D. 653, 656 (D.Colo. 2010).*

### 3. Discovery of Extrinsic Evidence Relevant to Policy Interpretation.

Defendant argues that because Plaintiff has moved for summary judgment on the grounds that the policy language is unambiguous, he should be barred from pursuing discovery on the issue of policy ambiguity. It is not necessarily contradictory for an insured to argue that the plain language of the policy supports his position on coverage, or, in the alternative, that the policy language is ambiguous and should be construed in his favor. Plaintiff has therefore not abandoned his right to assert that the policy is ambiguous if his motion for partial summary judgment is denied.

"'The question of whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted.'" *Powell v. Liberty Mutual Fire Ins. Co., 127 Nev. 14, 252 P.3d 668, 672 (2011),* quoting *United Nat'l Ins. Co. v. Frontier Ins. Co., 120 Nev. 678, 684, 99 P.3d 1153, 1157 (2004).* Any ambiguity in the policy will be interpreted against [*12] the insurer. *Id.* The terms used in the policy should be understood in their plain, ordinary and popular sense. *National Union Fire Ins. v. Reno's Exec. Air, 100 Nev. 360, 364, 682 P. 2d 1380, 1383 (1984).* Clauses providing coverage are interpreted broadly so as to afford the greatest possible coverage to the insured. *Id. 100 Nev. at 365, 682 P.2d at 1383.*

Extrinsic evidence can be used to prove the meaning of an ambiguous policy provision. *Machinery Movers v. Fidelity and Deposit Co. of Maryland, 2007 U.S. Dist. LEXIS 78376, 2007 WL 3120029, *3 (N.D. Ill. 2007)* (applying Illinois law). *See also M.C. Multi-Family Dev. v. Crestdale Assocs., 124 Nev. 901, 914, 193 P.3d 536 (2008)* ("Parole evidence is admissible for ... ascertaining

the true intentions and agreement of the parties when the written instrument is ambiguous."). The Ninth Circuit, in applying California law, has also stated that even where the contract's language may initially appear unambiguous, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is susceptible. *First Nat'l Mortgage. Co. v. Federal Realty Investment Trust, 631 F.3d 1058, 1067 (9th Cir. 2010),* citing [*13] *Morey v. Vannucci, 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998).*

Courts generally decline to decide the issue of ambiguity on a motion to compel production of information potentially relevant to the insurance policy's interpretation. *See Machinery Movers v. Fidelity and Deposit Co. of Maryland, 2007 U.S. Dist. LEXIS 78376, [WL] at *3; Sunnen Products Co. v. Travelers Cas. and Sur. Co., 2010 U.S. Dist. LEXIS 16953, 2010 WL 743633, *2 (E.D.Mo. 2010); Leksi v. Federal Ins. Co., 129 F.R.D. 99, 104 (D.N.J. 1989)* and *Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 105 (D.N.J. 1990).* Because relevant information need not be admissible in order to be discoverable, however, the fact that a party is permitted to discover extrinsic evidence does not mean that it will be admissible at trial.

Two examples of extrinsic evidence potentially relevant to the interpretation of an ambiguous insurance policy provision are (1) the policy's drafting history and (2) other claims or lawsuits involving the same policy provision in issue. Courts generally hold that the policy drafting history is discoverable. *Leksi v. Federal Ins. Co., 129 F.R.D. at 104; Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 104 (D.N.J. 1990); Champion International Corp. v. Liberty Mut. Ins. Co., 129 F.R.D. 63, 67 (S.D.N.Y. 1989);* [*14] *Mariner's Cove Site B. Assocs. v. Travelers Indemnity. Co., 2005 U.S. Dist. LEXIS 8352, 2005 WL 1075400, *1 (S.D.N.Y 2005); Young v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 6987, 1999 WL 301688, *5 (D.Conn. 1999);* and *Viking Yacht Co. v. Affiliated FM Insurance Co., 2008 U.S. Dist. LEXIS 123444, 2008 WL 8715540, *2 (S.D.Fla. 2008). Contra, Lappin v. Gwartney, 2001 U.S. Dist. LEXIS 1974, 2001 WL 185167 *3 (D. Kan. 2001)* (denying production of the policy drafting history because the insured had not made a showing that the policy language was ambiguous). Most courts also permit discovery regarding other lawsuits and claims involving the identical policy provisions. *Sunnen Products Co. v. Travelers Cas. and Sur. Co., 2010 U.S. Dist. LEXIS 16953, 2010 WL 743633, at *2; Transcap Associates, Inc. v. Euler Hermes American Credit Indemnity Co., 2009 U.S. Dist. LEXIS 46382, 2009 WL 1543857. *2 (N.D. Ill. 2009); Young v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 6987, 1999 WL 301688; Leksi v. Federal Ins. Co., 129 F.R.D. at 105-06;*

and *Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 106-07 (D.N.J. 1990).* As the court in *Nestle* observed, such information "may show that identical language has been afforded various interpretations by the insurer" and "could undermine the insurer's position that the language in question is clear and unambiguous." *Id., 135 F.R.D. at 106.*

Because [*15] discovery regarding other similar claims or lawsuits may be burdensome, however, the courts also impose limits on the scope, time frame or number of other similar claims to be produced. *See Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. at 107; Sunnen Products Co. v. Travelers Cas. and Sur. Co., 2010 U.S. Dist. LEXIS 16953, 2010 WL 743633 at \*4; Transcap Associates, Inc. v. Euler Hermes, 2009 U.S. Dist. LEXIS 46382, 2009 WL 1543857, at \*2;* and *Young v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 6987, 1999 WL 301688.* The courts in *Nestle, Sunnen* and *Young* limited the production to the ten earliest and ten most recent claims for a particular time period. A few decisions have denied other claim discovery on the grounds that the burden of the discovery outweighs its probative value. *Leksi v. Federal Ins. Co., 129 F.R.D. at 106; Champion Intern. Corp. v. Liberty Mut. Ins. Co., 129 F.R.D. 63, 1989 WL 299156 (S.D.N.Y. 1989)* (denying motion to compel because plaintiff did not adequately define the scope of requested "similar" claims).

### 4. Interrogatories.

### A. Defendant's Objections that Plaintiff's InterrogatoriesExceed the Authorized Limit of 25 Interrogatories.

Plaintiff's First Set of Interrogatories contained twenty-one (21) separately numbered interrogatories. Plaintiff's Second [*16] Set of Interrogatories contains two additional interrogatories, Nos. 22 and 23. The interrogatories do not contain expressly numbered subparts. Defendant objected to Interrogatory Nos. 14 through 23, however, on the ground that the first thirteen (13) interrogatories, including subparts, exceeded the authorized maximum of 25 interrogatories. Plaintiff disputes this contention, but requests leave to serve the additional interrogatories if the Court agrees with Defendant.

*Rule 33(a)(1) of the Federal Rules of Civil Procedure* provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." The 1993 Advisory Committee Note explained how this provision should be interpreted:

> Parties cannot evade this presumptive limitation through the device of joining as "subparts" questions that seek information

about discretely separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

In *Kendall v. GES Exposition Services Inc., 174 F.R.D. 684, 685 (D.Nev. 1997),* [*17] the court held that the subparts of an interrogatory are to be counted as part of but one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question. The court stated that the best test to determine whether subparts are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. If the question in the subpart can be answered independently of the "primary" question, then it should be treated as a separate interrogatory. Under this test, *Kendall* stated that an interrogatory which asked the defendant whether plaintiff was given any warning or reprimand during her employment, followed by a request to identify the date of each warning or reprimand, a brief description of the incident, and the person who administered the warning/reprimand by name, gender, position and address, should be considered as one interrogatory.

Other courts have used a "common theme" approach to determine whether an interrogatory contains one or more discrete subparts. An interrogatory directed at eliciting details concerning a common theme should not be counted as multiple interrogatories. [*18] *New River Dry Dock, Inc. v. The Falls at Marina Bay, L.P., 2008 U.S. Dist. LEXIS 67491, 2008 WL 2620727, \*4 (S.D.Fla. 2008),* citing *Cardenas v. Dorel Juvenile Group, Inc., 231 F.R.D. 616, 620 (D.Kan. 2005).* On the other hand, an interrogatory with subparts inquiring into discrete areas is more likely to be counted as more than one interrogatory. *Id.,* citing *Swackhammer v. Sprint Corporation PCS, 225 F.R.D. 658 (D.Kan. 2004).* Along the same line, *Willingham v. Ashcroft, 226 F.R.D. 57, 59 (D.D.C. 2005)* states that "once a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated." *See also Theobles v. Ind. Maint. Co., 247 F.R.D. 483, 485, 49 V.I. 537 (D.Vi. 2006)* and *Gregg v. Local 305 IBEW, 2010 U.S. Dist. LEXIS 14414, 2010 WL 61090, \*1 (N.D.Ind. 2010).*

*Kendall* held that an interrogatory which asks for information, and which also asks for the identification of documents relating to that information, contains two in-

terrogatories. The court explained that the second question was "really a fugitive request for production of documents and the discovery effort would be [*19] better served in that format." *Kendall, 174 F.R.D. at 686.* Other courts agree with this interpretation. *Banks v. Office of the Senate Sergeant-At-Arms, 222 F.R.D. 7, 10 (D.D.C. 2004)* states an interrogatory that demands information about an event and the identification of documents pertaining to that event asks two independent questions "because knowing that an event occurred is entirely different from learning about documents that evidence it occurred." *See also New River Dry Dock, Inc. v. The Falls at Marina Bay, L.P., supra.* Plaintiff's Interrogatory Nos. 2 and 7 both request information and the identification of documents related to the information. These interrogatories therefor each contain two interrogatories.

Defendant also uses Interrogatory No. 2 as the basis for its contention that the first 13 interrogatories contain multiple subparts which equal or exceed the limit of 25 total interrogatories. Interrogatory No. 2 states as follows:

> Please explain all bases for denying Plaintiff's claim for Catastrophic Cash Benefit and identify all facts, knowledge and documents supporting said denial.

Defendant argues that this interrogatory contains four questions. *Opposition (#54), pg.* [*20] *18.* The Court disagrees. The primary question in Interrogatory No. 2 asks Defendant to state all bases for its denial of Plaintiff's claim. The secondary question(s) asks for the facts or knowledge on which the denial was based. These secondary questions are "logically or factually subsumed within and necessarily related to the primary question." *Kendall, supra.* There is also only one theme to the interrogatory-the reasons or bases for Defendant's denial of Plaintiff's claim. The secondary questions asks for the details relating to that theme. Therefore, with the exception of the request for documents, Interrogatory No. 2 constitutes only one question.

Without any further explanation, Defendants asserts that "interrogatories 4, 5, 6, 7, 9, 10, 11 and 12 each contain 2 discrete questions." *Opposition (#54), pg. 18.* Based on the Court's review of these interrogatories, however, they each contain a single primary question or common theme. Most of the interrogatories ask the Defendant to state its position with regard to a particular event or contention and to identify the facts that support its position and the persons with knowledge of those facts. Having reviewed all 23 interrogatories, [*21] the Court finds that only Interrogatory Nos. 2 and 7 contain more than one question. Plaintiff has served a total of 25 interrogatories and Defendant's objections based on *Rule 33(a)(1)* are overruled. It is therefore unnecessary to grant Plaintiff's alternative request for leave to serve more than 25 interrogatories.

## B. Defendant's Other Objections.

**Interrogatory No. 7** states that "[w]ith respect to the history leading to the formation of the subject contract entered between National Union ... and Clark County School District, please identify the name, address and telephone number of all persons with knowledge of the formation of the subject contract, and identify all documents, notes, memos, or other written materials that relate to or were part of, directly or indirectly with any policy changes and additions made with evaluations and formation of the subject contract."[1]

> 1   Each interrogatory refers to "National Union or any of its affiliates, subsidiaries, divisions, or parent corporations." For sake of brevity, the Court omits this language in its recitation of each interrogatory. To the extent that Defendant's affiliated or related entities were involved in the subject matter of an interrogatory, [*22] Defendant's answer should respond in regard to those entities as well as to itself.

Defendant objected to Interrogatory No. 7, and to each of the subsequent interrogatories discussed herein, on the grounds that it seeks irrelevant information, is compound, vague, ambiguous, unintelligible, overly broad and unduly burdensome. Defendant also objected to the extent that the interrogatory seeks trade secrets or confidential business information, or information protected by the right of privacy.

Defendant's objections are boilerplate. There is, however, merit to its objections that Interrogatory No. 7 is vague and overly broad and, to that extent, irrelevant. The only policy provision at issue in this case is the Catastrophe Cash Benefit Rider. Information regarding any discussions or negotiations between Defendant and the Clark County School District relating to the Rider is potentially relevant to its interpretation. Defendant's objections to Interrogatory No. 7 are therefore overruled and it is ordered to answer the interrogatory and identify all persons who have knowledge regarding the formation of the insurance contract between Defendant and the Clark County School District. Defendant [*23] is also ordered to identify any and all responsive documents, in addition to the policy itself, that relate to Catastrophe Cash Benefit Rider.

**Interrogatory No. 8** asks Defendant to list "all schools (both within the State of Nevada and nationwide)

Case 2:12-cv-00564-MMD-NJK    Document 38-2    Filed 09/28/12    Page 18 of 161

Page 7
2012 U.S. Dist. LEXIS 5309, *

that National Union provides the same insurance contract and coverage as in this instant case for coverage, which includes the Catastrophe Cash Benefit, of student athletes from the time period of January 1, 2000 to January 1, 2011." The relevancy of the identities of all schools that have purchased the same insurance contract and coverage from Defendant is not readily apparent and Plaintiff has not provided any reason for obtaining this information. Accordingly, the Court denies Plaintiff's motion to compel Defendant to respond to Interrogatory No. 8.

**Interrogatory No. 10** asks Defendant whether it "allow[s] potential policyholders to make changes, modifications, additions, addendums, or deletions to any of the language in its disability policies or contracts. If so, please state any such changes, modifications, additions, addendums, or deletions that have been made with respect to its disability policies or contracts and the reasons for such [*24] changes." **Interrogatory No. 11** asks the related question "whether CLARK COUNTY SCHOOL DISTRICT request[ed] any changes, modifications, additions, addendums or deletions to any portion of the subject insurance policy before executing the contract. If so, please state any such changes, modifications, additions, addendums, or deletions, made and the reasons for such changes."

Insurance policy provisions are generally construed against the insurer because it drafts the policy language. Plaintiff has also alleged that Defendant's interpretation of the Catastrophe Cash Benefit Rider is unconscionably narrow. *Complaint (#1), Fifth Claim for Relief,* ¶¶ 36-37. To prevail on this claim, plaintiff must show that the provision is both procedurally and substantively unconscionable. A clause is procedurally unconscionable when a party lacks a meaningful opportunity to negotiate its terms. *D.R. Horton, Inc. v. Green, 120 Nev. 549, 553-54 96 P.3d 1159, 1162 (2004).* Interrogatory Nos. 10 and 11 are therefore relevant to the issue of ambiguity and Plaintiff's unconscionability claim. The Court, however, limits the scope of these interrogatories to the Catastrophe Cash Benefit Rider. Defendant's objections [*25] to Interrogatory Nos. 10 and 11 are overruled to this extent and it is ordered to answer the interrogatories.

**Interrogatory No. 13** asks Defendant to "state the number of claims that National Union ... [has] retained Leonid L. Topper, M.D. to conduct an evaluation of an insured of the Defendant to determine whether a particular coverage was applicable to an insured during the time period of September 5, 2003 to the present, and with respect to each of those instances, state the number of times Dr. Topper found the insured to meet the coverage definition at issue, and the number of times Dr. Topper found the insured did not meet the definition at issue." In addition to its other objections, Defendant objected that

Interrogatory No. 13 "assumes facts not in evidence. Dr. Topper was selected and retained through Genex Services, Inc., a third party vender."

In support of this interrogatory, Plaintiff relies on *Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d 998, 1011 (9th Cir. 2004)* which held that the insurer's use of a biased IME physician supported a verdict of bad faith against the insurer. Stated otherwise, an insurer has a potential defense to an allegation of bad faith [*26] if its denial of coverage is based a qualified expert's opinion. This defense may be overcome, however, by showing that the expert is biased. *Moore v. State Farm Mut. Auto. Ins. Co., 2011 U.S. Dist. LEXIS 46769, 2011 WL 1642298, *8 (N.D.Cal. 2011).* Dr. Topper's "track record" as a medical consultant for Defendant is therefore relevant.

Defendant objected to Interrogatory No. 13 on the ground that it would be extremely burdensome to locate and produce the requested information. In its opposition to the motion to compel, however, Defendant stated that it has identified thirty nine (39) claims in which Dr. Topper prepared reports at the request of the Defendant. Of those reports, fourteen (14) "appear to support payment of benefits at issue." *Opposition (#54), pg. 16.* Defendant also states that it has identified nine (9) other claims involving the Catastrophe Cash Benefit Rider at issue here. All of those claims were resolved in the insured's favor. Dr. Topper provided reports in four of those claims. *Id.* Defendant therefore has the necessary information to answer Interrogatory No. 13. Its objections are therefore overruled and it is ordered to answer Interrogatory No. 13.[2]

> 2    There was discussion during the hearing [*27] as to whether Plaintiff is entitled to production of Dr. Topper's reports in other cases. The Court indicated that the reports should be produced, but that Defendant may redact the identities of the insureds. Plaintiff, however, did not actually serve a request for production of the reports and absent such a request, the Court will not order Defendant to the produce them. Defendant should take note of the Court's statements, however, in responding to any future request for production of Dr. Topper's reports.

**Interrogatory No. 14** asks Defendant to "state the number of times that National Union ... [has] engaged the services of Genex Services, Inc. in the past 20 years to evaluate an insured of the Defendant to determine whether a particular coverage was applicable to an insured, and with respect to each of those instances, state the number of times that Genex Services, Inc. or any person acting on its behalf, found the insured to meet the coverage definition at issue, and the number of times

2012 U.S. Dist. LEXIS 5309, *

Genex Services, Inc. or the persons acting on its behalf, found the insured did not meet the definition at issue." This interrogatory is over broad as to both subject matter and time, and its relevance [*28] is, at best, remote. Information regarding Dr. Topper's record as a medical consultant for Defendant is sufficient to establish the presence or absence of bias. Defendant's objections to Interrogatory No. 14 are therefore sustained.

**Interrogatory No. 15** asks Defendant to "state all vendors, physicians, individuals or companies besides Genex Services, Inc. that National Union ... considered to become involved in Plaintiff's claim for benefits, including why National Union ... selected Genex Services Inc. in assisting with the determination of Plaintiff LaQuan Phillips' claim for benefits." With the exception of why Defendant selected Genex Services, Inc. to retain Dr. Topper to perform a records review of Plaintiff's claim, this interrogatory is also over broad and irrelevant. Defendant is only required respond to this interrogatory by stating why it selected Genex Services, Inc. to obtain the medical records review at issue. Otherwise, Defendant's objections are sustained.

**Interrogatory No. 16** asks the Defendant to "state the number of disability policies that include a Catastrophic Cash Benefit provision similar to the one at issue in Plaintiff's instant case that have been issued by [*29] National Union ... to other school districts throughout the country over the past twenty (20) years. The relevance of this information is, at best, remote. Defendant's objections to Interrogatory No. 16 are therefore sustained.

**Interrogatory No. 17** states that "[w]ith respect to your answer to Interrogatory No. 16 above, state how many times National Union paid out benefits under the Catastrophic Cash Benefit provision to student athletes throughout the country over the past twenty (20) years." Although the time period covered by this interrogatory is long, Defendant states in its opposition to the motion to compel that it has identified a total ten (10) claims for benefits under the identical Catastrophe Cash Benefit Rider, including Plaintiff's. Defendant also states that it has paid Catastrophe Cash Benefits to the insureds in the other nine claims. This information appears to be a sufficient response to the interrogatory and Defendant is ordered to provide it in an answer under oath to Interrogatory No. 17.

**Interrogatory No. 18** asks Defendant to identify "who the 'policyholder' is under the subject insurance contract which is the subject matter of this instant litigation." **Interrogatory [*30] No. 19** asks Defendant to identify "who the 'insured' is under the subject insurance contract which is the subject matter of this instant litigation." In addition to its other objections, Defendant objected to these interrogatories on the grounds that the insurance contract speaks for itself, and is the best evidence of its contents. While the insurance policy may be the best evidence at trial, Plaintiff is entitled to answers to these interrogatories given that there may be an issue of ambiguity arising from the identification of the "policyholder" on the declarations pages of the insurance policy and policy's definition of "Physician" as a practitioner of the healing arts other than "one selected by ... the policyholder." Defendant's objections are therefore overruled and it is ordered to answer Interrogatory Nos. 18 and 19.

**Interrogatory No. 20** asks Defendant to "[d]escribe all marketing plans and materials used by National Union ... from January 1, 2005 to the present date, for soliciting, advertising, marketing and selling any applicable insurance policies to the Clark County School District for coverage of its students participating in any sporting activities. Neither party's briefs [*31] address this interrogatory. Marketing, advertising or promotional materials that discuss the Catastrophe Cash Benefit Rider could be relevant to the interpretation of the Rider. Defendant's objections to Interrogatory No. 20 are therefore overruled to the extent it has responsive documents relating to the Catastrophe Cash Benefit Rider that may have been provided to the Clark County School District.

**Interrogatory No. 21** states that "[i]f it is your contention that Plaintiff LaQuan Phillips is not 'disabled' and 'paralyzed' as defined in the policy, because he can make modest efforts in performing some of life's functions, please state all facts upon which you base that allegation and identify each witness by name, employer and last known address that has knowledge of those facts." This is an appropriate contention interrogatory under *Rule 33(a)(2)*. Defendant's objections are overruled and it is ordered to answer Interrogatory No. 21.

**Interrogatory No. 22** (Plaintiff's Second Set) asks Defendant to "describe National Union Fire Insurance Company of Pittsburgh's relationship with AIG and set forth what role AIG has with respect to the subject policy contract which is the basis for this [*32] litigation." **Interrogatory No. 23** (Plaintiff's Second Set) asks Defendant to "describe National Union Fire Insurance Company of Pittsburgh's relationship with The Bank of New York (Delaware) as Trustee of the AIG Group Insurance Trust (Delaware) and set forth what role The Bank of New York (Delaware) as Trustee of the AIG Group Insurance Trust (Delaware) has with respect to the subject policy contract which is the basis for this litigation."

Defendant National Union Fire Insurance Company of Pittsburgh is an affiliate or subsidiary of the AIG group of insurance companies which has apparently been renamed. The insurance policy states that the "Policyholder" is "c/o The Bank of New York (Delaware) as

2012 U.S. Dist. LEXIS 5309, *

Trustee of the AIG Group Insurance Trust (Delaware)." Given this designation of the "policyholder," there is or may be an issue regarding who is the "policyholder" with respect to the definition of "Physician" as a practitioner of the healing arts other than "one selected by ... the policyholder." Defendant's objections are therefore overruled and it is ordered to answer Interrogatory Nos. 22 and 23.

**5. Requests for Production.**

Defendant objected to Plaintiff's requests for production of documents [*33] on substantially similar grounds as its objections to the interrogatories. Defendant also objected to the requests to the extent they seek documents protected by the attorney-client privilege or work-product doctrine. Some of the requests are duplicative, redundant or overlapping. The Court groups its discussion and rulings on the requests by subject matter categories.

**A. Underwriting Materials.**

**Request Nos. 1 and 18:** Request No. 1 requests the complete underwriting file relating to "the Master Application for the subject insurance policy. Request No. 18 requests all documents relating to the negotiations between Defendant and the Clark County School District regarding the subject policy that was in effect on the date of the Plaintiff's accident. Defendant's objections to these requests are overruled to the extent that Defendant has any documents in its underwriting file(s), besides the insurance policy itself, relating to negotiations between Defendant and the Clark County School District for the purchase of the subject policy or which relate to coverage under the Catastrophe Cash Benefit Rider of the subject policy.

**B. Claims Manuals or Policy Interpretation Documents.**

**Request Nos. 3, [*34] 11, 12, 13, 20, 21, 23 and 30:** Request No. 3 requests all claims manuals regarding the handling of insurance coverage claims and relating to coverage decisions. Request No. 11 requests claims bulletins, directives, guidelines or memorandum that relate to the adjusting of claims involving the Catastrophe Cash Benefit coverage. Request No. 12 requests documents reciting company philosophies and policies regarding claims handling policies, providing service to policy holders, good/bad faith claims handling practices, etc. Request No. 13 requests all manuals and other writings relative to legal and litigation practices and procedures. Request No. 20 requests procedural or operational manuals which instruct employees or agents on their day-to-day responsibilities, and procedures and guidelines for reviewing and determining claims for coverage by insureds. Request No. 21 requests procedural or operational

manuals which instruct employees or agents on their day-to-day responsibilities, and procedures and guidelines for reviewing and determining underwriting applications for insurance.

Documents relating to the handling of insurance claims, in general, or which relate to the handling of claims [*35] for benefits under the Catastrophe Cash Benefit Rider, in particular, are relevant and discoverable. Defendant's objections to the foregoing requests on grounds of relevancy or over breadth are overruled to this extent. Defendant represents, however, that it does not have any documents responsive to these requests. The Court cannot compel Defendant to produce documents that do not exist. Plaintiff is not precluded, however, from conducting discovery regarding Defendant's assertion it does not have any such documents.

**Request No. 23** requests all claims manuals, memorandum, policy statements, inter-office or inter-departmental correspondence, letters, or other writings and documents possessed by National Union and AIG and home or regional offices relating to the interpretation of the terms and exclusions to coverage of the insurance policy at issue in this action. As the Court understands this request, it seeks internal company documents relating to the interpretation of the policy at issue. To the extent that Defendant has any such documents relating to the interpretation of the Catastrophe Cash Benefit Rider, its objections are overruled and it is ordered to produce the documents.

**Request [*36] No. 30** requests all applicable written medical standards or qualifications used by Defendant or used by physicians at Defendant's request to determine an insured's physical ability to perform normal activities. Defendant again represents that it has no documents responsive to this request. Plaintiff's motion to compel is therefore denied as to Request No. 30 based on Defendant's representation that it has no documents responsive to the request.

**C. Employee Training Materials.**

**Request No. 14** requests all documentation that provides proof that Defendant's claims personnel who worked on the subject claim "successfully completed training in claims handling." The Court construes this as requests for documents evidencing the training that the employees received in claims handling. To that extent, Defendant's objections to Request No. 14 are overruled and it is ordered to produce documents responsive to the request as modified by the Court.

**D. Financial/Net Worth Information.**

**Request Nos. 5 and 6** make duplicative requests for documents relating to Defendant's net worth for the last

three years according to Generally Accepted Accounting Principles (GAAP). "A defendant's financial condition is relevant [*37] to the pursuit of punitive damages." *Momot v. Mastro, 2011 U.S. Dist. LEXIS 51747, 2011 WL 1833349, *3 (D.Nev.)*, quoting *Allstate Ins. Co. v. Nassiri, 2011 U.S. Dist. LEXIS 27234, 2011 WL 318101 at *3* and *United States v. Autumn Ridge Condominium Assoc., 265 F.R.D. 323, 327 (N.D.Ind.2009)*. "Although the Ninth Circuit has not defined the parameters of the dissemination of financial information during discovery when punitive damages are alleged, *EEOC v. Cal. Psychiatric Transitions, 258 F.R.D. 391 (E.D.Cal.2009)*, most courts do not require the plaintiff to make a prima facie showing of merit on its punitive damage claim before permitting discovery of a defendant's net worth." *Id.*

Defendant's financial condition and net worth information are not secret, since its annual financial reports should be on file with the departments of insurance in the states in which it is authorized to conduct business. Although Plaintiff could obtain such publicly available information from other sources, no significant burden is imposed on the Defendant by requiring it to produce its annual financial statements for the past three years. Defendant is only required to respond to one of these duplicative requests. Accordingly, Defendant's objections to Request No. [*38] 5 are overruled and it is ordered to respond the request in accordance with this order.

### E. Other Claims or Lawsuits.

**Request Nos. 7-10:** Request No. 7 requests "all documents or papers relating to previous lawsuits or claims against National Union ... within the last five (5) years alleging Breach of Contract arising from the denial of payment of the Catastrophic Cash Benefit coverage to other students athletes within the State of Nevada. Request No. 8 requests the same information on a nationwide basis. Request No. 9 requests "[c]opies of all documents or papers relating to previous lawsuits or claims against National Union ... within the last five (5) years alleging violation of the Unfair Claims Practices Act arising from the denial of payment of the Catastrophic Cash Benefit coverage to other student athletes within the State of Nevada." Request No. 10 requests the same information on a nationwide basis.

Defendant has failed to demonstrate that it would be unduly burdensome for it to locate and produce documents responsive to Request Nos. 7-10. As this Court stated in *Pham v. Wal-Mart Stores, Inc. 2011 U.S. Dist. LEXIS 130038, 2011 WL 5508832, *4 (D.Nev. 2011)*, the responding party has the burden of demonstrating [*39] that a request for similar claim information is unduly burdensome. To satisfy this burden, the objecting party must provide sufficient detail regarding the time, money and procedures required to produce the requested docu-

ments. The fact that production of documents will be time consuming and expensive is not ordinarily a sufficient reason to grant a protective order if the requested material is relevant and necessary to the discovery of admissible evidence. *Id.* citing *In re Toys "R" Us-Delaware, Inc. Litigation, 2010 U.S. Dist. LEXIS 130884, 2010 WL 4942645, *6 (C.D.Cal.2010)*. Nor can a party rely on an inadequate records keeping system as an excuse for not locating and producing relevant information regarding other claims or lawsuits. *Pham, supra,* citing *Thomas v. Cate, 715 F.Supp.2d 1012, 1033-34 (E.D.Cal.2010)*.

Because the Catastrophe Cash Benefit Rider only applies to injuries resulting in complete, permanent and irreversible Coma or Paralysis, the total number of claims made under this coverage is likely to be small. As evidence of this, Defendant states that it has identified only ten claims for benefits under the Rider. Defendant states that it located these claims by reviewing accident insurance claim files [*40] in which substantial medical payments were made on the logical assumption that claims for the Catastrophe Cash Benefit will likely only be made in conjunction with policy claims involving substantial medical expenses. The Court does not disapprove of the search method chosen by the Defendant so long as it is reasonably calculated to reveal all responsive claims.

Request Nos. 7 and 8 only request documents relating to previous lawsuits or claims arising from the *denial of payment* of the Catastrophic Cash Benefit. According to Defendant, the nine other claims involving the Rider all resulted in payment of the benefits. Unless there was a prior denial of a claim, Request Nos. 7 and 8 do not require production of documents regarding claims that were accepted and paid. To the extent any other claim for the Catastrophic Cash Benefit was denied, Defendant is also not initially required to produce documents that it alleges are protected by the attorney-client privilege or work-product doctrine. Defendant must, however, provide an appropriate privilege log regarding any such documents. Plaintiff may further move for production of such documents, if it does not believe the assertion of privilege [*41] is valid.

In regard to Request Nos. 9 and 10, Defendant states that it "reasonably believes it has been the defendant in two matters involving a policy that contains the CAT Benefit. Neither lawsuit was filed in Nevada, nor was the CAT Benefit directly at issue." *Opposition (#54), Declaration of Elaine Langley,* ¶ 8. The meaning of the statement that the CAT Benefit was not "directly at issue" is vague. Was it in some manner *indirectly* at issue?

Defendant also argues that because the lawsuits were filed in other jurisdictions, they are irrelevant to

2012 U.S. Dist. LEXIS 5309, *

this action which concerns alleged violations of the "Nevada Unfair Claims Practices Act." *Opposition (#54), pg. 21.* This argument is without merit. *Nevada Revised Statute (NRS) 686A.310* was patterned after the National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act, Section 4.9. *See Tweet v. Webster, 614 F.Supp. 1190, 1192 (D. Nev. 1985).* Numerous states have adopted versions of the NAIC Model Act. *See* Stephen S. Ashley, BAD FAITH ACTIONS LIABILITY & DAMAGES (2011), §9:2. Lawsuits from another state alleging violation of that state's version of the Model Act, or a substantially similar statute, are therefore [*42] potentially relevant and discoverable. The Court, therefore, overrules Defendants relevancy objections to Request Nos. 9 and 10. The Court orders the Defendant to produce the complaints and responsive pleadings in the two lawsuits referred to in Ms. Langley's declaration. Plaintiff may seek additional documents relating to the actions if the pleadings indicate that the actions involved substantially similar claims to those at issue in this action.

### F. Documents Relating to the Handling of Plaintiff's Claim.

**Request Nos. 15, 17, 24, 25, 28, and 29** request documents relating to the handling of the Plaintiff's claim that may not be included in the produced claims file. Although Defendant states its standard boilerplate objections, it also responded to these requests by stating that any documents responsive to these requests are contained in the claim file produced to the Plaintiff, except for a limited number of documents as to which privilege has been claimed and a privilege log provided. Plaintiff has not moved to compel the production of allegedly privileged documents. Accordingly, Plaintiff's motion to compel further production of documents in response to Requests 15, 17, 24, 25, 28 and [*43] 29 is denied so long as Defendant has produced all responsive documents relating to Plaintiff's claim, other than those which it asserts are privileged.

### G. Sales or Promotional Materials Relating to the Catastrophe Cash Benefit Rider.

**Request No. 19** requests "all sales and promotional brochures, pamphlets or literature relating to or describing the Catastrophic Cash Benefits coverage within the subject insurance policy that was in effect on September 5, 2008." While such documents, if they exist, cannot override unambiguous policy provisions, they are potentially relevant to the interpretation of the Rider if the Court finds that it is ambiguous. Defendant's objections to Request No. 19 are therefore overruled and it is or-

dered to produce any documents responsive to the request.

### H. Documents Relating to Defendant's Denials of Plaintiff's Requests for Admissions.

**Request No. 33** is inartfully worded, but appears to request all documents which relate to Defendant's denials, in whole or in part, of any of Plaintiff's requests for Admissions. Alternatively, Request No. 33 asks Defendant to identify any documents it has already produced that relate to its denials of requests for admission. The [*44] Court sustains Defendant's objection to this Request to the extent that it requires Defendant to identify documents produced in response to other requests for production. To the extent that Defendant's denials of the requests for admissions are based on non-privileged documents that have not been otherwise produced, it should produce those documents in response to Request No. 33.

### 6. Plaintiff's Request for an Award of Reasonable Expenses Incurred in Filing the Motions.

*Rule 37(a)(5)(C)* provides that if a motion to compel is granted in part and denied in part, the court may apportion the reasonable expenses for the motion. Although Plaintiff's motions have been partially granted, several of the discovery requests were over broad and properly objected to. Because there is no adequate way to apportion the attorney's fees, the Court concludes, on balance, that an award of attorney's fees or expenses to the Plaintiff is not justified.

### CONCLUSION

**IT HEREBY ORDERED** that Plaintiff's Motion to Compel Responsive Answers to Plaintiff's Written Discovery and Request for Leave of Court to Propound Additional Interrogatories to Defendant National Union Fire Insurance Company (#39) and Plaintiff's Second [*45] Motion to Compel Responsive Answers to Plaintiff's Written Discovery and Request for Leave of Court to Propound Additional Interrogatories to Defendant National Union Fire Insurance Company (#55) are **granted, in part,** and **denied,** in part, in accordance with the foregoing provisions of this order.

DATED this 18th day of January, 2012.

/s/ George Foley, Jr.

GEORGE FOLEY, JR.

United States Magistrate Judge

0023

8/30/12 e-mail

## Jim Whitmire

**From:** Jim Whitmire
**Sent:** Thursday, August 30, 2012 4:30 PM
**To:** 'Butovich, Nicholas'
**Cc:** litchfield@litchfieldcavo.com; CRD@thorndal.com

Nick,

In response to your e-mail below, let's set a time certain to talk on Tuesday, the 4th, as we now losing about another 5 days. Following up on our nearly two hour meet and confer last Friday (8/24), here are the items we need to follow-up on.

Protective Order -- perhaps Craig can approve in the meantime. This should not be a complicated issue to review.

Interrogatories

1. Identification of the attorneys who provided the advice and counsel to Travelers (e.g. intg 2-5, 8).

2. Identification of the several qualified law firms that Travelers purportedly proferred (e.g. intg 7). I can't derive the answer from the documents you produced yesterday. Please just list them out or give me particular bates references.

Document Production Requests

1. Reserve and reinsurance communications (e.g. general objections 3-4, dpr 40). The case cite I gave you last Friday was 244 FRD 638. How Travelers perceived the underlying litigation is relevant to our coverage case.

2. Underwriting documents (dpr 1 and 2). As discussed, the Phillips case I sent you supports production, there's very little burden here and we believe we are entitled to these documents as the relevancy standard is broad for discovery purposes.

3. Claims files (dpr 3-4, passim). Have you folks produced the entire claims file now (initial production plus that which we received yesterday)?

3a. Does your client have any documents in its claims file relating to the underlying case? Please clarify one way or another as I'm trying to get a handle on whether your position is that the claims file production is complete.

3b. Privilege log -- in light of the redactions in the claims notes, we need the log relatively soon (I realize it is following and am okay with that concept, but we do need it as there were substantial redactions)

4. Communications b/w Travelers and Plaintiffs/Plaintiffs' counsel (e.g. dpr 5-6). Is it your position that the production is complete?

5. Claims Manuals/Guidelines/Bulletins/Other Documents regarding claims handling (e.g. dpr 7-9). Nothing has been received to date. When will we receive materials that were referenced

**0025**

9/28/2012

to be forthcoming.

6. Claims Manuals/Guidelines/Bulletins/Other Documents regarding how law firms are selected, whether rates are reasonable for a particular matter, whether a law firm is qualified to act as counsel for Travelers' insured and/or whether a law firm is qualified to act as counsel for Travelers (e.g. dpr 10-11, 15-18). These requests, which are clearly relevant to the issues in this case, are requests that you were taking under advisement and/or for which you were conducting additional research.

7. Claims Manuals/Guidelines/Bulletins/Other Documents regarding auditing of bills (e.g. dpr 12). Nothing has been received to date.

8. Documents regarding the interpretation of voluntary payment clauses and/or whether pre-notice defense costs will be reimbursable (e.g. dpr 13-14 -- you unequivocally stated that there were no such documents and that you were careful about that answer -- in light of that representation, I'm not sure there's a lot to discuss on this item).

9. Billing guidelines for non-panel counsel (dpr 19). I don't recall seeing these. Have they been produced? If so, can you give me a reference? If not, when will they arrive?

10. Billing guidelines for panel counsel (dpr 20). This was one of the quick items we discussed. Just need an answer as to whether these will be produced.

11. Documents supporting various contentions by Travelers (dpr 21, 23, 26-28, 34). These requests involved what we referred to as a wave 2 issue (that the documents we received yesterday would be responsive to the requests). Is it your clients' position that production is complete on these topics?

12. Documents regarding Travelers efforts to determine whether firms other than SA were qualified (dpr 22).

13. Documents relating to what Travelers considers to be an acceptable amount for a particular task, fee, etc. (dpr 24-26). We discussed the concept of policy statements/similar documents that may relate to these issues.

14. Documents commenting on SA and/or contract lawyers used by SA (dpr 29-30). Based on my limited review of the claims logs, it looks like significant redactions may have been made concerning this topic. Are there any documents concerning this matter that are not in the claims logs and/or the materials produced to date?

14a. Were any redactions made concerning the substance of the underlying litigation?

15. Audit documents, including but not limited to Meckler and costs associated therewith (dpr 31-32). Has your client produced all of the documents generated by that firm (i.e. beyond e-mails)? I suspect there is more. And, the bills from Meckler have not been produced.

16. Documents regarding suing ProCaps (dpr 33). Need the privilege log and we'll go from there.

17. Documents relating to Travelers litigation where it has been a party (dpr 35-37). We need to close the loop on these topics.

18. Documents regarding 5 highest billing rates paid by Travelers/related companies for its insured's (dpr 38). This was one where you were circling back.

9/28/2012

19. Documents reflecting instances where, within the last 10 years, Travelers or its related companies have reimbursed and insured for pre-tender fees/costs (dpr 39). Your position was very clear that this would be an incredibly burdensome request to respond to. I suggested a company wide e-mail on the issue to lessen any burden associated with a file by file review. Suffice it to say, we agreed to disagree on this request. Let's just confirm our respective positions on this request as I think we've discussed the matter in good faith and we just disagree.

20. Documents supporting Plaintiffs" claims (dpr 41-42). Travelers objected. As noted in our call, those requests track the Federal Rules.

I'll talk to you next week. Thanks.

Jim

---

**From:** Butovich, Nicholas [mailto:Butovich@litchfieldcavo.com]
**Sent:** Thursday, August 30, 2012 2:59 PM
**To:** Jim Whitmire
**Cc:** litchfield@litchfieldcavo.com
**Subject:**

Jim,

I'm sorry I missed your call this afternoon. I've already left the office and will be out tomorrow. Out of state for family wedding. Let's connect next week? Thanks.

Nick


Nicholas Butovich
Litchfield Cavo LLP

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.

Chicago      Hartford      Boston      New York      New Jersey      Pittsburgh
Philadelphia      Houston      Los Angeles      Fort Lauderdale      Tampa      Wisconsin

9/28/2012

9/5-6/12 e-mail

**Jim Whitmire**

| | |
|---|---|
| **From:** | Butovich, Nicholas [Butovich@litchfieldcavo.com] |
| **Sent:** | Thursday, September 06, 2012 8:46 AM |
| **To:** | Jim Whitmire |
| **Cc:** | Craig R. Delk; Litchfield, Daniel |

**Subject:** RE:

Jim,

Let's talk today in the afternoon. 3pm Central? Thank you.

Nick

---

**From:** Jim Whitmire [mailto:JWhitmire@santoronevada.com]
**Sent:** Wednesday, September 05, 2012 5:38 PM
**To:** Butovich, Nicholas
**Cc:** Craig R. Delk
**Subject:**

Nick,

I have received no response to the e-mail below (which requested that we set a time certain to talk yesterday). Since I sent the e-mail below, we have received your clients' Motion for Partial Summary Judgment and a CD (the letter was dated 8/30, yet we just received the package today). We've spent nearly two weeks in the meet and confer process without conclusion, yet your client was able to find the time to file a dispositive Motion (which we contend is premature). We need to know where your client stands on the issues set forth below. Clearly, time is of the essence. What time are you available tomorrow afternoon to talk as we have lost even more time due to no fault of my clients? Please advise. Thank you.

Jim

---

**From:** Jim Whitmire
**Sent:** Thursday, August 30, 2012 4:30 PM
**To:** 'Butovich, Nicholas'
**Cc:** litchfield@litchfieldcavo.com; CRD@thorndal.com
**Subject:**

Nick,

In response to your e-mail below, let's set a time certain to talk on Tuesday, the 4th, as we now losing about another 5 days. Following up on our nearly two hour meet and confer last Friday (8/24), here are the items we need to follow-up on.

Protective Order -- perhaps Craig can approve in the meantime. This should not be a complicated issue to review.

Interrogatories

1. Identification of the attorneys who provided the advice and counsel to Travelers (e.g. intg 2-

9/14/12 e-mail

## Jim Whitmire

| | |
|---|---|
| **From:** | Butovich, Nicholas [Butovich@litchfieldcavo.com] |
| **Sent:** | Friday, September 14, 2012 2:13 PM |
| **To:** | Jim Whitmire |
| **Cc:** | Litchfield, Daniel |
| **Subject:** | RE: ProCaps |

That is all, Jim.

Nick

Nicholas D. Butovich | Litchfield Cavo LLP
303 W. Madison Street | Suite 300 | Chicago, Illinois 60606-3300
312.781.6573 | 312.781.6630 (fax)
butovich@litchfieldcavo.com

-----Original Message-----
From: Jim Whitmire [mailto:JWhitmire@santoronevada.com]
Sent: Fri 9/14/2012 4:00 PM
To: Butovich, Nicholas
Subject: Re: ProCaps

Thanks.  Are there any other batches/categories of documents on hold and/or about to be produced?

Sent from my iPhone

On Sep 14, 2012, at 12:46 PM, "Butovich, Nicholas"
<Butovich@litchfieldcavo.com<mailto:Butovich@litchfieldcavo.com>> wrote:

Jim,

We were waiting for the protective order to be agreed to before producing the attached. Please note that the attached
is being produced pursuant to that protective order (filed September 13, 2012), and that each page of the attached
document is marked "Confidential." Travelers does not waive any objection asserted in this matter by making this
production.

Sincerely,
Nick

Nicholas D. Butovich | Litchfield Cavo LLP
303 W. Madison Street | Suite 300 | Chicago, Illinois 60606-3300
312.781.6573 | 312.781.6630 (fax)
butovich@litchfieldcavo.com<mailto:butovich@litchfieldcavo.com>

From: Jim Whitmire [mailto:JWhitmire@santoronevada.com]
Sent: Friday, September 14, 2012 2:19 PM
To: Butovich, Nicholas
Subject: RE: ProCaps

9/28/2012

I booked my flight. Please send the claims manuals, etc. and other outstanding documents ASAP. I did not see those in the latest production. If I'm mistaken, please point me to those. Thank you.

---

From: Butovich, Nicholas [mailto:Butovich@litchfieldcavo.com]
Sent: Friday, September 14, 2012 10:16 AM
To: Jim Whitmire
Cc: litchfield@litchfieldcavo.com<mailto:litchfield@litchfieldcavo.com>
Subject: RE: ProCaps

Jim,

Has to be Hartford. That's really the only way.

Nick

Nicholas Butovich
Litchfield Cavo LLP


-----Original message-----
From: Jim Whitmire <JWhitmire@santoronevada.com<mailto:JWhitmire@santoronevada.com>>
To: "Butovich, Nicholas" <Butovich@litchfieldcavo.com<mailto:Butovich@litchfieldcavo.com>>
Sent: Fri, Sep 14, 2012 16:32:56 GMT+00:00
Subject: RE: ProCaps

D.C.? Chicago? CT is difficult for travel. Let me know ASAP, please. Thanks.

---

From: Butovich, Nicholas [mailto:Butovich@litchfieldcavo.com]
Sent: Friday, September 14, 2012 8:04 AM
To: Jim Whitmire
Cc: Litchfield, Daniel; Craig R. Delk
Subject: ProCaps

Jim,
We can proceed with Heather Miranda's deposition on September 20, 2012, as noticed.
Nick
Nicholas D. Butovich | Litchfield Cavo LLP
303 W. Madison Street | Suite 300 | Chicago, Illinois 60606-3300
312.781.6573 | 312.781.6630 (fax)
butovich@litchfieldcavo.com<mailto:butovich@litchfieldcavo.com>

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally
privileged and confidential. If you are not an intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
e-mail is strictly prohibited. If you have received this e-mail in error,
please notify the sender and permanently delete the e-mail and any
attachments immediately. You should not retain, copy or use this e-mail
or any attachment for any purpose, nor disclose all or any part of the
contents to any other person. Thank you.

Chicago   Hartford   Boston   New York   New Jersey   Pittsburgh
Philadelphia   Houston   Los Angeles   Fort Lauderdale   Tampa   Wisconsin


PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally

0032

privileged and confidential. If you are not an intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
e-mail is strictly prohibited. If you have received this e-mail in error,
please notify the sender and permanently delete the e-mail and any
attachments immediately. You should not retain, copy or use this e-mail
or any attachment for any purpose, nor disclose all or any part of the
contents to any other person. Thank you.

Chicago   Hartford   Boston   New York   New Jersey   Pittsburgh
Philadelphia   Houston   Los Angeles   Fort Lauderdale   Tampa   Wisconsin


PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally
privileged and confidential. If you are not an intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
e-mail is strictly prohibited. If you have received this e-mail in error,
please notify the sender and permanently delete the e-mail and any
attachments immediately. You should not retain, copy or use this e-mail
or any attachment for any purpose, nor disclose all or any part of the
contents to any other person. Thank you.

Chicago   Hartford   Boston   New York   New Jersey   Pittsburgh
Philadelphia   Houston   Los Angeles   Fort Lauderdale   Tampa   Wisconsin


<TRAV000204-000374 (confidential).pdf>

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally
privileged and confidential. If you are not an intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
e-mail is strictly prohibited. If you have received this e-mail in error,
please notify the sender and permanently delete the e-mail and any
attachments immediately. You should not retain, copy or use this e-mail
or any attachment for any purpose, nor disclose all or any part of the
contents to any other person. Thank you.

Chicago     Hartford     Boston     New York     New Jersey     Pittsburgh
Philadelphia     Houston     Los Angeles     Fort Lauderdale     Tampa     Wisconsin

0033

9/28/2012

# EXHIBIT "B"

0034

Case 1:10-cv-00094-SLR   Document 1   Filed 02/05/10   Page 1 of 19 PageID #: 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | JURY TRIAL DEMANDED |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

QVC, Inc. and QHealth, Inc., by their attorneys, for their complaint against Your

Vitamins, Inc. (d/b/a/ Procaps Laboratories) and Andrew Lessman (collectively "Defendants"),

allege as follows:

## PARTIES AND JURISDICTION

1.      QVC, Inc. ("QVC") is a Delaware corporation, having an address at 1200 Wilson

Drive, West Chester PA.

2.      QHealth, Inc. ("QH") is a Delaware corporation, having an address at 1200

Wilson Drive, West Chester PA and is a wholly owned subsidiary of QVC.

3.      Upon information and belief, Your Vitamins, Inc. is a Nevada corporation doing

business as Procaps Laboratories and having an address at 430 Parkson Road Henderson Nevada

89011 (hereinafter "Procaps").

4.      Andrew Lessman is an individual and, upon information and belief, the principal

owner of Your Vitamins, Inc., having an address at 430 Parkson Road Henderson Nevada 89011

(hereinafter "Lessman").

0035

5.     This is an action for use of false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the Delaware Deceptive Trade Practices Act; Del. Code Ann. Tit. 6 § 2531 et seq. (2009); for unfair competition under Delaware and false advertising and unfair competition under Delaware common law.

6.     This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over the claims arising under the statutory and common law of the State of Delaware pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

7.     Upon information and belief, at all times material to this action, each of the Defendants was the agent of each of the other Defendant; that the acts of each of the Defendants were in the scope of such relationship; that in doing the acts complained of herein, each of the Defendants acted with the knowledge, permission, and/or consent of the other Defendant; and that each of the Defendants aided and/or abetted the other Defendant in the conduct complained of herein.

8.     This Court has personal jurisdiction over Lessman because, as an officer and principal owner of Procaps, and, as set forth more fully herein, together with Procaps and the non-party, HSN LP, a Delaware Limited Partnership that operates the Home Shopping Network, he conducts substantial business within this district related to the unlawful activities at issue in this Complaint; because the acts complained of herein have been directly and specifically intended to cause injury to QVC and QH in this district, and because the harm suffered by Plaintiff within this district flows directly from such business conducted by defendants.

2

0036

9.      This Court has personal jurisdiction over Procaps because, together with Lessman, and, as set forth more fully herein, as part of its business relationship with HSN, described more fully herein, it conducts substantial business within this district related to the unlawful activities at issue in this Complaint; because the acts complained of herein have been directly and specifically intended to cause injury to QVC and QH in this district, and because the harm suffered by Plaintiff within this district flows directly from such business conducted by defendants.

10.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims occurred in this District.

<u>FACTS COMMON TO ALL COUNTS</u>

11.      QVC operates the leading nationally broadcast cable television shopping channel and the website qvc.com at which it sells and offers for sale a wide variety of consumer products.

12.      Since at least as early as 1997, QVC and QH (including its predecessor entity) have promoted and sold on QVC's television channel and website a line of vitamins and dietary supplements under the trademark NATURE'S CODE.

13.      Since its introduction, the NATURE'S CODE line of vitamins and dietary supplements, sold exclusively through QVC, has been very successful, with sales of hundreds of millions of dollars of such products.

14.      Among the NATURE'S CODE food supplements sold by QVC and QH are NATURE'S CODE "Hair, Skin & Nails" and NATURE'S CODE "Resveratrex".

15.      The high quality of QVC's NATURE'S CODE Hair, Skin & Nails product has been and is certified by the United States Pharmacopeia ("USP"), the leading standards–setting

0037

authority for prescription and over–the–counter medicines and other healthcare products manufactured or sold in the United States.

16.     QVC's NATURE'S CODE Resveratrex products (in tablet or liquid form), because they do not fall under USP governance, but are all manufactured under the Center for Professional Innovation & Education's "cGMP" guidelines at a certified facility, and are guaranteed to be of the highest quality.

17.     The marketing of vitamins and dietary supplements via television shopping channels is a highly competitive market that is extremely dependant on brand loyalty, such that damage to the reputation of a brand can directly cause a loss of customers.

18.     Defendants Lessman and Procaps produce a line of vitamins and dietary supplements sold under the name PROCAPS that compete directly with the NATURE'S CODE vitamins and dietary supplements sold exclusively through QVC.

19.     Although Lessman and Procaps at one time offered their products for sale on the QVC network, they now promote their products through Home Shopping Network ("HSN"), a nationally broadcast cable network and operator of the website hsn.com, which competes directly with QVC's television network and website.

20.     Lessman and Procaps also promote and sell their PROCAPS vitamins and dietary supplements at the website procapslabs.com.

21.     Upon information and belief, Lessman and Procaps further promote their PROCAPS vitamins and dietary supplements by posting videos – including videos containing the false and misleading representations at issue herein – on YouTube.

22.     Among the dietary supplements offered for sale by defendants under the trademark PROCAPS are a products called "Healthy Hair, Skin & Nails" and "Resveratrol-100."

4

0038

23.    Upon information and belief, defendants' PROCAPS Healthy Hair Skin & Nails product is offered for sale and sold throughout the United States, including in this judicial district, at the website operated by Procaps, procapslabs.com, and on the HSN television network and website, hsn.com.

24.    Upon information and belief, defendants' PROCAPS Resveratrol-100 product is offered for sale and sold throughout the United States, including in this judicial district, at the website operated by Procaps, procapslabs.com, and on the HSN television network and website, hsn.com.

A. Defendants' Deceptive Promotion of PROCAPS Healthy Hair Skin & Nails

25.    In advertising and promoting their Healthy Hair Skin & Nails product, defendants' have identified as their principal or only direct competition the NATURE'S CODE "Hair, Skin & Nails" product sold by QVC.

26.    In advertising and promoting their Healthy Hair Skin & Nails product, defendants' blog (at http://andrew.procapslabs.com/default.aspx) is devoted principally to denigrating the quality QVC's competing products - and only QVC's competing products - through the use of false and completely unsubstantiated allegations.

27.    In advertising and promoting their Healthy Hair Skin & Nails product (which, upon information and belief, are not USP certified), defendants have made numerous false and misleading representations concerning QVC's NATURE'S CODE "Hair, Skin & Nails" product, including the following:

> a.      In a statement published on their website under the untrue headline "QVC's Hair Skin and Nails isn't Healthy (sic)...it is just sleazy and deceptive", Mr. Lessman and Procaps make numerous untrue statements disparaging the quality of QVC's Nature's Code Hair Skin & Nails product, including referring to the NATURE'S CODE products as "inferior vitamins", "a low quality product" asserting an alleged "lack of quality of their vitamins" and calling them "a terrible imitation".

5

0039

b.      There is no factual basis for Lessman's and Procaps' assertions as aforesaid that the NATURE'S CODE USP certified dietary supplements are unhealthful, low quality, lacking quality or inferior.

c.      In a further statement published on their website under the headline "QVC's Hair Skin and Nails...Over 99% Additives!" (a headline which is itself false and misleading) Lessman and Procaps identify as a "sobering fact" about QVC's NATURE'S CODE "Hair, Skin & Nails" that it includes Hyaluronic Acid, of which defendants assert: "there is no science that shows it offers any benefit when taken orally and there is a significant body of troubling research that connects it to cancer". To emphasize the alleged risk, defendants add that Lessman has "followed the research on HA for over 30 years", thus implying he has special expertise on the subject.

d.      There is no factual basis for Lessman's and Procaps' assertions as aforesaid that Hyaluronic acid, a naturally occurring compound found in the human body, is a carcinogen or that "there is no science that shows [hyaluronic acid] offers any benefit when taken orally".

e.      In a further statement published on their website Mr. Lessman and Procaps state falsely about the NATURE'S CODE "Hair, Skin & Nails" that although it includes biotin (the efficacy of which defendants do not dispute) the biotin "sadly is buried in a mass of tableting additives, including two artificial colors and there is nothing else in the formula to support its benefits. This is basically a very big, yellow Biotin tablet with 99% additives and not much more."

f.      There is no factual basis for Lessman's and Procaps' false comparison between tablets and capsules. Although there is no scientific data that capsules are superior to tablets, Mr. Lessman incorrectly leads his audience to believe that capsules are superior while failing to provide any information to explain the distinction and thus distorts the fact that part of the very benefit of tablets is that the active ingredients are delivered in a matrix of processing aids and excipients designed to ensure that the nutrients are readily available for absorption and that size of the pill is thus largely a function of the matrix used to support the active ingredients.

g.      There is no factual basis for Lessman's and Procaps' false implication that there is anything harmful regarding the presence in NATURE'S CODE "Hair, Skin & Nails" product of FD&C Yellow #5 and FD&C Yellow #6.

h.      In fact, FD&C Yellow #5 and FD&C Yellow #6 have been in use throughout the food industry for many years and are deemed "generally recognized as safe" by the FDA.

i.      In a further statement published on their website Mr. Lessman and Procaps state falsely as a "sobering fact" about NATURE'S CODE "Hair, Skin & Nails" fact that the product includes silica, which defendants assert is "virtually insoluble (think

6

0040

of glass or sand)". Lessman and Procaps further falsely imply  superiority of the silica Procaps uses in its own competing product.

j.       There is no factual basis for Lessman's and Procaps' assertions as aforesaid in that the particle size of the silicon dioxide in NATURE'S CODE "Hair, Skin & Nails, has been structure engineered to maximize absorption.

k.       Upon information and belief, the silica used in Procaps' competing supplement has no higher absorption rate than does the NATURE'S CODE product offered by QVC.

l.       In a further statement published on their website Mr. Lessman and Procaps state falsely as a "sobering fact" about NATURE'S CODE "Hair, Skin & Nails" that it includes lutein in allegedly insufficient qualities and that "Lutein will NOT improve the growth of your hair, skin and nails."

m.       There is no factual basis for Lessman's and Procaps' assertions as aforesaid, and QVC makes no health claim that that lutein will improve the growth of hair, skin and nails.  By attributing to QVC a statement that it and QH have not made, Mr. Lessman and Procaps falsely denigrate the quality of plaintiffs' product.

28.       The unambiguous message and necessary implication conveyed by the defendants' misrepresentations is that plaintiffs' NATURE'S CODE Hair Skin & Nails product is a carcinogen, is dangerous and/or is of poor quality and greatly inferior to defendants' competing product.

29.       To further disparage QVC and its products, Lessman and Procaps falsely accuse QVC of trademark infringement for use of the descriptive phrase "Hair, Skin & Nails" for their NATURE'S CODE product when in fact neither Lessman nor Procaps own exclusive rights in the descriptive phrase, which is also used by third parties, and when neither Lessman nor Procaps own any registered rights in the phrase or have ever sought to establish legal rights in the descriptive phrase.

30.       Defendants have never objected directly to QVC that its NATURE'S CODE Hair Skin & Nails infringes any trademark rights defendants purport to own or explained the basis for any such claim.

7

0041

31. Defendants' foregoing representations are materially false and misleading.

32. Upon information and belief, said representations of defendants are unsubstantiated, and, upon information and belief, defendants do not possess scientific evidence to support the above representations challenging the quality and safety of QVC's products.

33. Consistent with the unambiguous message and necessary implication conveyed by defendants' misrepresentations as aforesaid, and as set forth more fully below, numerous consumers exposed to defendants' misrepresentations have concluded mistakenly that the NATURE'S CODE Hair Skin & Nails product offered by QVC is indeed a carcinogen, is dangerous and/or is of poor quality and greatly inferior to defendants' competing product.

34. While appearing on-air on HSN, defendant Lessman further directed viewers to read the above false statements posted on his blog, and HSN continues to make available videos of Mr. Lessman's on-air presentations at its website, hsn.com.

35. Defendants' false and misleading statements as aforesaid have directly injured QVC and caused lost sales.

36. Among the comments of consumers published by defendants on their website in response to defendants' false and misleading representations are the following:

a. "Thanks for setting the record straight. I knew QVC's product was falsely represented."

b. "I am SO glad that you are speaking out about this! I saw this product on TV and almost called to yell at them. I got SO MAD and I feel so sorry for anyone spending their money on those vitamins. I hope you are able to fight them about the name - SO UNETHICAL. Anyone who has ever watched your shows or taken your product knows the difference! We are educated (thanks to you) and WILL NOT BE FOOLED."

c. "I have decided to STOP purchasing anything from QVC until they post a retraction and apology. I sent them an email explaining my decision. ... I ask that others join me in a boycott of QVC and please send QVC an email explaining your decision."

0042

d. "It's astounding! How do these products get past their quality department?! They are treading into dangerous territory when they are dealing with people's health, and the utter lack of quality control. I mean let's face it, if you buy an ugly ring, it doesn't matter you don't have to wear it but if you buy vitamins year after year thinking you are getting benefits and you aren't. wow. It is criminal."

e. "In a world of charlatans and hype, it's comforting to know that we all have a 'partner' in this vitamin maze - YOU! I respect and appreciate your knowledge and integrity when it comes to manufacturing your supplements and only trust your products."

f. "With 99% additives and just the little bit of biotin, the [QVC] product cannot begin to have the results that Andrew's HSN--Hair, Skin, and Nails ...product has. It is also in a hard tablet form and the good ingredients will not be as easily absorbed as if they were in a powder form."

g. "My friend's wife ordered QVC's Hair, Skin, and Nails product and then promptly returned it after reading this blog. They keep speaking about USP as if it's better than a no additive product in capsule form."

37.     In publishing on their website and selectively responding to comments of their readers and viewers while failing to correct their mistaken conclusions regarding the quality of QVC's products and the integrity of QVC, and in continuing to allow such comments to remain in print without correction, defendants Lessman and Procaps have adopted as their own these false, disparaging and injurious statements.

38.     Exemplifying Lessman's and Procaps' selective and misleading efforts to foster confusion, defendants conspicuously failed to respond to a question of one angry customer who asked why, if they criticized QVC's use of silica in its product, Lessman's and Procaps' own Healthy Hair Skin & Nails product also includes silica.

39.     Defendants' foregoing representations are materially false and misleading.

40.     Upon information and belief, Lessman's and Procaps' false and misleading comments directed at QVC and its products (and only QVC and its products) were made maliciously and with a deliberate intent to mislead consumers and cause injury to QVC.

9

0043

B. Defendants' Deceptive Promotion of Resveratrol-100

41.     In advertising and promoting their Resveratrol-100 product, defendants' have

identified as their principal or only direct competition QVC's NATURE'S CODE "Resveratrex"

product (in its liquid and tablet forms)

42.     In advertising and promoting their Resveratrol-100 product, defendants' blog (at

http://andrew.procapslabs.com/default.aspx) is devoted principally to denigrating the quality

QVC's competing Resveratrex products, and only QVC's competing products, through the use of

false and completely unsubstantiated allegations.

43.     In advertising and promoting their Resveratrol-100 product, defendants' have

made numerous false and misleading representations concerning QVC's NATURE'S CODE

"Resveratrex" product, including the following:

> a.     In a statement published on their website under the headline "A Few
> Words on Resveratrol and QVC's Colorful and Sweet Versions" Lessman and
> Procaps summarize their false views of QVC's products as follows: "I will try to keep
> it brief, but these products are very disappointing and apparently misleading. The Q
> in QVC has always stood for Quality, but when it comes to their Resveratrol
> products, the Q might better stand for Questionable."

> b.     There is no factual basis for Lessman's and Procaps' assertions that the
> NATURE'S CODE Resveratrex products offered by QVC are disappointing and of
> questionable quality.

> c.     Lessman and Procaps falsely characterize as "sad" that NATURE'S
> CODE Resveratrex uses Carmine coloring, not natural grape extracts, and although
> Carmine is a natural product, defendants nonetheless find fault with QVC by stating,
> on the one hand that it "is still not Grapes" and, on the other, that some time ago the
> Resveratrex product was colored with FD&C Red #40, FD&C Yellow #6 and FD&C
> Blue #2.

> d.     There is no factual basis for Mr. Lessman's and Procaps' contention that
> Carmine impairs the quality of the NATURE'S CODE products offered by QVC, or
> that, in the past, FD&C Red #40, FD&C Yellow #6 and FD&C Blue #2 were
> detrimental to quality or safety. In fact Natural Carmine and FD&C Red #40, FD&C
> Yellow #6 and FD&C Blue #2 have been in use throughout the food industry for
> many years and have no harmful or negative effects.

10

0044

e.      Lessman and Procaps falsely accuse QVC of deceptively marketing their NATURE'S CODE Resveratrex as having grape content, disputing the fact there is a substantial grape base to NATURE'S CODE Resveratrex; and they contend that grape extract and Muscadine grape seed extract, which are in fact used in NATURE'S CODE Resveratrex, are a "secondary source of Resveratrol" in the product, adding that: "I doubt if those materials contribute much."

f.      In fact, by volume, there is almost as much grape extract and Muscadine grape seed extract in the Resveratrex tablet as there is Polygonum Cuspidatum, the principal source of Resveratrol in Resveratrex (and evidently the sole source or resveratrol in defendants competing product). NATURE'S CODE Resveratrex includes grape extract and Muscadine grape seed extract in addition to Polygonum Cuspidatum because the grape extracts contain additional beneficial compounds not found in Polygonum Cuspidatum alone.

g.      Again falsely challenging the fact there is a substantial grape base to NATURE'S CODE Resveratrex, Mr. Lessman represents that the active ingredient "Healthy Heart Blend" in Reveratrex is "an all but meaningless list of seven different botanicals NONE of which states a standardization of any kind."

h..      In fact NATURE'S CODE "Healthy Heart Blend" consists of grape skin extract standardized for polyphenols and anthocyanins, pomegranate extract standardized for 40% ellagic acid, quercitin, grape leaf extract 4:1, olive leaf extract 4:1, lemon extract standardized for 45% total bioflavonoids and prune powder, and the presence of each of these ingredients, including grape skins and polygonum, is supported by substantial research and defined Oxygen Radical Absorbance Capacity (ORAC) scores. The presence of polyphenols, anthocyanins, ellagic acid, bioflavonoids, etc. are all additional compounds not found in Polygonum Cuspidatum and all add additional benefits over resveratrol from polygonum cuspidatum alone, and there is no basis for defendants' contention otherwise.

i.      In further disparaging Resveratrex as a "large, red artificially-colored tablet" Mr. Lessman makes a false comparison between tablets and capsules.

j.      In fact, there is no scientific data that capsules are superior to tablets (and laying aside that Carmine is a natural coloring agent), Mr. Lessman incorrectly leads his audience to believe that capsules are superior by failing to provide the relevant information to understand the distinction; by failing to mention the fact that part of the very benefit of tablets is that the active ingredients are delivered in a matrix of other products (principally calcium in the Resveratrex product) that are needed in order to make a tablet.

k.      In disparaging the NATURE'S CODE Resveratrex product, Mr. Lessman nowhere discloses that, upon information and belief, his own gelatin capsules are made from hoofs and hides of cattle and pigs, and there is no basis to say that

11

0045

processed hoofs and hides are more natural or beneficial to a person than calcium, an essential mineral in the human diet.

l.     Although Mr. Lessman and Procaps have no grape content in their own resveretrol product, but nonetheless use on the product label a prominent depiction of a bottle of wine, glass of wine, and multiple species of grapes (covering half of the principal display panel on the Resveratrol-100 label), Mr. Lessman and Procaps falsely assert that the "principal source" of Resveratrex Drink "is NOT of the 'vine'".

m.     In fact, approximately 20% of the NATURE'S CODE Resveratrex drink is made up of grape juice concentrate, grape skin and grape seed, all of which are "of the vine."

n.     Mr. Lessman falsely asserts that the NATURE'S CODE Resveratrex products and his own Resveratrol-100 have comparable proportions of ingredients "associated with red wine".

o.     In fact, despite the prominent depiction of wine and grapes on the Procaps product, Resveratrol-100 has no grape-derived ingredients at all, whereas NATURE'S CODE Resveratrex tablets and drink contain significant portions of ingredients derived from grapes.

p.     Mr. Lessman and Procaps falsely mislead their audience to believe that the NATURE'S CODE Reveratrex drink is artificially sweetened and thus of inferior quality to their own, including by representing that 4 grams of sugar in the Resveratrex Drink is from a "mystery source" and (to arouse suspicion) "must be hiding somewhere and you'll never guess where".

q.     In fact, the only sugar content in the NATURE'S CODE Reveratrex drink comes from the natural red and white grape juice in the drink.  No artificial sweeteners are added, and there is nothing hidden in or suspicious about the product.

r.     Mr. Lessman and Procaps falsely mislead their audience to believe that the NATURE'S CODE Reveratrex drink is artificially sweetened and thus of inferior quality to their own, by representing that "Grape Concentrate is apparently not an anti-oxidant rich standardized extract of Grapes for Heart Health, but some kind of sugar-rich concentrate from grapes that sweetens the drink".

s.     In fact, the grape juice concentrate in the NATURE'S CODE Reveratrex drink is a pure juice with some of the water removed.  It is rich in antioxidants and nutrients and other healthful compounds that are not found in Polygonum Cuspidatum alone.

t.     To further mislead his audience that the NATURE'S CODE Reveratrex drink is artificially sweetened and thus of inferior quality to defendants' own

0046

resveratrol capsules, Mr. Lessman and Procaps assert that "Sugar is the dominant ingredient in the Healthy Heart Blend" of the Resveratrex Drink.

u.    In fact, the dominant ingredients in the NATURE'S CODE Reveratrex drink are natural grape juice and resveratrol, supported by additional polyphenols, anthocyanins, bioflavonoids and other elements from the Healthy Heart Blend of anti-oxidants, and there is nothing harmful regarding the natural grape juice used in the product.

44.    The unambiguous message and necessary implication conveyed by the defendants' representations is that the NATURE'S CODE Resveratrex product offered by QVC is artificial, bloated with valueless ingredients and/or is of poor quality and inferior to defendants' competing product.

45.    Defendants' foregoing representations are materially false and misleading.

46.    Upon information and belief, said representations of defendants are unsubstantiated, and defendants do not possess scientific evidence to support the above representations challenging the quality and safety of QVC's products.

47.    Consistent with the unambiguous message and necessary implication conveyed by defendants' misrepresentations as aforesaid, and as set forth more fully below, numerous consumers exposed to defendants' misrepresentations have concluded that QVC's Resveratrex product is indeed a of poor quality and greatly inferior to defendants' competing product.

48.    While appearing on-air on HSN, defendant Lessman further directed viewers to read the above false statements posted on his blog, and HSN continues to make available videos of Mr. Lessman's on-air presentations on its web-site at hsn.com.

49.    Defendants' false and misleading statements as aforesaid have directly injured QVC and caused lost sales.

0047

50.    Among the comments of consumers published by defendants on their website in response to defendants' false and misleading representations regarding QVC's Resveratrex products are the following:

a.    "I saw early this morning [QVC's] presentation and watched it just to see how they would sell it. When I heard and saw the 'tablet' my sensitive stomach felt queezy (sic) for those people who don't realize there are binders in there that are not needed, you educated us on that!

b.    "QVC has so gone down the wrong path, and now I will wonder about a lot of the products they offer. This will come to no good for them, as their credibility has taken a severe nosedive."

c.    "While I certainly understand your previous hesitation to discuss the inferiority of QVC vitamins/supplements, I am so glad that you are defending your own products - and in the process, speaking your mind (and the truth). ... Not only is it scientifically sound, but you have proven beyond a doubt that you are on top of the latest research....so what you offer is the best possible product available. QVC can't even come close (as you've shown through your blogs regarding the subject)."

d.    "'...but when it comes to their Resveratrol products, the Q might better stand for Questionable'. ... well said!"

e.    "QVC Natures Code is a joke. Sometimes I'll watch a few minutes of one of their shows just for a good laugh. Andrew I applaud you for exposing Natures Code for the joke that it is. As always, you have given us the truth, the whole truth, and nothing but the truth. "

f.    "Join us and take superior products that are made by someone who is passionate about and committed to what he does. ... Or continue to support others who choose instead, to aggressively market poor products, which they KNOW are cheaper and clearly not likely to contribute (sic) to better health! ... Andrew..Please continue to ROCK ON and know that you are loved and appreciated by your loyal customers who continue to stand behind you while others aggressively to try (unsuccessfully) compete with your QUALITY and innovation! ... they simply can't! Certainly not in THIS case!"

g.    "this is simply a demonstration of the pure facts. It isn't putting down another brand. What he is showing can be found on the product labels - he's simply saving us the hassle of finding the info on our own (he's already gathered it and put it into chart form - making the comparison easy for the customer)."

h.    "Your loyal HSN customers LOVE you and are very angry & disappointed at QVC for going so low in trying to make vitamin and supplement sales. The truth shall prevail ultimately and your products are so much superior to

14

0048

Nature's Code that there is no doubt in my mind that you will come out ahead after all this dirty warfare is over."

51.    In publishing customers' testimonials on their website and failing to correct their customers' mistaken conclusions regarding the quality of QVC's and QH's products and the integrity of QVC, and in continuing to allow such comments to remain in print without correction, defendants Lessman and Procaps have adopted as their own these false, disparaging and injurious comments.

52.    Defendants' foregoing representations are materially false and misleading.

53.    Upon information and belief, Lessman's and Procaps' false and misleading comments directed at QVC and its products were made maliciously and with a deliberate intent to mislead consumers and cause injury to QVC.

54.    Contrary to applicable law, Lessman and Procaps fail to disclose on their website that they are sponsored by and affiliated with HSN, QVC's direct competitor.

55.    Upon information and belief, defendants' acts complained of herein have been willful and malicious, and intended to injure and trade upon the reputation of Plaintiff and its products and thereby and cause harm to plaintiffs.

56.    Upon information and belief, defendants' acts complained of herein have been willful and malicious, and intended to injure and trade upon the reputation of plaintiffs and their products and thereby and cause harm to plaintiffs.

## FIRST CAUSE OF ACTION
[False Advertising Under 15 U.S.C. § 1125(a)]

57.    Plaintiffs reallege and incorporates by reference Paragraphs 1 through 56 as though fully set forth herein.

58.    Defendants' false and misleading advertising and promotional statements are material to consumer purchasing decisions.

0049

59.     Defendants' conduct as aforesaid constitutes use of false designations of origin and false and misleading descriptions or representations that are likely to cause confusion, to cause mistake or to mislead in violation of 15 U.S.C. §1125(a).

60.     Defendants' conduct as aforesaid has caused great and irreparable injury to plaintiffs, and unless such conduct is enjoined, it will continue and plaintiffs will continue to suffer great and irreparable injury.

61.     Plaintiffs have no adequate remedy at law.

### SECOND CAUSE OF ACTION
[Common Law False Advertising]

62.     Plaintiffs reallege and incorporates by reference Paragraphs 1 through 61 as though fully set forth herein.

63.     Defendants' false and misleading advertising and promotional statements are material to consumer purchasing decisions and have caused and are likely to continue to cause consumer confusion.

64.     The foregoing conduct of the defendants constitutes false advertising in violation of the common law of the State of Delaware.

65.     Defendants' conduct as aforesaid has caused great and irreparable injury to plaintiffs, and unless such conduct is enjoined, it will continue and plaintiffs will continue to suffer great and irreparable injury.

66.     Plaintiffs have no adequate remedy at law.

### THIRD CAUSE OF ACTION
[Violation of Delaware Consumer Fraud Act, 6 Del. C. § 2531 et seq.]

67.     Plaintiffs reallege and incorporates by reference Paragraphs 1 through 66 as though fully set forth herein.

0050

68.     The State of Delaware has an important interest in ensuring that persons and entities doing business with Delaware residents comply with Delaware law and the false and misleading statements of defendants implicate the public interest.

69.     Defendants' false and misleading advertising and promotional statements are material to consumer purchasing decisions and have caused and are likely to continue to cause consumer confusion.

70.     The conduct complained of herein constitutes unlawful consumer fraud deceptive trade practices, in violation of Delaware Consumer Fraud Act, 6 Del. C. § 2513.

71.     Defendants' conduct as aforesaid has caused great and irreparable injury to plaintiffs, and unless such conduct is enjoined, it will continue and plaintiffs will continue to suffer great and irreparable injury.

72.     Plaintiffs have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
[Violation of Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2532]

73.     Plaintiffs reallege and incorporates by reference Paragraphs 1 through 72 as though fully set forth herein.

74.     The State of Delaware has an important interest in ensuring that persons and entities doing business with Delaware residents comply with Delaware law and the false and misleading statements of defendants implicate the public interest.

75.     Defendants' false and misleading advertising and promotional statements are material to consumer purchasing decisions and have caused and are likely to continue to cause consumer confusion

76.     Upon information and belief, defendants have knowingly disparaged plaintiffs' goods, services, and business by false and/or misleading representation of fact, and knowingly

17

created a likelihood of confusion and/or misunderstanding among plaintiffs' and defendants' consumers.

77.     The conduct complained of herein constitutes deceptive trade practices, in violation of the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2532.

78.     Defendants' conduct as aforesaid has caused great and irreparable injury to plaintiff, and unless such conduct is enjoined, it will continue and plaintiffs will continue to suffer great and irreparable injury.

79.     Plaintiffs have no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### [Unfair Competition Under Delaware Common Law]

80.     Plaintiffs reallege and incorporates by reference each of the allegations contained in Paragraphs 1 through 79 of this Complaint as though fully set forth herein.

81.     The foregoing conduct of defendants constitutes unfair competition with under the common law of the State of Delaware.

82.     Defendants' conduct as aforesaid has caused great and irreparable injury to plaintiffs, and unless such conduct is enjoined, it will continue and plaintiffs will continue to suffer great and irreparable injury.

83.     Plaintiffs have no adequate remedy at law.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury as to all issues so triable in this action.

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants as follows:

1.      Preliminarily and permanently enjoining defendants, their agents, representatives, employees, assigns and suppliers, and all persons acting in concert or privity with them, from

18

making false or misleading statements concerning Plaintiff's or its products or from competing unfairly with plaintiffs;

2.     Directing that defendants engage in corrective advertising appropriate to remedy the injury caused to plaintiffs;

3.     Awarding plaintiffs their damages and defendants profits derived by reason of the unlawful acts complained of herein as provided by law;

4.     Awarding plaintiffs treble damages as provided by law;

5.     Awarding plaintiffs exemplary damages as provided by law; and

6.     Awarding plaintiffs their reasonable attorney fees, prejudgment interest, and costs of this action as provided by law.

Dated: February 5, 2010

**CROSS & SIMON, LLC**

Joseph Grey (No. 2358)
Sean T. O'Kelly (No. 4349)
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200
(302) 777-4224 (fax)
jgrey@crosslaw.com
sokelly@crosslaw.com
*Attorneys for Plaintiff*

Of Counsel

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016

19

0053

Case 1:10-cv-00094-SLR   Document 1-1   Filed 02/05/10   Page 1 of 1 PageID #: 20

**CIVIL COVER SHEET**

JS 44 (REV. 07/89)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| QVC, Inc. and QHEALTH, Inc. | YOUR VITAMINS, INC. d/b/a PROCAPS LABORATORIES AND ANDREW LESSMAN |
| (b) County of residence of first listed plaintiff (EXCEPT IN U.S. PLAINTIFF CASES) | County Of Residence Of First Listed Defendant (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED |
| (c) Attorneys (Firm Name, Address, and Telephone Number) Joseph Grey (#2358) Sean O'Kelly (#4349) Cross and Simon, LLC 913 North Market Street, 11th Floor Wilmington, DE 19801 (302) 777-4200 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicates Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influence and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | | ☐ 690 Other | ☒ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL INJURY** ☐ 362 Personal Injury- Med Malpractice | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA(1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 864 SSID Title XVI | |
| ☐ 196 Franchise | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 371 Truth in Lending | **FEDERAL TAX SUITS** | | |
| ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | | | ☐ 892 Economic Stabilization Act |
| ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | | | ☐ 893 Environmental Matters |
| ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 749 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 501 Motions to Vacate Sentence Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities- Employment | ☐ 550 Civil Rights | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities- Other | ☐ 555 Prison Condition | | |
| | ☐ 440 Other Civil Rights | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statue under which you are filing (Do not cite jurisdictional statues unless diversity):

15 U.S.C. § 1125; 6 Del. C. § 2531 et seq

Brief description of cause:

**Action under trademark laws and Delaware Consumer Fraud Act**

**VII. REQUEST IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demand in complaint:
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____    DOCKET NUMBER _____

DATE 2/5/2010

SIGNATURE OF ATTORNEY OF RECORD _[signature]_

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

0054

# EXHIBIT "C"

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 10-094 (UNA) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | **PLAINTIFFS' MOTION FOR A** |
| LABORATORIES and ANDREW | ) | **TEMPORARY RESTRAINING** |
| LESSMAN, | ) | **ORDER AND PRELIMINARY** |
| | ) | **INJUNCTION** |
| Defendants. | ) | |

Pursuant to Fed.R.Civ.P. Rule 65, plaintiffs, QVC, Inc. and QHealth, Inc., hereby move this Honorable Court for a preliminary injunction and temporary restraining order enjoining defendants, their agents, representatives, employees, assigns and suppliers, and all persons acting in concert or privity with them, from making or continuing to make false or misleading statements concerning plaintiffs or their products during the pendency of this action.

The grounds for this motion are more fully set forth in the accompanying declaration of Rich Yoegel, sworn to on February 8, 2010, the declaration of Michael Bengivenga, sworn to on February 8, 2010, the declaration of Michael Bradley, sworn to on February 8, 2010, the declaration of Mary Davis, sworn to on February 8, 2010, and the accompanying Memorandum of Law.

Dated: February 9, 2010

NYC_752952.1

**0056**

Respectfully submitted,

By:   /s/ Joseph Grey

Joseph Grey (ID2358)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.  10 094 (UNA) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF QVC, INC.
## IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## PRELIMINARY INJUNCTION
## AND EXPEDITED DISCOVERY

Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

3NYC_752646.4

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     FACTUAL BACKGROUND............................................................................ 3

  A. Defendants' Deceptive Promotion of ProCaps' Healthy Hair Skin & Nails ........................ 4

  B. Defendants' Deceptive Promotion of Resveratrol-100 ....................................................... 7

III.    ARGUMENT.................................................................................................. 10

  A. Under Applicable Standards, QVC Is Entitled to Injunctive Relief .................................... 10

    1.      QVC Is Likely to Succeed on the Merits of its False Advertising Claim................. 10

      a.    Defendants' Claims Are Literally False................................................................. 12

      b.    Defendants' Claims Are False by Necessary Implication....................................... 13

      c.    Defendants' Unsubstantiated Claims Are Literally False ....................................... 14

      d.    Defendants' Website Violates FTC Regulations.................................................... 16

      e.    Evidence of Actual Confusion Renders All of Defendants' Claims Unlawful........ 16

    2.      QVC has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive

            Relief ..................................................................................................................... 17

    3.      Defendants Will Not Be Harmed By The Grant Of A Preliminary Injunction ........ 20

    4.      The public interest supports an injunction .............................................................. 21

  B. There Exists Good Cause to Allow Expedited Discovery. ................................................. 22

IV.     CONCLUSION............................................................................................... 24

NYC_752646.4

0059

## TABLE OF AUTHORITIES

**CASES**

*BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation Corp.,*
224 F.R.D. 581 (D. Del. 2004) .................................................................................22

*Benham Jewelry Com. v. Aron Basha Corp.,*
45 U.S.P.Q. 2d 1078, 1997 WL 639037 (S.D.N.Y. 1997)........................................24

*Castrol Inc. v. Pennzoil Co.,*
987 F.2d 939 (3d Cir. 1993)...........................................................................12, 14, 17

*Castrol, Inc. v. Pennzoil Quaker State Co.,*
169 F. Supp. 2d 332 (D. N.J. 2001) ..................................................................... 20-21

*Checkpoint Sys. v. Check Point Software Tech.,*
269 F.3d 270 (3d Cir. 1991)......................................................................................18

*Church & Dwight Co. v. S.C. Johnson & Son, Inc.,*
873 F. Supp. 893 (D.N.J. 1994) ................................................................................21

*Clorox Co. P.R. v. Proctor & Gamble Commercial Co.,*
228 F.3d 24 (1st Cir. 2000)........................................................................................13

*Commissariat a L'Energie Atomique v. Dell Computer Corp.,*
No. Civ.A. 03-484-KAJ, 2004 WL 406351 (D. Del. Mar. 3, 2004)........................22

*Conopco, Inc. v. Campbell Soup Co.,*
95 F.3d 187 .................................................................................................................21

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,*
No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982).........................13

*Donsco, Inc. v. Casper Corp.,*
587 F.2d 602 (3d Cir. 1978).......................................................................................18

*Edudata Corp. v. Scientific Computers, Inc.,*
599 F. Supp. 1084 (D. Minn. 1984) ..........................................................................23

*Ellsworth Assocs., Inc. v. United States,*
917 F. Supp 841 (D.D.C. 1996).................................................................................22

*Entm't Tech. Corp. v. Walt Disney Imagineering,*
No. Civ.A. 03-3546, 2003 WL 22519440 (E.D. Pa. Oct. 2, 2003)..........................22

NYC_752646.4

**0060**

*Facenda v. N.F.L. Films, Inc.,*
    448 F. Supp. 2d 491 ..............................................................................................................18

*Fed. Express Corp. v. Fed. Expresso, Inc.,*
    NO. 97 CV 1219 (RSP) (GJD), 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997) .....................23

*Highmark, Inc. v. UPMC Health Plan, Inc.,*
    276 F.3d 160 (3d Cir. 2001).......................................................................................12, 16

*Instant Air Freight v. C.F. Air Freight, Inc.,*
    882 F.2d 797 (3d Cir. 1989)................................................................................................20

*Irish Lesbian & Gay Org. v. Giuliani,*
    918 F. Supp. 728 (S.D.N.Y. 1996).......................................................................................23

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
    Civ. No. 01-55154, 2002 WL 1163624 (9th Cir. 2002) ......................................................21

*Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham,*
    960 F.2d 294 (2d Cir. 1992)................................................................................................19

*Johnson Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Inc.,*
    19 F.3d 125 (3d Cir. 1994)............................................................................................17, 19

*Kennedy Indus. Inc. v. Aparo,*
    41 F. Supp. 2d 311 (E.D. Pa. 2005) .....................................................................................14

*Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
    290 F.3d 578 (3d Cir. 2002)..................................................................................... Passim

*Onan Corp. v. United States,*
    476 F. Supp. 428 (D. Minn. 1979).......................................................................................23

*Optic-Electronic Corp. v. United States,*
    683 F. Supp. 269 (D.D.C. 1987) .........................................................................................22

*Pappan Enters., Inc. v Hardee's Food Sys., Inc.*
    143 F.3d 800 (3d Cir. 1998)................................................................................................20

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare,*
    292 F. Supp. 2d 611 (D.N.J. 2003) ...............................................................................15, 19

*Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co.,*
    204 F.R.D. 675 (D. Colo. 2002) ....................................................................................22, 24

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*
    902 F.2d 222 (3d Cir. 1990).......................................................................................12, 15, 18

NYC_752646.4

*Semitool, Inc. v. Tokyo Electron Am., Inc.,*
    208 F.R.D. 273 (N.D. Cal. 2002)..................................................................22, 24

*Southland Sod Farms v. Stover Seed Co.,*
    108 F.3d 1134 (9th Cir. 1997) .....................................................................14

*Sys. Corp. v. Advanced Cerametrics, Inc.,*
    No. CIV. A. 95-7956, 1996 WL 130991 (E.D. Pa. Mar. 15, 1996)..........................23

*Tambrands v. Warner-Lambert,*
    673 F. Supp. 1190 (S.D.N.Y. 1987)...............................................................14

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
    497 F.3d 144 (2d Cir. 2007)........................................................................13

*Tisch Hotels, Inc. v. Americana Inn, Inc.,*
    350 F.2d 609 (7th Cir. 1965) ......................................................................18

*W.L. Gore & Assocs., Inc. v. Totes. Inc.,*
    788 F. Supp. 800 (D. Del. 1992).......................................................... 17, 20-21

*Warner-Lambert Co. v. Breathasure Inc.,*
    204 F.3d 87 (3d Cir. 2000)......................................................................11, 15


STATUTES, RULES & REGULATIONS

16 C.F.R. § 255.0(b) ...................................................................................16

16 C.F.R. §255.3(b) ....................................................................................16

16 C.F.R. § 255.5 .......................................................................................16

15 U.S.C. § 1125(a) ....................................................................................10

Del. Code Ann. Tit. 6 § 2532........................................................................11

Delaware Consumer Frad Act, 6 Del. C. 2525 .................................................11

Delaware Consumer Fraud Act........................................................................11

Delaware Consumer Fraud Act, 6 Del. C. 2513 ...............................................2, 11

Delaware Deceptive Trade Practices Act ...........................................................11

Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2531 et seq. (2009)
    ("DDTPA").........................................................................................2

iv

NYC_752646.4

Fed. R. Civ. P. 26, 26(b)(2), 26(d) and 26(f) ................................................................22

Fed.R.Civ.P. Rule 34(b).................................................................................................22

Fed.R.Civ.P. Rule 65(b).................................................................................................10

Section 43(a) of the Lanham Act ...............................................................................2, 10, 17

NYC_752646.4

**0063**

## I.   PRELIMINARY STATEMENT

QVC brings this motion to bring a halt to a campaign of inflammatory, false and misleading promotions by defendants, who are seeking to promote their own dietary supplements by disparaging QVC's competing products. Defendants' false and unsustainable claims include the following:

QVC's dietary supplements include a carcinogen.

QVC's dietary supplements are "unhealthy" [sic].

QVC's dietary supplements are of poor quality, and the Q in QVC means questionable.

QVC's dietary supplements use unwholesome artificial flavors and sweeteners.

QVC's dietary supplements have no health benefits.

Certain active ingredients in QVC's dietary supplements are inert and have no benefits.

QVC's tablets are somehow inherently inferior to defendants' capsules.

QVC and its products are "sleazy and deceptive".

In truth, QVC's NATURE'S CODE dietary supplements are all certified by the most prominent applicable standards-setting authorities. For its NATURE'S CODE Hair Skin & Nails product, the appropriate certifying body is the United States Pharmacopeia ("USP"), the leading standards–setting authority for prescription and over–the–counter medicines and other healthcare products manufactured or sold in the United States. For its NATURE'S CODE Resveratrex product, the certification is under "cGMP" guidelines of the Center for Professional Innovation & Education. Defendants' competing products disclose no such independent certifications of quality.

Defendants' statements in issue are literally false, false by necessary implication, or are based on unsubstantiated claims that defendants can not possibly support. In each respect, as a

1

NYC_752646.4

**0064**

matter of law, defendants' advertising claims are unlawful even without further proof of harm. However, the harm to QVC from defendants' verbal assault is already palpable. In the few short weeks since defendants began their smear campaign, there is already substantial evidence of actually confused consumers proclaiming their refusal to purchase QVC's directly competing products; consumers returning the products they had already purchased from QVC, and even consumers proposing a boycott of QVC or refusing to purchase other products of QVC.

Defendants' openly publish the comments of such confused consumers on their website so as to foster further confusion. These include statements describing QVC as having an "utter lack of quality control"; referring to QVC's conduct as "criminal", branding QVC's products as "falsely represented", and the like. Although defendants undertake to respond to and correct some misimpressions of their audience and to answer some of the questions posed, they have taken no steps to respond to or correct numerous blatantly false assertions of their audience regarding QVC's products. In publishing comments of users who have been misled and only selectively responding to these comments, defendants embrace the comments as their own and the confusion is allowed to feed on itself. Unless stopped, it will continue to grow.

Defendants' publication of such false and misleading statements is plainly in violation of Section 43(a) of the Lanham Act, the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2531 et seq. (2009) ("DDTPA") and Delaware Consumer Fraud Act, 6 Del. C. 2513 ("DCFA"). Defendants publish these untrue and disparaging statements on their website and on QVC's principal competing shopping channel, Home Shopping Network (as well as on YouTube and no doubt on other platforms). All such publications should be enjoined *pendente lite*, and defendants should be held to account for the harm they have caused. As demonstrated by defendants' posting on their website and on YouTube on February 3, 4 and 5 of three new videos

2

attacking QVC, the slanderous campaign continues unabated. The immediacy of the harm caused by these ongoing publications is plain, and the already abundant evidence of harm being suffered by QVC demonstrates the need for a temporary restraining order pending a hearing for preliminary injunction. Expedited discovery in anticipation of a hearing on preliminary injunctive relief is also appropriate.

## II.    FACTUAL BACKGROUND

The facts relevant to this motion are set forth in full in the accompanying declarations of Michael Bradley, Mary Davis, Michael Bengivenga and Rich Yoegel, and will only be summarized here.

QVC, Inc. operates the leading nationally broadcast cable television shopping network and the website <qvc.com>, at which it sells and offers for sale a wide variety of consumer products. (Yoegel Decl. ¶ 3.) Since at least as early as 1997, QVC has promoted and sold on its television channel and website a line of dietary supplements under the trademark NATURE'S CODE. (*Id.*) The NATURE'S CODE line of dietary supplements from QVC and its QHealth subsidiary has been very successful, with sales totaling in the hundreds of millions of dollars. (*Id.*) Among the NATURE'S CODE food supplements sold by QVC are products named Hair, Skin & Nails and Resveratrex. (*Id.* ¶ 4.)

Andrew Lessman and Your Vitamins, Inc. d/b/a ProCaps Laboratories ("ProCaps") produce a line of vitamin products sold under the name PROCAPS, including PROCAPS Healthy Hair, Skin & Nails and Resveratrol-100, which compete directly with the NATURE'S CODE Hair, Skin & Nails and Resveratrex products sold by QVC. Although Lessman and ProCaps previously promoted their vitamin products on QVC, Defendants currently offer their vitamin products for sale on television on QVC's direct competitor, the Home Shopping

3

Network ("HSN"), including its website <hsn.com>. (Yoegel Decl. ¶ 5.)  Defendants Lessman and ProCaps also promote and sell their ProCaps dietary supplements at the website <procapslabs.com>, and advertise as well on YouTube and no doubt other platforms.  (Id.)

On January 17, 2010, QVC discovered that on Defendants' website, <http://andrew.procapslabs.com/default.aspx>, Defendants were promoting their competing products by disparaging the quality of QVC's dietary supplements.  (Yoegel Decl. ¶ 6.)  Until February 5, no other competing products were even mentioned. (Id. at Ex. A.)  On January 23 and 24, Lessman appeared on HSN further promoting defendants' products by disparaging QVC's competing dietary supplements, and directing viewers to their website to learn the full extent of their campaign against QVC.  Videos of those appearance continue to be published on-line at the website <hsn.com>. (Id.)  QVC has received similar complaints. (Id. ¶ 7)

A. Defendants' Deceptive Promotion of ProCaps' Healthy Hair Skin & Nails

As more fully described in the Complaint and in the declarations attached hereto, in advertising and promoting their Healthy Hair Skin & Nails product, Defendants' have made numerous statements challenging the quality and safety of the NATURE'S CODE Hair, Skin & Nails product QVC sells.  Defendants have published examples of what they contend are "sobering facts," including the statement that the compound Hyaluronic Acid, a naturally occurring substance in the human body and also present in NATURE'S CODE Hair Skin & Nails, is "connect[ed] to cancer." (Yoegel Decl. Ex. A.)  The statement is false. (Davis Decl. ¶¶ 6, 8.)  Moreover, although repeatedly emphasizing the point, Mr. Lessman also admits on his website that he is aware of no research substantiating the claim. (Yoegel Decl. Ex. A.) Another purported "sobering fact" is that the silica in the NATURE'S CODE product is not bio-absorbable. (Id.)  The statement is also false. (Bradley Decl. ¶ 9.)  Defendants broadly assert that

4

NYC_752646.4

0067

the NATURE'S CODE "isn't Healthy" [sic]. (Yoegel Decl.Ex. A.)  This too is untrue. (Davis Decl. ¶ 5.)

Without explaining the differences between tablets and capsules, and by disparaging the other active ingredients the NATURE'S CODE Hair Skin & Nails product, defendants deride the supplement as merely "a very big, yellow Biotin tablet with 99% additives and not much more." (Yoegel Decl. Ex. A.)  In addition to the general implication that the quality of the product is poor (a point repeatedly made by defendants), part of the premise of the contention is that capsules are inherently superior to tablets.  This premise is false. (Bradley Decl. ¶ 7.)  Indeed, the very structure of a tablet requires that the active ingredients be presented in a matrix of processing aids and excipients to ensure the nutrients are readily available for absorption and the size of the tablet is largely a function of the matrix used to support the dietary ingredients.  (*Id.*) Nor is there any factual basis for the implication that the coloring in the NATURE'S CODE product, which has been recognized as safe by the FDA, is dangerous or unwholesome. (Davis Decl. ¶ 10.)  Defendants further falsely attribute to QVC a claim it has not made: namely, that lutein will improve growth of hair, skin and nails. (Davis Decl. ¶¶ 11, 12.)

Finally, Defendants publicly accuse QVC of having pirated the descriptive name "hair, skin and nails" from them.  It is actually a widely used phrase that merely describes the product and for which defendants have made no effort to establish trademark rights.  While publicly accusing QVC of being an infringer, defendants have never addressed any such claim to QVC directly. (Yoegel Decl Ex. A)

As a result of these representations, numerous consumers have concluded that the NATURE'S CODE Hair Skin & Nails product is indeed a carcinogen, and is as lacking in quality as Lessman and ProCaps represent it to be.  As set forth in the following statements of

5

actual customers published on Defendants' website (Yoegel Decl. Ex A), many have returned

product purchased from QVC; state that they will no longer purchase from QVC and, indeed,

assert that QVC should be boycotted:

> a. "Thanks for setting the record straight. I knew QVC's product was falsely represented."

> b. "I am SO glad that you are speaking out about this! I saw this product on TV and almost called to yell at them. I got SO MAD and I feel so sorry for anyone spending their money on those vitamins. I hope you are able to fight them about the name - SO UNETHICAL. Anyone who has ever watched your shows or taken your product knows the difference! We are educated (thanks to you) and WILL NOT BE FOOLED."

> c. "I have decided to STOP purchasing anything from QVC until they post a retraction and apology. I sent them an email explaining my decision. ... I ask that others join me in a boycott of QVC and please send QVC an email explaining your decision."

> d. "It's astounding! How do these products get past their quality department?! They are treading into dangerous territory when they are dealing with people's health, and the utter lack of quality control. I mean let's face it, if you buy an ugly ring, it doesn't matter you don't have to wear it but if you buy vitamins year after year thinking you are getting benefits and you aren't. wow. It is criminal."

> e. "With 99% additives and just the little bit of biotin, the [QVC] product cannot begin to have the results that Andrew's HSN--Hair, Skin, and Nails ...product has. It is also in a hard tablet form and the good ingredients will not be as easily absorbed as if they were in a powder form."

> f. "My friend's wife ordered QVC's Hair, Skin, and Nails product and then promptly returned it after reading this blog. They keep speaking about USP as if it's better than a no additive product in capsule form."

Lessman and ProCaps not only publish such comments, but also respond to them – albeit

only selectively. For instance, on January 20, 2010 at 13:58 defendants did respond to a post by

"JB" on January 20, 2010 at 12:52  addressing JB's concern whether Hyaluronic Acid is a

carcinogen if used topically (see Yoegel Decl.Ex. A at 10.)  Defendants again responded  on

January 20, 2010 at 17:39 to a post by "Jessie" addressing Jessie's concerns about defendants'

NYC_752646.4

0069

capsules, and on January 21, 2010 at 11:32 defendants responded to a post by "Nick" on January 21, 2010 at 5:19, addressing Nick's concerns about "Candida". (*Id.* at 6.)  However, Defendants have not sought to correct any of the false conclusions of their audience regarding QVC and its competing products.

B.  Defendants' Deceptive Promotion of Resveratrol-100

As more fully described in the Complaint and in the declarations attached hereto, in advertising and promoting their Resveratrol-100 product, Defendants have made numerous representations disparaging QVC's Resveratrex products.  Defendants assert that the active ingredient "Healthy Heart Blend" in Reveratrex as "an all but meaningless list of seven different botanicals – NONE of which states a standardization of any kind." (Yoegel Decl. Ex. A)  QVC's "Healthy Heart Blend" in fact consists of grape skin extract standardized for polyphenols and anthocyanins, pomegranate extract standardized for 40% ellagic acid, quercitin, grape leaf extract 4:1, olive leaf extract 4:1, lemon extract standardized for 45% total bioflavonoids and prune powder. (Bengivenga Decl. ¶ 7).  Contrary to defendants' assertion that the compounds are meaningless, the presence of each of these ingredients, including the grape skins and polygonum, is supported by substantial research and defined "ORAC"[1] scores. (*Id.* ¶ 7.)  The presence of such elements provides additional benefits beyond Resveratrol from polygonum cuspidatum alone, (*Id.*), and defendants admit they do not even know what extracts comprise the Healthy Heart Blend. (Yoegel Decl. Ex. A.)

Defendants imply that there are unwholesome origins for the sugar content of Resveratrex Drink, imply its is artificially sweetened, and indicate that QVC is guilty of labeling law violations for allegedly concealing the source of the sugar in the drink.  Defendants further

---

[1] Oxygen Radical Absorbance Capacity (ORAC) is a method of measuring antioxidant capacities in biological samples.

7

claim that the "principal source" of Resveratrex Drink "is NOT the 'vine.'" (Yoegel Decl. Ex.A.) In fact much of the product is made up of grape juice concentrate, grape skin and grape seed, all of which are "of the vine", and by volume, there is almost as much grape extract and Muscadine grape seed extract in the Resveratrex tablet as there is Polygonum Cuspidatum, the principal source of Resveratrol in Resveratrex (and evidently the sole source or resveratrol in defendants' competing product). (Bengivenga Decl.¶ 6.) 19.2% of the NATURE'S CODE Resveratrex drink is made up of grape juice concentrate, grape skin and grape seed, all of which are "of the vine." (*Id.* ¶ 9.)   By contrast, although defendants have absolutely no grape content in their own resveratrol product, they nonetheless use on the product label a prominent depiction of a bottle of wine, glass of wine, and multiple species of grapes (covering half of the principal display panel on the Resveratrol-100 label). (*Id.* 9.)

Without explaining the relevant differences between tablets and capsules, and by disparaging the other active ingredients in the NATURE'S CODE Resveratrex product (which they admit they do not know), defendants ridicule it as merely a "large, red artificially-colored tablet." The implication, based on a false comparison of tablets versus capsules is that capsules are inherently superior to tablets. There is no basis to the claim. (Bengivenga Decl.¶ 8) Nor is there any factual basis for the assertion that the natural Carmine coloring of the NATURE'S CODE tablet is artificial or unwholesome. (*Id.* ¶ 5.)

Summarizing their objections to the NATURE'S CODE Resveratrex product, defendants also assert that the Q in QVC means "questionable" and identify as "sad," "disturbing" and "heart-breaking" the quality of the product. (Yoegel Decl. Ex. A.) There is no known basis for any of these criticisms. (Bengivenga Decl.¶ 4.)

8

As a result of these representations, numerous consumers have concluded that the NATURE'S CODE Resveratrex products (and other NATURE'S CODE products) are of inferior quality, lacking efficacy and a subject of ridicule. As set forth in the following excerpts, from defendants' website, customers have announced that they get "queezy" [sic] upon seeing QVC's product; that QVC's credibility has taken a "nosedive"; that defendants have exposed QVC as a "joke", and that they are "angry & disappointed" with QVC. Consumers have voiced many other unfounded criticisms of QVC:

a.   "I saw early this morning [QVC's] presentation and watched it just to see how they would sell it. When I heard and saw the 'tablet' my sensitive stomach felt queezy (sic) for those people who don't realize there are binders in there that are not needed, you educated us on that!

b.   "QVC has so gone down the wrong path, and now I will wonder about a lot of the products they offer. This will come to no good for them, as their credibility has taken a severe nosedive."

c.   "While I certainly understand your previous hesitation to discuss the inferiority of QVC vitamins/supplements, I am so glad that you are defending your own products - and in the process, speaking your mind (and the truth). … Not only is it scientifically sound, but you have proven beyond a doubt that you are on top of the latest research....so what you offer is the best possible product available. QVC can't even come close (as you've shown through your blogs regarding the subject)."

d.   "'…but when it comes to their Resveratrol products, the Q might better stand for Questionable'. … well said!"

e.   "QVC Natures Code is a joke. Sometimes I'll watch a few minutes of one of their shows just for a good laugh. Andrew I applaud you for exposing Natures Code for the joke that it is. As always, you have given us the truth, the whole truth, and nothing but the truth. "

f.   "Join us and take superior products that are made by someone who is passionate about and committed to what he does. … Or continue to support others who choose instead, to aggressively market poor products, which they KNOW are cheaper and clearly not likely to contribue (sic) to better health! …"

g.   "Your loyal HSN customers LOVE you and are very angry & disappointed at QVC for going so low in trying to make vitamin and

9

NYC_752646.4

supplement sales. The truth shall prevail ultimately and your products are so much superior to Nature's Code that there is no doubt in my mind that you will come out ahead after all this dirty warfare is over.".

Although there are other "hair, skin and nails" products and other resveratrol products, the all-but exclusive[2] focus of defendants' marketing has been denigrating and demeaning the NATURE'S CODE Hair, Skin & Nails and Resveratrex products, and castigating QVC. Defendants also fail to disclose on their website that they are sponsored by and affiliated with HSN, QVC's direct competitor.

### III.   ARGUMENT

A. Under Applicable Standards, QVC Is Entitled to Injunctive Relief

Preliminary injunctive relief is appropriate where the moving party shows:

1. a reasonable probability that it will succeed on the merits;

2. it will be irreparably injured by denial of such relief;

3. granting injunctive relief will not result in even greater harm on the non-moving party; and

4. granting injunctive relief is in the public interest.

*Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002). Not only does QVC satisfy all of these criteria, but defendants' continuing publication of new false statements, and the ongoing deception demonstrated by evidence of actual consumer confusion, demonstrates the immediacy of the harm required for the Court to grant a temporary restraining order pending a preliminary injunction. Fed.R.Civ.P. Rule 65(b).

1.   QVC Is Likely to Succeed on the Merits of its False Advertising Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the making in commerce of any "…false or misleading description of fact, or false or misleading representation of fact

---

[2] In one very recent, February 5, video, defendants also criticize Dr. Oz, who appears on the Oprah Winfrey television program. Otherwise, QVC has been the sole focus of defendants' criticisms.

NYC_752646.4

which ... (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities". To establish its Lanham Act claim, a plaintiff must show: (1) the defendant made false or misleading statements about the plaintiff's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods travel in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will. *Warner-Lambert Co. v. Breathasure Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000). A similar standard applies under the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532 (2009), and the Delaware Consumer Fraud Act, 6 Del. C. 2513, 2525 ("DCFA").[3] Because QVC's claims under the DDTPA and DCFA require only that the entity make the false representations, by meeting the requirements for a claim under the Lanham Act, QVC thereby establishes a claim under Delaware law as well.

---

[3] Under, the Del. Code Ann. Tit. 6 § 2532 (2009):

(a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

(5) Represents that goods ... have ... characteristics, ... uses, benefits, ... that they do not have; ...

(8) Disparages the goods, services, or business of another by false or misleading representation of fact; ... [or]

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

The DCFA, 6 Del. C. 2513 prohibits:

(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice. ...

Section 2525 of the DCFA provides that: "(a) A private cause of action shall be available to any victim of a violation of this subchapter. ..."

11

Many or most of defendants' claims here at issue are literally false. Others are false by necessary implication and thus also deemed false as a matter of law. Indeed, defendants repeatedly make baseless comparisons of a kind routinely held false by necessary implication. Further, many of defendants claims are completely unsubstantiated. There is, moreover, ample evidence that consumers actually have been deceived by the false advertising messages at issue and that QVC is suffering actual harm.[4] For all of these reasons, the Court need not decide whether all of defendants' claims are literally false or arguably true but misleading. The toxic mix of half truths and untruths is actually deceiving consumers and should be stopped.

> a.    Defendants' Claims Are Literally False

Advertising claims violate the Lanham Act where the claims are either literally false or, if literally true, are nonetheless misleading to the consumer. *Castrol Inc. v. Pennzoil Co.*, , 943 (3d Cir. 1993). If an advertisement is literally false, the plaintiff need not prove actual consumer deception. *Id.* If, on the other hand, an advertisement is literally true but nonetheless misleading, the plaintiff must prove actual deception by a preponderance of the evidence, including by "show[ing] how consumers actually do react.'" *Id.* (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990)). *See also Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001) (affirming a preliminary injunction against comparative advertising of health care plans). *Novartis*, 290 F.3d at 586 ("Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." citing *Castrol*, 987 F.2d at 943).

Among the literally false claims made by Lessman and ProCaps about the NATURE'S CODE Hair Skin & Nails product are that it is a carcinogen; that the silica in the product is non

---

[4] There should also be no dispute that the misrepresentations are material and that the parties' goods travel in interstate commerce.

NYC_752646.4

0075

absorptive; that the product itself is "unhealthy" (sic); and of poor quality. Among the literally false claims made by Lessman and ProCaps about the NATURE'S CODE Resveratrex product are that its Healthy Heart Blend of anti-oxidants is "meaningless" and lacking efficacy; it is not a genuine grape-based product; that it is artificially sweetened; that it is unlawfully mislabeled and that it is of "questionable" quality. Also untrue is the implication that the coloring agents in the NATURE'S CODE products are unwholesome or dangerous. Defendants have also published (with apparent approval) many false statements, including that QVC's products are inferior to their own; suffer from an "utter lack of quality control", and even that QVC's conduct is "criminal".

        b.    Defendants' Claims Are False by Necessary Implication

"[A] 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Novartis*, 290 F.3d at 586–87, quoting *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000). In *Novartis*, the offending message was deemed false by necessary implication because "[t]he phrase 'nighttime strength' . . . necessarily conveys a message that the [] product is specially made to work at night."

False comparisons such as those made by defendants based on differences between capsules and tablets, or based on health claims that QVC and QH have not made, routinely have been held false by necessary implication. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (finding that the statement "settling for cable would be illogical" taken in context "unambiguously made the false claim that cable's HD picture quality is inferior to that of" defendant's satellite service.); *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ. 731-

NYC_752646.4

0076

CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (finding that the statement "When all 21 of the three-star restaurants in France's Michelin Guide choose the same professional model food processor" in front of a scoreboard 'Robot-Coupe: 21, Cuisinart: 0' when in fact Cuisinart does not manufacture a professional model food processor was false by necessary implication); *Tambrands v. Warner-Lambert*, 673 F. Supp. 1190 (S.D.N.Y. 1987) (statement that a home pregnancy test works "as fast as ten minutes" necessarily implied that the tests were fully accurate after ten minutes when in fact the test is only fully accurate after thirty minutes).[5]

Not only are defendants' baseless comparisons between tablets and capsules false by necessary implication, so too is the premise that their own products are superior. False too by necessary implication is the attribution to QVC of health claims (such as that lutein promotes growth of hair) which QVC simply has not made. So too the implied claims that QVC's products are inferior to defendants' are untrue and unlawful, as is the implication that the parties' resveratrol products have similar levels of grape content. In fact, QVC's products do have substantial grape content and honestly say so; defendants' have none and misrepresent that they do.

c.    Defendants' Unsubstantiated Claims Are Literally False

In *Novartis*, the Third Circuit explained that "although the plaintiff normally has the burden to demonstrate that the defendant's advertising claims is false, a court may find that a completely unsubstantiated advertising claim by the defendant is per se false without additional evidence from the plaintiff to that effect." 290 F.3d at 590. *See also Kennedy Indus. Inc. v. Aparo*, 41 F. Supp. 2d 311 (E.D. Pa. 2005) (citing the *Novartis*' "completely unsubstantiated" standard; finding that the defendant did not conduct the correct studies to support its claims, and granting permanent injunction); *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare*,

---

[5] *See also Castrol*, 987 F.2d 939; *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997).

14

292 F. Supp. 2d 611, 618 (D.N.J. 2003) (citing the *Novartis* "completely unsubstantiated" standard, and finding defendant's unsupported claims to be per se false).

Many of defendants' claims are made to sound as if they have a "scientific" basis, when no such support actually exists. Accordingly, the court can and should conclude that these "completely unsubstantiated advertising claim[s]" are false on this ground alone. *Novartis*, 290 F. 3d at 590. Defendants expressly assert that QVC's dietary supplements are dangerous, carcinogenic and of poor quality, and press the point so that consumers can – and <u>do</u>! – take away the frightening concern that QVC's products can not be trusted and will cause cancer – and even that QVC's behavior is criminal. Yet, defendants also admit they have no evidence Hyaluronic Acid causes cancer. Indeed, there is none. (Davis Decl. ¶ 8.) Defendants baldly assert that the silica in QVC's NATURE'S CODE Hair Skin & Nails product is no more bio-absorbable than glass or sand, yet no research can possibly support the claim. Defendants assert that the Healthy Heart Blend of nutrients in QVC's Resveratrex product are meaningless, yet by admitting they do not even know what the ingredients are. Defendants make plain their claims are without substantiation. So too, defendants insist there must be something suspicious about the source of sugar in the Resveratrex drink, even while they concede they do not know.

Such unsubstantiated claims are false and violate the Lanham Act. *Novartis*, 290 F. 3d at 590. *See also Sandoz*, 902 F.2d at 228 n.7 ("[T]here is a plausible argument that the claim is literally false because the advertiser has absolutely no grounds for believing that its claim is true."); *Breathasure*, 204 F.3d at 96 (affirming that defendants claims were "not supported by any reliable scientific evidence" and that the "unsupported claims made in advertising . . . regarding the efficacy of its ingestible capsules is without any scientific foundation," and thus calling for the grant of a permanent injunction).

15

NYC_752646.4

0078

### d.   Defendants' Website Violates FTC Regulations

As a matter of law, defendants blog violates FTC regulations by failing to disclose the terms of defendants' relationship with HSN, QVC's largest direct competitor. *See* 16 C.F.R. § 255.5 ("When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (*i.e.,* the connection is not reasonably expected by the audience), such connection must be fully disclosed.")[6] It would also appear that defendants failed to conduct appropriate testing and evaluations of plaintiffs' NATURE'S CODE products to support their disparaging conclusions.[7]

### e.   Evidence of Actual Confusion Renders All of Defendants' Claims Unlawful

Because there is evidence of actual confusion, it is not necessary for the Court to parse out which of defendants' claims are literally false, false by necessary implication, per se false as lacking substantiation, or "merely" misleading. *Highmark*, 276 F.3d at 171 (affirming that "[t]he District Court found nine separate claims made in the [defendant's] ad false and, in the alternative misleading" as proven by testimonial evidence of, among other things, "employees specifically ask[ing] questions about the claim" at issue); *Novartis*, 290 F.2d at 590 (finding that plaintiffs were likely to succeed on the merits because (1) defendant's claims were per se false as

---

[6] *See* 16 C.F.R. § 255.0(b) For purposes of this part, an endorsement means any advertising message . . . that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser. . .

[7] *See* 16 C.F.R. §255.3(b) Although the expert may, in endorsing a product, take into account factors not within his or her expertise (*e.g.*, matters of taste or price), the endorsement must be supported by an actual exercise of that expertise in evaluating product features or characteristics with respect to which he or she is expert and which are relevant to an ordinary consumer's use of or experience with the product and are available to the ordinary consumer. This evaluation must have included an examination or testing of the product at least as extensive as someone with the same degree of expertise would normally need to conduct in order to support the conclusions presented in the endorsement. . . . . Moreover, where the net impression created by the endorsement is that the advertised product is superior to other products with respect to any such feature or features, then the expert must in fact have found such superiority.

16

NYC_752646.4

**0079**

unsubstantiated, and (2) in the alternative, misleading as plaintiff's survey evidence proved confusion). It is enough that consumers here have been and are being misled.

Because QVC has presented ample evidence of actual deception, a likelihood of success on the merits is established. *See Novartis*, 290 F.3d at 586 (in analyzing likelihood of success, noting that "a plaintiff must prove either literal falsity or consumer confusion" and finding that plaintiff was likely to succeed. (*quoting Castrol*, 987 F.2d at 943 (affirming that plaintiff had proven defendant's ads were literally false and were likely to succeed on the merits)). Not only are the above-quoted consumer comments regarding QVC's NATURE'S CODE Hair, Skin & Nails and Resveratrex products evidence of actual confusion caused by defendants' false advertising, but in publishing on their website and only selectively responding to comments of their readers while failing to correct their mistaken conclusions regarding the quality of QVC's products and the integrity of QVC, and in continuing to allow such comments to remain in print without correction, defendants have adopted as their own these false, disparaging and injurious comments.

2.      QVC has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief

"To prove irreparable injury under § 43(a), [the plaintiff] need only provide a reasonable basis for the belief that [it] is likely to be damaged as a result of the false advertising. Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill." *W.L. Gore & Assocs., Inc. v. Totes. Inc.*, 788 F. Supp. 800, 810 (D. Del. 1992) (internal citations omitted). In a false advertising case, "public reaction is the measure of a commercial's impact." *Johnson Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Inc.*, 19 F.3d 125 (3d Cir. 1994). However, where as here there is substantial evidence of actual confusion, courts have found the irreparable harm prong to

17

be satisfied. *Novartis*, 290 F. 3d at 595–96 (finding that the defendant's advertising "had already had a measureable effect on [plaintiff's] market share as reflected by a decrease in sales . . . that corresponds to the increased sales [for defendant]").

Actual evidence of consumer misinterpretation is an acceptable measure of public reaction, demonstrating that a claim is "verifiably misleading" by showing "how consumers actually do react." *Sandoz*, 902 F.2d at 229, 231 (3d Cir. 1990); *see also Novartis*, 290 F.3d at 595–96 (evidence of "loss of market share constitutes irreparable harm"); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 605 (3d Cir. 1978) (The district court considered evidence of actual confusion including "unsolicited letters to [plaintiff] from shop owners and customers 'asking if (or assuming that) [defendant's] banks, advertised as 'certified, authentic' replicas with a certificate of authenticity (but with no manufacturer's name given), are [plaintiff's] banks'" and the Third Circuit affirmed that plaintiff had shown likelihood of success.). "Where evidence of actual confusion exists, courts have weighed it heavily precisely because it is so hard to obtain." *Facenda v. N.F.L. Films, Inc.*, 448 F. Supp. 2d 491, 512 (citing *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 291 (3d Cir. 1991) (citing *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir. 1965) ("[S]ince reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion")).

Substantial evidence of actual harm in the form of consumer postings to defendants' blog and inquiries to QVC (Yoegel Decl. Exs. A and B), confirm that injunctive relief is needed. The comments of consumers published by defendants on their website in response to defendants' false and misleading representations of QVC's NATURE'S CODE Hair, Skin & Nails and Resveratrex products demonstrate that consumers are returning products already purchased from

18

QVC, are refusing to make additional purchases, are contemplating boycotting QVC and are expressing their own "sobering" doubts about the quality of all of QVC's products and threatening to refuse other purchases. The harm is thus very real, and the need for injunctive relief is immediate. In equal measure, such consumers are concluding that defendants' products are superior, thus generating sales for defendants at plaintiffs' expense.

Given defendants' single-minded focus on QVC and its NATURE'S CODE products, and given defendants' prior relationship with QVC, the inescapable conclusion is that their false and misleading comments directed at QVC and its products are made <u>deliberately</u> to mislead consumers and cause injury to QVC. Where as here a defendant acts with "intent to mislead" and there is evidence of "deliberate conduct" of an "egregious nature" a presumption of likelihood of confusion arises. *Johnson & Johnson-Merck*, 19 F.3d 125 (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham*, 960 F.2d 294, 298–99 (2d Cir. 1992) ("[W]here a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." (citation and quotations omitted)).

Moreover "where the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed." *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare*, 292 F. Supp. 2d 611, 621 (D.N.J. 2003) (quoting *Novartis*, 129 F. Supp. 2d at 367). Defendants' false and misleading claims of product superiority (including, for example, based on inherently misleading comparisons between tablet and capsule forms of the parties' supplements) warrants such a presumption here.

NYC_752646.4

0082

Not only should irreparable harm be presumed, evidence of actual confusion confirms that QVC is suffering and, absent injunctive relief will continue to suffer, irreparable harm in the form of consumer confusion, lost sales and market share, eroding consumer confidence, declining profits and loss of goodwill. It is well-settled that "loss of market share constitutes irreparable harm." *Novartis*, 290 F.3d at 596. ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial." quoting *Instant Air Freight v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). Likewise the injury to QVC's reputation makes clear the need for an injunction. *Pappan Enters., Inc. v Hardee's Food Sys., Inc.* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

3.      Defendants Will Not Be Harmed By The Grant Of A Preliminary Injunction

It should be possible for defendants to promote their vitamin products on the merits, without their single-minded focus on disparaging QVC's goods. A preliminary injunction will simply bar defendants from further disseminating false information and advertisements, which the law does not condone. "Commercial speech is protected only in so far as it serves an informational function and it loses its protection if it deceives, misleads, or constitutes fraudulent activity." *Castrol*, 169 F. Supp. 2d at 339. Where claims are "carelessly or irresponsibly made . . . any 'prejudice' which accrues can be considered to be self-inflicted." *W.L. Gore & Assocs.*, 788 F. Supp. at 812. By disseminating the several false, misleading and unsubstantiated advertising claims at issue, defendants have brought on themselves any potential injury from an injunction. Defendants can continue to make truthful, accurate, and scientifically supported claims about their products.

NYC_752646.4

**0083**

Moreover, although the harm to QVC is already very real - albeit difficult to measure or quantify precisely in monetary damages - the harm to defendants of having to advertise and promote their products honestly is insignificant. The harm to QVC of not granting an injunction thus far outweighs speculative injury, if any, to defendants.

4.      The public interest supports an injunction

"There is a strong public interest in the prevention of misleading advertisements . . . where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more towards granting the injunction." *Novartis*, 290 F. 3d at 597 (internal citations and quotations omitted). "The public has a right not to be deceived or confused." *W.L. Gore & Assocs.*, 788 F. Supp. at 813.[8] This is particularly true where health-related products are at issue. *Novartis*, 290 F. 3d at 597 ("There is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned." (citations omitted)); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, Civ. No. 01-55154, 2002 WL 1163624, at *10 (9th Cir. 2002) ("[T]he public has a particularly strong interest in an accurate description of health and medical products."); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 ("We have consistently held that the public's interest is especially significant when health and safety concerns are implicated, as with the advertising of over the counter medications."). QVC has demonstrated a reasonable likelihood of success on the merits, as explained above, and thus, the public interest favors granting the preliminary injunction to prevent defendants' persistent dissemination of the false statements at issue. Additionally, as consumers rely on these nutritional supplements in addressing their various health concerns, it is

---

[8] *See also Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 440 (D.N.J. 2001) (noting the "compelling public interest in protecting competitors and consumers from false advertising claims"); *Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 912 (D.N.J. 1994) ("Because defendant S.C. Johnson's false advertisements actually deceive and confuse the consuming public, there is sufficient public interest to permanently enjoin defendant from continuing in its deceptive advertising practices.")

21

imperative that the advertising regarding these products be truthful, further implicating the public interests and supporting an injunction.

## B. There Exists Good Cause to Allow Expedited Discovery.

Courts enjoy broad discretion under the Federal Rules to vary the timing and sequence of discovery.[9] *BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 587 (D. Del. 2004). A reasonableness or good cause standard is applied "when the purpose of the expedited discovery is to gather evidence for an upcoming preliminary injunction hearing." *Id.* [10]

In addition to the pendency of a preliminary injunction motion, and the actual circumstances of the given case, other relevant factors include the breadth of the discovery requests; the purpose for requesting the expedited discovery; the burden on the defendants to comply with the requests; and how far in advance of the typical discovery process the request is made. *Id.* at 587; *Entm't Tech. Corp. v. Walt Disney Imagineering*, No. Civ.A. 03-3546, 2003 WL 22519440, at *3–5 (E.D. Pa. Oct. 2, 2003); *Commissariat a L'Energie Atomique v. Dell Computer Corp.*, No. Civ.A. 03-484-KAJ, 2004 WL 406351, at *1 (D. Del. Mar. 3, 2004) (allowing expedited discovery to permit plaintiff to fully brief a pending preliminary injunction motion).

"Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp 841, 844 (D.D.C. 1996) (ordering expedited discovery where it would "expedite resolution of [plaintiffs'] claims for injunctive relief") (citing *Optic-Electronic Corp.*

---

[9] *See, e.g.*, Fed. R. Civ. P. 26(b)(2) and 26(d) (A party may seek discovery before the parties have conferred as required by Rule 26(f) "when authorized by [Court] order"); see also Rule 34(b) (giving courts discretion to vary response time).

[10] *See also Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275–76 (N.D. Cal. 2002) (applying a good cause standard, involving a balancing between the need for expedited discovery in consideration of the administration of justice and the prejudice to the responding party); *Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002) (noting that Rule 26 "allows [the court] to order expedited discovery upon a showing of good cause").

NYC_752646.4

**0085**

*v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987) and *Onan Corp. v. United States*, 476 F. Supp. 428, 434 (D. Minn. 1979)). Expedited discovery may "better enable the court to judge the parties' interest and respective chances for success on the merits" at a preliminary injunction hearing. *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 429 (8th Cir. 1985).[11]

Here, plaintiffs' false advertising allegations go primarily to the scientific support for and accuracy of the defendants' false advertising claims concerning plaintiffs' products. In ruling on the motion for preliminary injunction, the Court will be in a better position to judge the parties' chances for success on the merits if it has the opportunity to review the research, if any, on which defendants relied to support the claims in issue. Expedited discovery thus is appropriate. Plaintiffs proposed discovery requests are also narrowly "tailored to the time constraints under which both parties must proceed [and] to the specific issues that will have to be determined at the preliminary injunction hearing."[12]

If plaintiffs are correct that many or most of defendants advertising claims lack proper substantiation, it will be a simple matter to confirm that defendants are without proper scientific support for their claims. Nor should a great deal of time be required to learn on what scientific data defendants actually did rely in making the claims in issue. As need be, and particularly if a temporary restraining order is in place, the parties can adjust the timing for defendants' responses to discovery to meet the Court's schedule for a hearing on a preliminary injunction motions.

---

[11] *See also Sys. Corp. v. Advanced Cerametrics, Inc.*, No. CIV. A. 95-7956, 1996 WL 130991, at *2 (E.D. Pa. Mar. 15, 1996) (permitting expedited discovery in connection with a previously filed motion for preliminary injunction).

[12] *Fed. Express Corp. v. Fed. Expresso, Inc.*, NO. 97 CV 1219 (RSP) (GJD), 1997 WL 736530, at *2 (N.D.N.Y. Nov. 24, 1997) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 728, 731 (S.D.N.Y. 1996) (granting expedited discovery in anticipation of preliminary injunction hearing on trademark infringement)).

NYC_752646.4

**0086**

Defendants will not be prejudiced by having to produce on an expedited basis (with appropriate protections for confidentiality) documents that they already have prepared in preparation for their advertising campaign and to which they likely have ready access. By contrast, plaintiffs face lasting harm to their goodwill and customer loyalty as a result of defendants' false and deceptive advertising. Assessing damages after such harm is done presents unique challenges. Not surprisingly, courts have noted the special nature of intellectual property litigation in considering requests for expedited discovery, holding that such discovery can be particularly appropriate in such cases.[13] Such discovery is appropriate here.

## IV.   CONCLUSION

For the foregoing reasons, defendants should be restrained and enjoined during the pendency of this action from disseminating false and misleading statements concerning QVC and its NATURE'S CODE Hair, Skin & Nails and Resveratrex products, and the Court should enter such other and further relief as appropriate.

Dated:     February 9, 2010

Respectfully submitted,

By:   _/s/ Joseph Grey_
        Joseph Grey (ID 2358)
        Sean T. O'Kelly (ID 4349)
        Cross & Simon, LLC
        913 North Market Street
        Eleventh Floor
        P.O. Box 1380
        Wilmington, DE  19899-1380
        Telephone: (302) 777-4200
        Facsimile: (302) 777-4224 (fax)
        Email: jgrey@crosslaw.com

---

[13] _Pod-Ners_, 204 F.R.D. at 676 ("Good cause [for expedited discovery] frequently exists in cases involving claims of infringement and unfair competition."); _Benham Jewelry Com. v. Aron Basha Corp._, 45 U.S.P.Q. 2d 1078, 1997 WL 639037, at *20 (S.D.N.Y. 1997) ("[Expedited] discovery is routinely granted in actions involving infringement and unfair competition."); _see also Semitool_, 208 F.R.D. at 278 (permitting expedited discovery in infringement case).

24

and
Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

25

NYC_752646.4

# EXHIBIT "D"

0089

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs/ | ) | |
| Counter-Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-094 (SLR) |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants/ | ) | |
| Counter-Plaintiffs. | ) | |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY [D.I. 4&5]**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

OF COUNSEL:

Jonathan F. Cohn
Gordon D. Todd
Matthew D. Krueger
SIDLEY AUSTIN LLP
1501 K Street
Washington, DC 20005
(202) 736-8000

*Attorneys for Defendants*

James D. Arden
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

May 3, 2010

0090

## TABLE OF CONTENTS

Page

TABLE OF AUTORITIES ............................................................................................... iii

NATURE AND STAGE OF PROCEEDINGS .................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT ................................................................................................................... 6

I.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ................ 6

    A.    Mr. Lessman's Statements Were Not Literally False .............................................. 7

        1.    Statements About QVC's Hair, Skin & Nails ................................................. 8

            a.    99% Additives .......................................................................... 8

            b.    Hyaluronic Acid ....................................................................... 9

            c.    Lutein ..................................................................................... 12

            d.    Silica ...................................................................................... 13

            e.    Artificial Colors .................................................................... 14

            f.    Capsules and Tablets ............................................................. 14

        2.    Statements About QVC's Reservatrex Products ....................................... 15

            a.    "Healthy Heart Blend" ........................................................... 15

            b.    Sugar in Resveratrex Drink .................................................... 15

            c.    Grape-Base of Resveratrex .................................................... 16

            d.    Added Colors ......................................................................... 16

         3.    Opinion Statements About QVC's Dietary Supplements .......................... 17

        4.    Third-Party Comments .............................................................................. 18

    B.    Mr. Lessman's Statement Were Not Misleading ................................................. 20

    C.    Plaintiffs Are Unlikely to Prevail Because of Their Own Unclean Hands ........... 21

II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY ................... 22

III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST
       GRANTING AN INJUNCTION ....................................................................................... 23

CONCLUSION ........................................................................................................................... 24

ii

0092

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Accu Personnel v. Accustaff, Inc.*,
   846 F. Supp. 1191 (D. Del. 1994)...............................................................................................7

*Alexander v. United States*,
   509 U.S. 544 (1993)....................................................................................................................6

*Bailey v. Systems Innovation, Inc.*,
   852 F.2d 93 (3d Cir. 1988)..........................................................................................................6

*Ben Ezra, Weinstein, & Co. v. AOL*,
   206 F.3d 980 (10th Cir. 2000) ..................................................................................................19

*Beneficial Corp. v. F.T.C.*,
   542 F.2d 611 (3d Cir. 1976)......................................................................................................24

*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998)................................................................................................19

*Carafano v. Metrosplash.com, Inc.*,
   207 F. Supp. 2d 1055 (C.D. Cal. 2002), *aff'd*, 339 F.3d 1119 (9th Cir. 2003).......................19

*Castrol Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993)..............................................................................................7, 17

*Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.*,
   148 F.3d 242 (3d Cir. 1998)......................................................................................................24

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*,
   441 F. Supp. 2d 695 (M.D. Pa. 2006)......................................................................................21

*Diessner v. Mortgage Elec. Registration Sys.*,
   618 F. Supp. 2d 1184 (D. Ariz. 2009) .....................................................................................19

*Dimeo v. Max*,
   433 F. Supp. 2d 523 (E.D. Pa. 2006) ..................................................................................18, 19

*Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*,
   847 F.2d 100 (3d Cir. 1988)......................................................................................................23

*Gerardi v. Pelullo*,
   16 F.3d 1363 (3d Cir. 1994)......................................................................................................23

0093

*Grand Ventures, Inc. v. Whaley,*
    632 A.2d 63 (Del. 1993) ..................................................................................................7

*Green v. AOL,*
    318 F.3d 465 (3d Cir. 2003)........................................................................................18, 19

*IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.,*
    250 Fed. Appx. 476 (3d Cir. 2007)...................................................................................23

*In re R.M.J.,*
    455 U.S. 191 (1982)..........................................................................................................24

*John P. Prods., Inc. v. CBS, Inc.,*
    10 F. Supp. 2d 395 (S.D.N.Y. 1998)................................................................................21

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,*
    19 F.3d 125 (3d Cir. 1994)............................................................................................20, 21

*Langdon v. Google, Inc.,*
    474 F. Supp. 2d 622 (D. Del. 2007)..................................................................................18

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,*
    511 F.3d 350 (3d Cir. 2007)..............................................................................................6

*Minn. Mining & Mfg. Co. v. Dentsply, Int'l, Inc.,*
    1994 WL 827735 (D. Del. Nov. 1, 1994) ........................................................................20

*Monsanto Co. v. Rohm & Haas Co.,*
    456 F.2d 592 (3d Cir. 1972)........................................................................................21, 22

*Monsanto Co. v. Syngenta Seeds, Inc.,*
    443 F. Supp. 2d 648 (D. Del. 2006)...................................................................................7

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,*
    290 F.3d 578 (3d Cir. 2002)........................................................................................6, 7, 20

*Parker v. Learn Skills Corp.,*
    530 F. Supp. 2d 661 (D. Del. 2008)..........................................................................14, 17, 19

*Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.,*
    -- F. Supp. 2d -- , 2010 WL 1348241 (D. Del. Apr. 6, 2010)......................................20, 24

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,*
    227 F.3d 489 (5th Cir. 2000) ............................................................................................17

*Procter & Gamble Co. v. Kimberly-Clark Corp.,*
    569 F. Supp. 2d 796 (E.D. Wisc. 2008)............................................................................17

iv

0094

*Regscan, Inc. v. Dean Mark Brewer,*
  2006 WL 4100007 (E.D. Pa. Sept. 5, 2006) ...............................................20

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*
  902 F. 2d 222 (3d Cir. 1990)..............................................................7, 19, 20

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.,*
  642 F. Supp. 2d 304 (D. Del. 2009).............................................................23

*Teleconference Systems v. Proctor & Gamble Pharm., Inc.,*
  676 F. Supp. 2d 321 (D. Del. 2009)...............................................................8

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
  497 F.3d 144 (2d Cir. 2007)..........................................................................17

*Triangle Publications v. Knight-Ridder Newspapers,*
  626 F.2d 1171 (5th Cir. 1980) ......................................................................24

**STATUTES**

15 U.S.C. § 1125(a), (ii) ......................................................................................6

42 U.S.C. § 230(c)(1)..........................................................................................18

42 U.S.C. § 230(e)(3)..........................................................................................18

42 U.S.C. § 230(f)(2) ..........................................................................................18

Delaware Consumer Fraud Act, 6 Del. C. 2513, 2525 ........................................6

Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532, and (iii)........................6

**OTHER AUTHORITIES**

U.S. CONST. amend. I ..........................................................................................24

16 C.F.R.§§ 255.5, 255.3(b) ...............................................................................19

Webster II New Riverside University Dictionary at 1084 (1984) ......................13

Webster's New World Dictionary at 691 (1966)................................................13

0095

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs QVC Inc. and QHealth, Inc. filed false advertising claims against Defendants ProCaps Laboratories, Inc. and Andrew Lessman, D.I. 1 (Feb. 5, 2010), and moved for a temporary restraining order and preliminary injunction. *See* D.I. 4 (Feb. 9, 2010); *see also* Opening Brief in Support of Motion, D.I. 5 (Feb. 9, 2010) ("Op. Br."). Defendants have filed counter-claims based on Plaintiffs' false advertising and trademark infringement. D.I. 15 (Mar. 1, 2010). Pursuant to the Court's Order, D.I. 27 (Apr. 12, 2010), Defendants submit this Answering Brief in Opposition ("Opposition") to Plaintiffs' motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

While stealing the name of Defendants' most important and heavily promoted vitamin product, Plaintiffs misrepresented the efficacy and safety of their own. Most notably, QVC promoted its Hair, Skin & Nails product as containing "three dimensions" of support, even though two of these so-called dimensions do not support the health of hair, skin, and nails. QVC also invoked "certification" by United States Pharmacopeia ("USP") as guaranteeing the efficacy and safety of QVC's supplement, even though USP does not certify any products, let alone QVC's. These marketing tactics caused confusion and implied that Defendants' product was inferior – lacking key ingredients and possessing no USP certification.

In response, Mr. Lessman posted several blog entries clarifying that he had nothing to do with QVC's new product, and stating why QVC's promotions were misleading. Each and every one of Mr. Lessman's statements is true. Indeed, his statements serve the public interest by disclosing the products' true characteristics and alerting the public to important information, including the significant body of research demonstrating a relationship between cancer and hyaluronic acid (one of the ingredients in QVC's product). Plaintiffs' lawsuit and request for

injunctive relief are baseless attempts to silence Mr. Lessman and to shield QVC's product from fair and open scrutiny. Their motion should be denied for the following reasons:

1.      Plaintiffs are unlikely to succeed on the merits. Each of Defendants' statements is true on its face, not literally false. Moreover, Plaintiffs cannot prove that consumers were misled, and Plaintiffs' unclean hands foreclose their claims.

2.      Plaintiffs cannot show irreparable injury. Plaintiffs have conducted no consumer surveys and proffered no evidence of market-share loss or reputational injury. In any event, loss of sales can be remedied at law.

3.      The balance of harms and public interest do not favor an injunction, which would censor Mr. Lessman on issues vital to consumers.

**STATEMENT OF FACTS**

The parties to this action are no strangers. Mr. Lessman began marketing ProCaps products on QVC in 1992. Lessman Decl. ¶ 5. After a successful five-year run, Mr. Lessman left QVC and thereafter began marketing his vitamins at QVC's chief rival, the Home Shopping Network ("HSN"). *Id.* ¶ 6. Defendants have enjoyed tremendous success at HSN, where some 13 years later, Mr. Lessman still markets his products today. *Id.* ¶ 8.

One of ProCaps' most successful products is Healthy Hair Skin & Nails™, a vitamin supplement designed to support the hair, skin, and nails. *Id.* ¶ 9, 11. Although "beauty vitamins" are not usually major sellers, in less than ten years, Healthy Hair Skin & Nails™ has enjoyed enormous success, with sales of more than $70 million reaching more than one million customers. *Id.* Defendants have generated incalculable goodwill in this product name, which is widely and closely associated with ProCaps and Mr. Lessman. *Id.* ¶ 11.

In November 2006, a QVC executive inquired of Mr. Lessman whether he would consider returning to QVC to replace its soon-to-be-retiring on-air vitamin spokesman. *Id.* ¶ 13.

2

This led to discussions with QVC executives, during which Mr. Lessman disclosed the critical importance of his Healthy Hair, Skin & Nails™ product. *Id.* ¶ 13-14. He explained that it was ProCaps' most successful stand-alone product in terms of on-air sales. *Id.* ¶ 14. It was also the most productive product in terms of generating re-orders and in terms of capturing valuable new customers for ProCaps and HSN. *Id.*

In November 2007, Mr. Lessman broke off discussions with QVC and elected to remain with HSN. *Id.* ¶ 13. Approximately two years later, on January 14, 2010, QVC rolled out a competing product, under the surprisingly similar name, "Hair, Skin & Nails." *Id.* ¶ 15. QVC launched this new product with substantial fanfare, giving it significant airtime and promoting it as a "Today's Special Value." *Id.* Notably, QVC did not market the product using its given name, but instead chose to call it "*Healthy* Hair, Skin & Nails" throughout QVC's broadcasts and website, thus misappropriating the precise product name that Defendants had worked for a decade to develop. *See* Lessman Decl. ¶ 16; *id.* Exs. A-C (show transcript, website pages, product purchase receipt). QVC's misappropriation resulted in immediate customer reaction, causing some confused consumers to inquire whether QVC was selling ProCaps' product, and many consumers to express outrage that QVC would use Defendants' product's name. *See* Lessman Decl. ¶ 17; Cohn Decl. Ex. A (comments posted on QVC's and Defendants' websites).

Moreover, in promoting its product, QVC made numerous false statements that unfairly disadvantaged Defendants' Healthy Hair Skin & Nails™. QVC's overriding sales pitch was that the four active ingredients in its product provide a unique "three dimensions of support":

> Number one, nutritional support coming from **biotin** and **silica**. Second dimension [is] antioxidant protection given through **lutein**. And then the third piece of protection, I love this one, **hyaluronic acid**. ... This is all about the extra cellular matrix that actually helps to give structural support to the cells. So you're getting three dimensions, [Host], all in one tablet.

3

Cohn Decl., Ex. B (emphasis added); *see also id.*, Ex. C (graphic from video).   Although Defendants' Healthy Hair Skin & Nails product contains more than a dozen ingredients, it contains only two of Plaintiffs' four ingredients—biotin and silica, the so-called first dimension of support.   Defendants' product does not contain lutein or hyaluronic acid ("HA").   For this reason, QVC's spokesperson contended: "Outside of [biotin and silica], you will never see a product like this anywhere other than Nature's Code because you're getting three dimensions of support, [Host], for healthy hair, skin and nails." *See* Cohn Decl., Ex. B.   QVC also claimed that its Hair, Skin & Nails product has "certification" by USP, which "can give you peace of mind" about its "safety and efficacy." *Id.*   In fact, as Plaintiffs have conceded in this litigation, Reply to Counterclaims, ¶¶ 34-38, USP does not "certify" any products and did not certify Plaintiffs' products.   Nor does USP test safety or efficacy of products.   Nicolosi Decl. ¶ 12.

In response to QVC's actions—indeed, while QVC's presentation was still on the air—Mr. Lessman stated on his blog that the product being advertised on QVC was not ProCaps' Healthy Hair, Skin & Nails™.   *See* Cohn Decl., Ex. D (Jan. 14, 2010 blog post entitled "QVC's Hair Skin and Nails isn't Healthy … it is just sleazy and deceptive.").   Mr. Lessman informed his readers that "I have **nothing** to do with this product from QVC.   I find it shocking that they would use my exact product name to sell this product." *Id.* (emphasis in original).

Over the next few days, Defendants reviewed QVC's products and claims, and responded with three additional blog posts.   On January 19, 2010, Mr. Lessman wrote a blog entry entitled "A Quick Follow-up on QVC's Hair, Skin and Nails." *See* Cohn Decl., Ex. E.   Mr. Lessman explained that, while the "Hair, Skin & Nails" name on QVC's product label was "harmless" and "generic," he objected to QVC promoting the product under his own precise product's name. *Id.*

4

0099

Next, on January 20, 2010, Mr. Lessman posted a blog entitled "QVC's Hair, Skin and Nails ... Over 99% Additives!" Lessman Decl., Ex. G. Before posting the blog, Defendants ordered QVC's Hair, Skin & Nails product and weighed the tablet; it weighed 1480 mg. Lessman Decl. ¶ 31; *id.*, Ex. H. Defendants also determined from the product label that the four claimed active ingredients – *i.e.*, the ingredients providing the "three dimensions of support" – weigh 14.6 mg, or less than 1% of the tablet's weight. *Id.* ¶ 31. QVC's product contains 15 other ingredients that QVC did not disclose on television or on its website. The weight of these added ingredients comprise over 99% of the tablet's weight. *Id.*

Mr. Lessman then discussed the product's four active ingredients, including HA and lutein, to explain why he specifically chose to exclude those two "dimensions" from his product. *Id.*, Ex. G. Mr. Lessman stated that he "has never used" HA in his products because "there is no science that shows [HA] offers any benefits when taken orally," and because of a potential risk associated with HA. *Id.* Specifically, he stated that although "HA does not necessarily 'cause' cancer," there is a "significant body of troubling research that connects it to cancer." *Id.* With respect to lutein, Mr. Lessman observed that although it has some "ability to absorb harmful radiation," QVC's "formula provides only 0.6 mg, which is likely far below the levels required for this benefit to the skin." *Id.* He also explained that "[l]utein will NOT improve the growth of your hair, skin and nails." *Id.*

Two days later, Mr. Lessman added a post addressing the contents and packaging of QVC's Resveratrex products, as well as the different sources of the compound resveratrol in them. Cohn Decl., Ex. F. Finally, on February 3, 4, and 5, 2010, Mr. Lessman added video posts discussing essentially the same content as his prior written posts.

Plaintiffs responded with this lawsuit and moved for a temporary restraining order and preliminary injunction. In their papers, Plaintiffs mischaracterize the content of the blogs and attribute to Mr. Lessman statements he never made. Because each of Mr. Lessman's actual statements is literally true or a non-actionable opinion, the motion should be denied.

**ARGUMENT**

A preliminary injunction "is 'an extraordinary remedy, which should be granted only in limited circumstances.'" *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted). This is particularly true where, as here, the moving party seeks remedies "that actually forbid speech activities— classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Bailey v. Systems Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir. 1988).

A preliminary injunction may issue only if the Court is "convinced" that the plaintiff has shown that "each" of four factors "favors the requested relief":

> (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007). Here, none of the four factors favors an injunction.

## I.   PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS

Plaintiffs' motion fails because Plaintiffs cannot show a likelihood of success. Plaintiffs seek preliminary injunctive relief under (i) the Lanham Act, 15 U.S.C. § 1125(a), (ii) the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532, and (iii) the Delaware

6

Consumer Fraud Act, 6 Del. C. 2513, 2525.[1]  *See* Op. Br. at 10-11.  Plaintiffs' claim under the Delaware Consumer Fraud Act has no chance of success because, as competitors rather than consumers, Plaintiffs lack standing.  *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993).  Plaintiffs' remaining two claims are subject to the same analysis because "the Deceptive Trade Practices Act affords no greater protection than the Lanham Act."  *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 648, 653 (D. Del. 2006).

To prevail on these claims, Plaintiffs must demonstrate, among other things, that "the defendant has made false or misleading statements as to his own product [or another's]."  *Novartis*, 290 F.3d at 590.  Plaintiffs must show that the statements are either (1) "literally false" or (2) have "the tendency to deceive consumers."  *Novartis*, 290 F.3d at 586.  Either way, Plaintiffs "bear[] the burden of proving that a challenged [statement] is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof."  *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F. 2d 222, 228 (3d Cir. 1990).  Because Plaintiffs cannot carry this burden, their request for injunctive relief should be denied.

### A.    Mr. Lessman's Statements Were Not Literally False

A "literally false" message may be "either explicit or conveyed by necessary implication," but, in all cases, "only an *unambiguous* message can be literally false."  *Novartis*, 290 F.3d at 587.  Literal falsity must be discerned from a "facial analysis" of the statement, *id.*, reading it "in full context," *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993).  Although a "completely unsubstantiated" statement is *per se* false, the plaintiff retains the burden

---

[1]    Plaintiffs' Complaint also alleges two Delaware common law counts (false advertising and unfair competition), D.I. 1, Complaint ¶¶ 62-66, 80-83, but Plaintiffs do not move for injunctive relief under those counts.  At any rate, those common law claims parallel the statutory claims.  *Accu Personnel v. Accustaff, Inc.*, 846 F. Supp. 1191, 1215-16 (D. Del. 1994).

7

to show literal falsity so long as a defendant has "some semblance of support" for his claims. *Novartis*, 290 F.3d at 589-90.

As explained below, Plaintiffs cannot show that Mr. Lessman's statements were literally false. Indeed, Plaintiffs do not even challenge Mr. Lessman's principal points, including that the "four active ingredients" in QVC's Hair, Skin & Nails product comprise only "about 1%" of the weight of the tablet. *See* Lessman Decl., Ex. G. Instead, Plaintiffs pluck words out of context, misconstrue them, and attribute to Mr. Lessman statements he never made. Read in full, Mr. Lessman's comments are all literally true or non-actionable statements of opinion.

### 1. Statements About QVC's Hair, Skin & Nails

#### a. 99% Additives

Plaintiffs' papers hardly dispute Mr. Lessman's statement that QVC's Hair, Skin & Nails product is "99% additives." *See* Op. Br. 5. Nor could they. The "weight of [a Hair, Skin & Nails tablet] is 1480 mg," and the four ingredients that QVC promoted as supporting the hair, skin, and nails total 14.6 mg. Lessman Decl., Ex. G. His statement thus reflected the unassailable mathematical conclusion that the other added ingredients constitute 99% of the product. *See id.*; Op. Br., Yoegel Decl., Ex. C, at 4 (transcript of Mr. Lessman's video statement that "[i]t's 99% additives because the four ingredients [QVC] tell[s] us are their active ingredients weigh less than 15 milligrams, the tablet weighs almost 1500 milligrams.").

During their deposition of Mr. Lessman, Plaintiffs for the first time suggested that ingredients other than the four active ingredients provide some health benefit and, for that reason, are not additives. *See* Cohn Decl., Ex. N (Deposition of Andrew Lessman, at 61 (Apr. 23, 2010) ("Lessman Dep."). Not only is this argument waived, *see Teleconference Systems v. Proctor & Gamble Pharm., Inc.*, 676 F. Supp. 2d 321, 331 n.13 (D. Del. 2009), but it cannot be squared with QVC's promotion of its product. QVC repeatedly marketed Hair, Skin &

Nails as delivering just four ingredients for hair, skin, and nails. Cohn Decl., Ex. B (show transcript). These four ingredients make up the so-called "three dimensions of support." *Id.* Likewise, QVC's website formerly provided a "Supplement Facts" panel that describes only these four ingredients, and nowhere discloses the other ingredients. Cohn Decl., Ex. G. (QVC now provides no Supplement Facts panel at all for the product on its website.) And the actual QVC Hair, Skin & Nails label lists only the four ingredients in bright red under the Supplement Facts panel, disclosing their weight, while listing all other ingredients only in small black print without their respective weights. *Id.*, Ex. H. QVC has not promoted the other ingredients, such as Calcium Carbonate and Dicalcium Phosphate, as delivering any benefits for hair, skin, and nails.

### b.    Hyaluronic Acid

Plaintiffs accuse Mr. Lessman of claiming that HA "is a carcinogen." Op. Br. at 4; *see also id.* at 1, 12. But Mr. Lessman made no such statement. To the contrary, Mr. Lessman said that HA "does not necessarily 'cause' cancer, since it occurs naturally in the body." Lessman Decl., Ex. G. There is, however, "a significant body of troubling research that connects HA to cancer." *Id.* Ultimately, Mr. Lessman stated that Plaintiffs' product contains only 1 mg of HA, an "ultra-low level," so low that it is "all but meaningless" and "likely poses no risk." *Id.*

Mr. Lessman's statements are true. As Professor Nicolosi explains in his accompanying declaration, Mr. Lessman's comments accurately describe the current scientific literature on HA. *See* Nicolosi Decl. ¶¶ 11-13. Before posting the statements, ProCaps's research staff and Mr. Lessman confirmed that a large body of scientific literature shows that HA is related to the growth and spread of cancer. Lessman Decl. ¶ 33; *id.*, Ex. I (emails). Following is just a small sample of the literature they reviewed, which amply substantiates Mr. Lessman's statement:

9

0104

- "This volume attempts to bring attention to the critical role of HA in cancer biology, in its initiation, progression, and spread." Robert Stern, Hyaluronan in Cancer Biology, xix (2009) (Lessman Decl., Ex. K).

- "HA has been associated with aberrant cell behavior in cancer development and progression." Patel, et al. *The Role of Hyaluronan in Cancer*, in Chemistry and Biology of Hyaluronan, 285 (Garg & Hales eds. 2004) (Lessman Decl., Ex. L).

- "[HA] and its biosynthetic enzymes, HA synthases (HAS1, 2, and 3) are thought to participate in cancer progression. . . . [A]ddition of exogenous HA restored invasion [of the extracellular matrix by colon carcinoma cells]." Kim, et al., *Hyaluronan Facilitates Invasion of Colon Carcinoma Cells* in Vitro *via Interaction with CD44*, Cancer Research 64, 4569 (July 1, 2004) (Lessman Decl., Ex. J, at YV_PI_29).

- "Adhesion [of cancer cells] to the ECM [extracellular matrix] is a prerequisite to" the "process of metastasis." . . . Scientific "[r]eports suggest that HA may play a critical role in facilitating cellular adhesion necessary for metastasis in some tumors." Laurich, et al., *Hyaluronan Mediates Adhesion of Metastatic Colon Carcinoma Cells*, J. of Surgical Research, 122, 70-74 (2004) (Lessman Decl., Ex. J, at YV_PI_38).

- "A [HA]-rich environment often correlates with tumor progression, and may be one mechanism for the invasive behavior of malignancies." Shuster, et al., *Hyaluronidase Reduces Human Breast Cancer Xenografts in SCID Mice*, Int. J. Cancer, 102, 192-97 (2002) (finding that the increases in the enzyme that degrades HA (*i.e.*, hyaluronidase) may reduce tumor growth) (Lessman Decl., Ex. J, at YV_PI_50).

HA's relationship with cancer is such a fundamental principle of cellular biology that a 468-page book was recently published entitled "Hyaluronan in Cancer Biology." Lessman Decl. ¶ 34; *id.*, Ex L. When Mr. Lessman entered the words "cancer" and "hyaluronic acid" into the online database (PubMed) maintained by the U.S. National Library of Medicine and the National Institutes of Health, more than 2,100 citations were returned. Lessman Decl. ¶ 34. Indeed, HA's association with cancer is noted in such common sources as Wikipedia. *See id.*; *id.*, Ex. M.

Not only was Mr. Lessman's statement true, it was a necessary response to QVC's deceptive promotion of its Hair, Skin & Nails product. QVC claimed that HA provided an additional "dimension" of support that Mr. Lessman's product lacked. Cohn Decl., Ex. B. And QVC falsely invoked a non-existent "certification" by claiming that USP certified its product as

safe, while saying nothing about the research connecting HA to cancer. *Id.* Against that backdrop, Mr. Lessman's statement fairly responded and also defended his product.

During their deposition of Mr. Lessman, Plaintiffs probed whether the scientific literature specifically addressed the relationship between cancer and HA delivered orally, as opposed to HA delivered through other routes (like injection) or naturally occurring in the body. Cohn Decl., Ex. N (Lessman Dep. at 32). If Plaintiffs raise such a distinction in their reply brief, it would be meritless. The research demonstrates that HA generally promotes the growth and spread of cancer because of its presence and role in the "extracellular matrix." Nicolosi Decl. ¶ 12.[2] QVC claims that the HA in its product "is all about the extracellular matrix." Cohn Decl., Ex. B (show transcript); *see also id.* ("this is obviously coming on the cellular level"); *id.* ("[HA] is all about making sure that a structural support is given to you in the extra extracellular matrix of the cells themselves."). If QVC is correct that its product delivers HA to the extracellular matrix, then the significant body of research that Mr. Lessman identified cannot be ignored. Moreover, as Mr. Lessman stated in his blog, the science does not show HA to be beneficial when delivered orally, Nicolosi ¶¶ 9-10, which might explain why the research on HA and cancer does not focus on oral delivery. In any event, Mr. Lessman made clear that QVC's product contains only a miniscule amount of HA (1 mg) and thus "likely poses no risk." Lessman Decl., Ex. G.

---

[2]     *See also, e.g.* Kim, et al., *Hyaluronan Facilitates Invasion of Colon Carcinoma Cells* in Vitro *via Interaction with CD44*, Cancer Research 64, 4569 (July 1, 2004) (Lessman Decl., Ex. K, at YV_PI_29) ("pericellular HA is critical for" colon cancer cells' "invasion of the extracellular matrix"); Laurich, et al., *Hyaluronan Mediates Adhesion of Metastatic Colon Carcinoma Cells*, J. of Surgical Research, 122, 70-74 (2004) (Lessman Decl., Ex. K, at YV_PI_37) ("pericellular HA mediates adhesion to the ECM"); Shuster, et al., *Hyaluronidase Reduces Human Breast Cancer Xenografts in SCID Mice*, Int. J. Cancer, 102, 192-97 (2002) (Lessman Decl., Ex. K, at YV_PI_50) ("Hyaluronan . . . is prominent in the extracellular matrix surrounding cancer cells . . . Hyaluronan promotes growth and spread of tumor cells.").

11

Plaintiffs also implied that they may argue that certain scientific studies suggest that HA can play a beneficial role in reducing tumor growth. *See* Cohn Decl., Ex. N (Lessman Dep. at 19-20). As an initial matter, Plaintiffs have never before suggested that HA reduces the risk of cancer, even though they readily have made cancer-risk reduction claims for other products. *See, e.g.*, Cohn Decl., Ex. I (Vitamin D promotion). This is not surprising, because the studies suggesting that HA can play a beneficial role are limited and the exceptions to the norm. *See* Nicolosi Decl. ¶ 11 n.7; Lessman Decl., Ex. J, at YV_PI_1-2 (Adamia, et al., *Hyaluronan and Hyaluronan Synthases: Potential Therapeutic Targets in Cancer*, Current Drug Targets, 2005, 5:3-14 (noting such studies but concluding that HA, "a core component of [the extracellular matrix], contributes to certain types of cancer development"). In any event, the existence of some isolated and explainable exceptions is expected in the biological sciences and does not negate the substantial body of science supporting Mr. Lessman's statement. Plaintiffs can present their own view of the scientific literature, but they should not be awarded an injunction silencing Defendants.

Plaintiffs also dispute Mr. Lessman's statement that "there is no science that shows HA offers any benefit when taken orally." Compl. ¶ 27(d); Op. Br., Davis Decl. ¶ 9. But Plaintiffs' declarant relies on a single, very small pilot study, which, in fact, concluded that any reduction in joint pain experienced by people taking HA orally was *not* statistically distinguishable from the effect of a placebo. *See* Nicolosi Decl. ¶ 9. Thus, plaintiffs cannot carry their burden.

### c.    Lutein

Plaintiffs take issue with Mr. Lessman's comments regarding lutein. Plaintiffs do not, however, dispute that the 0.6 mg of lutein is likely insufficient to impart any benefit. Nor do they dispute that lutein will not improve hair, skin, or nail growth. Instead, Plaintiffs' argue that

12

Mr. Lessman "falsely *attribute[d]* to QVC a claim it has not made, namely that lutein will improve growth of hair, skin, and nails." Op. Br. at 5; *see also id.* at 14; *id.*, Davis Decl. ¶ 12.

This argument is meritless. As an initial matter, Mr. Lessman did not "attribute" anything to QVC except the inclusion of an ingredient in its hair, skin, and nails product that does nothing to promote the growth of hair, skin, and nails. In any event, Plaintiffs' argument ignores how QVC has marketed the product. During its broadcasts, QVC repeatedly claimed that lutein provides one of the "three dimensions" of support for hair, skin, and nails. Cohn Decl., Ex. B; *see also id.*, Ex. C (QVC graphic claiming "three layers of protection"); *id.*, Ex. G (product label). Given Plaintiffs' marketing, Mr. Lessman had every right to inform consumers that "Lutein will NOT improve the growth of your hair, skin and nails." Lessman Decl., Ex. G.

### d.    Silica

Mr. Lessman's statements regarding silica—an ingredient that is in both his product and Plaintiffs' product—were also literally true. Mr. Lessman wrote:

> **Silica (from Silicon Dioxide).** We are all familiar with the more common names for Silica: Sand or Glass. **Silica** is the oxide form of the mineral **Silicon**, but it is not the ideal form, since it is virtually insoluble (think of glass or sand). We also use Silica in our **Healthy Hair Skin & Nails**, but because we recognize its solubility limitations, we include our Soluble Organic Silica.

*See* Lessman Decl., Ex. G (emphasis in original). Mr. Lessman also noted, in response to a comment on the blog, that although silica is not "totally insoluble," it "possesses very limited solubility." Op. Br., Yoegel Decl. Ex. A, at 13-14.[3]

As Professor Nicolosi explains, these statements accurately describe the properties of silica, which is the molecule in sand and glass and which is known to be virtually insoluble. *See* Nicolosi Decl. ¶ 16; *see also* Webster's New World Dictionary at 691 (1966) (Silica: "the

---

[3]    For this reason, Mr. Lessman explained, Soluble Organic Silicon is added to ProCaps products "to insure that even those with absorptive challenges and/or limited Silicon in their diets will be assured of getting the small amounts of Silicon we all need." Lessman Decl., Ex. G.

13

dioxide of silicon, SiO$_2$, a hard, glassy mineral found in a variety of forms, as quartz, sand, etc."); Webster II New Riverside University Dictionary at 1084 (1984) (Silica: "occurring as . . . sand . . . and used to make glass and concrete").

Moreover, contrary to Plaintiffs' claim, Compl. ¶ 27(i)-(k), Mr. Lessman did not "false[ly] imply superiority" of "the silica ProCaps uses" over the silica in Plaintiffs' products. Mr. Lessman's point was simply that one of the four "active" ingredients in Plaintiffs' product is known to have significant solubility problems, which he admits occur in his products as well. Critically, Plaintiffs do not dispute Mr. Lessman's statement that silica has limited solubility. Although Plaintiffs assert that they use a form of silica "structur[ally] engineered to maximize absorption," *Id.* ¶ 27(j), they do not contend that, even as "maximized," the absorption is anything but limited. Nor could they. *See* Nicolosi Decl. ¶ 16.

### e.     Artificial Colors

Plaintiffs accuse Mr. Lessman of falsely suggesting that the artificial colors in QVC's Hair, Skin & Nails are "dangerous or unwholesome." *See* Op. Br. at 5, 13. Mr. Lessman made no such statement. Rather, he simply pointed out the undisputed fact that among the product's many additives are two artificial colors, and that QVC fails to disclose these artificial colors on its website. Lessman Decl., Ex. G. Because of this omission, "QVC prevents you from knowing what's in this product until you get it home." *Id.*; *see also* Nicolosi ¶¶ 3, 8. This matters because many consumers seek to avoid artificial colors, *see* Nicolosi ¶ 8, as QVC itself has recognized, trumpeting its joint supplement as being free of artificial colors, *see* Cohn Decl., Ex. J.

### f.     Capsules and Tablets

Plaintiffs also allege that Mr. Lessman falsely implied that tablets are inferior to capsules. *See* Op. Br. at 5, 8, 13. Although Mr. Lessman did not compare tablets to capsules on the blogs about which Plaintiffs complain, he has expressed his preference for capsules in other video and

14

0109

television appearances. Mr. Lessman's preference is a non-actionable statement of opinion. *See Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661, 679 (D. Del. 2008). Moreover, many consumers share his preference, either because they find capsules easier to swallow or digest, or because capsules are less likely to contain "a matrix of processing aids and excipients," Compl. ¶ 27 (f); *see* Cohn Decl., Exs. A, K (consumer comments); Nicolosi Decl. ¶ 8.

### 2.   Statements About QVC's Reservatrex Products

Plaintiffs' claims regarding QVC's Resveratrex products likewise distort Mr. Lessman's actual statements, all of which are literally true.

### a.   "Healthy Heart Blend"

Plaintiffs accuse Mr. Lessman of claiming that the "Healthy Heart Blend" of botanical ingredients included in their Resveratrex product is "'meaningless' and lacking efficacy." Op. Br. at 13. But Mr. Lessman did not say that. Instead, he simply criticized how QVC presents the *list* of botanicals on the Resveratrex product labels. *See* Cohn Decl., Ex. F ("an all but meaningless *list* of seven different botanicals") (emphasis added). Neither label provides the amount or standardization[4] of the many different ingredients within the "Healthy Heart Blend." *Id.*, Ex. L (product labels). Consequently, as Mr. Lessman wrote: "You have NO idea how much you get of each of the seven ... none at all. In short, you know nothing about the quantity, quality, standards, or nature of any of this Healthy Heart Blend." Cohn Decl., Ex. F. QVC has not disputed this statement, which is undeniably true. *See* Nicolosi Decl. ¶¶ 23-26.

### b.   Sugar in Resveratrex Drink

Next, Plaintiffs argue that Mr. Lessman falsely implied that the Resveratrex drink is "artificially sweetened." Op. Br. at 7, 13. Mr. Lessman said no such thing. Rather, he observed

---

[4]   "Standardization" refers to the concentration of a desired beneficial compound within a botanical ingredient. Thus, 200 mg of a botanical with a 50% standardization for a compound of interest delivers 100 mg of that desired compound.

15

that the drink contains "sugar" from grape concentrate—a natural, not artificial, sweetener. Cohn Decl., Ex. F. Mr. Lessman's point was that "<u>Sugar</u> [is] the dominant ingredient in the Healthy Heart Blend" in the Resveratrex drink. *Id.* As Mr. Lessman remarked, "four grams of sugars" is a *lot* for a vitamin supplement. *Id.*; *see also* Nicolosi Decl. ¶¶ 5, 27-28. Further, the amount of sugar and its source—grape concentrate added to the so-called "Healthy Heart Blend"—may come as a surprise to consumers. [5] Nicolosi Decl. ¶¶ 5, 27. Plaintiffs do not dispute the truth of Mr. Lessman's actual statements.

### c.    Grape-Base of Resveratrex

Plaintiffs claim that Mr. Lessman falsely stated that Resveratrex is not "grape-based" or "of the vine." Op. Br. at 13. Mr. Lessman stated precisely the opposite, by acknowledging that Resveratrex contains "Grape Concentrate," "grape extract[,] and Muscadine grape seed extract." Cohn Decl., Ex. F. Mr. Lessman's point was that the grape in the Resveratrex products is not their principal source of resveratrol. *See id.* ("most of the Resveratrol comes from Polygonum Cuspidatum"); *id.* ("the primary source of Resveratrol in this product is NOT Red Wine or even Grapes"). Plaintiffs' papers confirm that Mr. Lessman's statements are true. *See* Op. Br. at 8 (noting that "Polygonum Cuspidatum [is] the principal source of Resveratrol in Resveratrex").

### d.    Added Colors

Plaintiffs argue that Mr. Lessman falsely asserted that the carmine coloring of the Resveratrex tablet is "artificial or unwholesome." This, too, is incorrect. Mr. Lessman explicitly stated that "the Artificial Colors that were present in this product have apparently now been removed and it is [now] colored with Caramel and Carmine." Cohn Decl., Ex F. Mr. Lessman

---

[5]    Plaintiffs are thus incorrect when they assert that Mr. Lessman admitted not knowing the source of the sugar in Plaintiffs' product. *See* Op. Br. at 15. He identified the source precisely.

16

did not claim that these natural coloring additives have any detrimental health effects (though they might, *see* Nicolosi Decl. ¶ 24).

### 3.    Opinion Statements About QVC's Dietary Supplements

The remainder of Mr. Lessman's statements challenged by Plaintiffs are simply opinions and therefore not actionable.  The Lanham Act and Delaware law prohibit only "statements of fact capable of being proven false." *Parker*, 530 F. Supp. 2d at 679; *see Castrol Inc.*, 987 F.2d at 945.  The law does not reach "personal opinions on nonverifiable matters." *Parker*, 530 F. Supp. 2d at 679.  These include statements the accuracy of which depends on customers' subjective evaluations. *E.g., Procter & Gamble Co. v. Kimberly-Clark Corp.*, 569 F. Supp. 2d 796, 800-02 (E.D. Wisc. 2008) (rejecting attack on Huggies Diapers' claim to "fit more naturally" because it was "an assertion whose truth depends solely on customer opinion"); *see also Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 498-99 (5th Cir. 2000) (rejecting attack on Papa John's Pizza's claim to have "Better Ingredients, Better Pizza").

Plaintiffs attack Mr. Lessman as having claimed that their products are "inferior," of "poor" and "questionable quality," Op. Br. at 1, 5, 13, and a "terrible imitation," Compl. ¶ 27(a).[6] Plaintiffs likewise claim that Mr. Lessman falsely described their Resveratrex products as "sad," "disturbing," "heart-breaking," Op. Br. at 8, and "disappointing," Compl. ¶ 43(b).  These are all quintessential opinion statements, akin to "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Pizza Hut, Inc.*, 227 F.3d at 497; *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007) (same).

---

[6]    Although Plaintiffs' attack Mr. Lessman's statement that the "Q in QVC ... stand[s] for Questionable," *e.g.*, Op. Br. at 1, this is simply opinion, irony, and satire, not the stuff of liability.

17

Finally, Plaintiffs distort Mr. Lessman's words in claiming he stated that QVC's products are "unhealthy," Op. Br. 1, 5, 13. He did not use that word. The title of Mr. Lessman's first responsive blog posting was "QVC's Hair Skin and Nails isn't Healthy…it is just sleazy and deceptive," but that plainly refers to QVC's appropriating the word "Healthy" from his product's name—*Healthy* Hair, Skin & Nails—and does not comment on the healthfulness of QVC's product. In any event, as discussed above, after acknowledging that 3 mg of biotin is "a great start," Mr. Lessman's account of the remaining active ingredients and additives are all true. Lessman Decl., Ex. G.

### 4.   Third-Party Comments

Plaintiffs separately seek to hold Defendants liable for comments posted by third-parties. *See* Op. Br. at 5-7, 10. This claim is foreclosed by the Communications Decency Act ("CDA"), which states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 42 U.S.C. § 230(c)(1). This safe harbor "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions— such as whether to publish, withdraw, postpone, or alter content.'" *Dimeo v. Max*, 433 F. Supp. 2d 523, 528 (E.D. Pa. 2006) (quoting *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003)). Additionally, CDA immunity preempts state law claims. *See* 42 U.S.C. § 230(e)(3); *id.* § 230(b)(2); *see also Green*, 318 F.3d at 471; *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 626 (D. Del. 2007).

CDA immunity applies when: (1) the defendant is a provider or user of an "interactive computer service," which is any "system, or access software provider that provides or enables computer access by multiple users to a computer server," 42 U.S.C. § 230(f)(2); (2) the claims

18

treat the defendant as a publisher or speaker of information; and (3) the challenged communication was provided by another content provider. *Dimeo*, 433 F. Supp. 2d at 529. Each element is met here. First, Mr. Lessman's blog is both a "provider" of "interactive computer services," because it enables readers to access a computer server that hosts the blog, and also a "user" of "interactive computer services," because it uses an internet service provider, XO Communications, to access the Internet. *See* Lessman Decl. ¶ 27; *see Dimeo*, 433 F. Supp. 2d at 529 (website is both a provider and user of interactive computer service under the CDA). Second and third, Plaintiffs seek to hold Defendants liable for failing to edit or delete comments made by third parties. *See Dimeo*, 433 F. Supp. 2d at 530 (finding website entitled to immunity).

Courts have repeatedly held that a website operator is not responsible for third-party posts. *See, e.g., Green*, 318 F.3d at 471; *Carafano v. Metrosplash.com, Inc.*, 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002), *aff'd*, 339 F.3d 1119 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co. v. AOL*, 206 F.3d 980, 985 (10th Cir. 2000); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-53 (D.D.C. 1998). Thus, the CDA forecloses liability under each of Plaintiffs' claims.[7]

Moreover, even if Defendants could be liable for third-party comments, Plaintiffs' claims would still fail because the comments are non-actionable statements of opinion. Contrary to Plaintiffs' suggestion (Op. Br. 5), none of the comments states that QVC's Hair, Skin & Nails is

---

[7]   Plaintiffs also argue half-heartedly that Mr. Lessman's blog "violates FTC regulations by failing to disclose the terms of defendants' relationship with HSN." Op. Br. at 16. This argument fails because "there is no private right of action under the FTCA, 'which vests initial remedial power solely in the Federal Trade Commission.'" *Diessner v. Mortgage Elec. Registration Sys.*, 618 F. Supp. 2d 1184, 1191 (D. Ariz. 2009); *see also Sandoz*, 902 F.2d at 231 (declining to read a private right of action to enforce FTC and FDA statutes and regulations into the Lanham Act). Nor, in any event, do the FTC guidelines provide any support for Plaintiffs' claims. *See* 16 C.F.R. §§ 255.5, 255.3(b) (addressing failure to disclose endorsement or expert testimonials, neither of which HSN provides on Mr. Lessman's blog).

19

"a carcinogen." *See* Yoegel Decl. Ex. A. Rather, the comments reflect readers' own generalized opinions, such as "QVC Natures Code is a joke." *Id.*; *see also Parker*, 530 F. Supp. 2d at 679.

### B.    Mr. Lessman's Statement Were Not Misleading

Because Plaintiffs cannot show that Mr. Lessman's statements were literally false, Plaintiffs can succeed only by showing that the statements were misleading. *Novartis*, 290 F.3d at 586. However, a statement "that is truthful on its face cannot be proven misleading" by reference to extrinsic evidence, like "surveying customers." *Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*, -- F. Supp. 2d --, 2010 WL 1348241, at *8 (D. Del. Apr. 6, 2010). As demonstrated above, each of Mr. Lessman's statements is "truthful on its face" or non-actionable opinion.

In any event, Plaintiffs must show "actual deception or at least a tendency to deceive a substantial portion of the intended audience." *Novartis*, 290 F.3d at 590. To do this, Plaintiffs cannot rest on their subjective belief that customer confusion will result, but must adduce evidence "to establish the reasonableness of the belief." *Warner-Lambert*, 204 F.3d at 96. Customer-confusion claims "usually turn[] on the persuasiveness of a consumer survey." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994); *Sandoz*, 902 F.2d at 229 (plaintiff "*must* produce consumer surveys or some surrogate therefore") (emphasis added). Absent a consumer survey, the plaintiff must proffer some acceptable surrogate such as market-share data. *Novartis*, 290 F.3d at 595-96; *Sandoz*, 902 F.2d at 229.

Plaintiffs have not presented a single consumer survey or any market-share data. Instead, Plaintiffs claim that a few customer comments, which Plaintiffs cherry-picked from Mr. Lessman's blog and QVC's website, suggest actual confusion. *See* Op. Br. at 6; *id.*, Yoegel Decl. Exs. A & B. But such scant and selective evidence is not enough. *See, e.g., Regscan, Inc. v. Dean Mark Brewer*, 2006 WL 4100007, at *5 (E.D. Pa. Sept. 5, 2006) (dismissing claim

20

where "plaintiff failed to submit any consumer survey or other such evidence necessary to prove actual deception"); *Minn. Mining & Mfg. Co. v. Dentsply, Int'l, Inc.*, 1994 WL 827735, at *4 (D. Del. Nov. 1, 1994) (holding that inquiries from public regarding representations are not proof of confusion among the target audience of consumers); *John P. Prods., Inc. v. CBS, Inc.*, 10 F. Supp. 2d 395, 397-98 (S.D.N.Y. 1998) (affidavits of three concert attendees out of 3800 did not support summary judgment); *see also, e.g., Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 710 (M.D. Pa. 2006) ("A single incident of customer confusion is not sufficient to establish a Lanham Act claim.").[8]

Moreover, Plaintiffs do not dispute many of Mr. Lessman's principal critiques, including that the four active ingredients in Hair, Skin & Nails comprise only 1% of the product and that QVC failed to disclose on its website and on television the 15 ingredients comprising 99% of the product. The negative comments from consumer may reflect nothing more than agreement with Mr. Lessman on these undisputed points. The comments may also reflect a negative view of QVC's products that pre-dates Mr. Lessman's blog postings. *See* Cohn Decl., Ex. K, at 5-7 (comments on QVC's website); *see also id.*, Ex. M (comments on Mr. Lessman's blog). Plaintiffs have not shown that Mr. Lessman misled consumers.

### C.   Plaintiffs Are Unlikely to Prevail Because of Their Own Unclean Hands

Even if Plaintiffs could show that Mr. Lessman's statements were literally false or misleading, Plaintiffs' claims would still fail because their misconduct bars recovery. Plaintiffs'

---

[8]   Plaintiffs also invoke "a presumption of likelihood of confusion" on the ground that Defendants "deliberately" misled consumers. Op. Br. 19. The Third Circuit has not adopted this presumption. *See Johnson & Johnson*, 19 F.3d at 130-32 (reserving the issue). In any event, Plaintiffs cannot support it. Defendants carefully avoided critiquing QVC for years even while commenting on other brands, and changed course only after QVC began promoting its product under Defendants' name and with unfair and misleading claims. Lessman Decl. ¶¶ 22-24. At that point, Defendants had no choice but to clarify the products' identities and attributes; Defendants' intent was simply to tell the truth and to inform consumers.

21

motion arises in equity and "concerns the public interest as well as the private interest of litigants." *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972). Accordingly, the unclean hands doctrine has "significant proportions" in this case. *Id.* Plaintiffs have engaged in numerous unfair and deceptive tactics to promote their competing supplements. Most notably, Plaintiffs misappropriated the name of Defendants' product. *See supra* 2-4; Lessman Decl. ¶¶ 15-18. In addition, Plaintiffs claimed that their products are USP certified for safety and efficacy. As Plaintiffs have already admitted, this claim is false. *See* D.I. 25, Reply to Counterclaims, ¶¶ 34-38. Finally, Plaintiffs failed to disclose, on their website and on television, the 15 ingredients that make up 99% of the weight of their Hair, Skin & Nails product, and Plaintiffs never disclosed the voluminous research connecting HA to cancer, instead claiming falsely that USP certified the product as safe. Plaintiffs' unclean hands bar their claims.

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY

In any event, Plaintiffs' request for injunctive relief must be denied because they have not demonstrated irreparable injury. Plaintiffs assert a loss of market share and reputational harm, *see* Op. Br. at 17-20, and baldly allege that consumers are returning products and refusing to make additional purchases because of Mr. Lessman's blogs. Op. Br. at 18. But Plaintiffs fail to proffer any supporting data on product sales or returns.

Instead, Plaintiffs point again to the same handful of customer statements posted on Mr. Lessman's blog—the vast majority of which simply express a preference for ProCaps' products. *See, e.g.*, Op. Br. at 6 ("Your loyal HSN customers LOVE you and are very angry & disappointed at QVC for going so low in trying to make vitamin and supplement sales."); Yoegel Decl. Ex. A. Plaintiffs' also point to a few comments submitted to QVC directly, *see* Yoegel Decl. Ex. B, but only one obliquely suggests that the author will not purchase QVC's products again, whereas the other comments suggest that the authors never were QVC customers. *Id.*

22

At any rate, apart from counsel's *ipse dixit*, Plaintiffs make no showing that any alleged lost sales are not fully compensable through money damages. Although "loss of market share can constitute irreparable harm," "a preliminary injunction should not be granted if the injury suffered by the moving party can be recouped in monetary damages." *IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 Fed. Appx. 476, 479 (3d Cir. 2007); *see also Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994); *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988) (loss of sales is not irreparable injury). Visits to the disputed blogs have become infrequent at best with most receiving just a few dozen visits for the entire month of April. That number includes visits by people working on this litigation, such that, very few consumers are still reading the blogs in question. Lessman Decl. ¶ 29. Any loss of sales going forward would be marginal and easily compensated. Injunctive relief is not necessary.

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Because Plaintiffs are unlikely to prevail on the merits and have not demonstrated irreparable injury, the Court need not address the final two factors:  the balance of harms to Plaintiffs and Defendants, and the public interest. *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 642 F. Supp. 2d 304, 309 (D. Del. 2009). Nevertheless, these factors also independently compel a denial of an injunction.

The balance of harms is clear. The requested injunction would restrain Defendants from speaking out against Plaintiffs' misconduct and providing consumers with valuable and important health information. To this day, Plaintiffs' website contains no complete list of ingredients and continues to host a video promoting their product as *"Healthy* Hair, Skin & Nails." Lessman Decl. ¶ 18. And Plaintiffs continue to assert that the HA and lutein in their product offers entire "dimensions" not found in Defendants' product. Likewise, Plaintiffs

23

0118

continue to claim falsely that the HA in their product is "certified" as safe and effective by USP, even though they have admitted in this litigation that USP has not certified the products. *See* D.I. 25, Reply to Counterclaims, ¶¶ 34-38.

Mr. Lessman's statements, shared on his blog, are constitutionally protected speech. *See Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.*, 148 F.3d 242, 247 (3d Cir. 1998). Even to the extent Mr. Lessman's statements are commercial, they still enjoy "First Amendment protect[ions]." *Pernod Ricard*, 2010 WL 1348241, at *8; *In re R. M. J.*, 455 U.S. 191, 203 (1982). Courts should not issue injunctions to preclude defendants from making statements not yet adjudged to be false or misleading, and in no event should an injunction restrict truthful, non-misleading speech. *See Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 619 (3d Cir. 1976). As demonstrated above, *none* of the alleged statements is untruthful or unlawful.

To the contrary, Mr. Lessman's statements serve vital public interests by giving consumers "important information" to "assist[] them in making rational purchase decisions" and in fairly evaluating QVC's deceptively promoted products. *Triangle Publications v. Knight-Ridder Newspapers*, 626 F.2d 1171, 1176 (5th Cir. 1980). As Plaintiffs concede, "'the public has a particularly strong interest in an accurate description of health and medical products.'" Op. Br. at 21. This very reason requires protection of Mr. Lessman's ability to provide valuable information to consumers thereby shining light on QVC's products and deceptive advertising. Plaintiffs' motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction and temporary restraining order.

24

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*
_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Jonathan F. Cohn
Gordon D. Todd
Matthew D. Krueger
SIDLEY AUSTIN LLP
1501 K Street
Washington, DC  20005
(202) 736-8000

James D. Arden
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

May 3, 2010
3526018

25

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2010, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Joseph Grey, Esquire
> Sean T. O'Kelly, Esquire
> CROSS & SIMON, LLC

I further certify that I caused copies of the foregoing document to be served on May 3,

2010, upon the following in the manner indicated:

Joseph Grey, Esquire                                    *VIA ELECTRONIC MAIL*
Sean T. O'Kelly, Esquire
CROSS & SIMON, LLC
913 North Market Street
11th Floor
Wilmington, DE  19801

Jonathan E. Moskin, Esquire                             *VIA ELECTRONIC MAIL*
Britton Payne, Esquire
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY  10016


/s/ *Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)

# EXHIBIT "E"

0122

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 10-094 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF QVC, INC.
## IN FURTHER SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## PRELIMINARY INJUNCTION
## AND EXPEDITED DISCOVERY

Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

I.      PRELIMINARY STATEMENT ......................................................................... 1

II.     ARGUMENT ....................................................................................................... 3

        A. Studies Do Not Establish HA As A Cancer Risk ........................................ 3

        B. In Context, Defendants' 99% Additives Claim Is a False Product Inferiority Claim ..... 6

        C. Studies Do Not Support Lessman's Claims That QVC's Silica is Not Absorbable ....... 8

        D. False Accusations Regarding Lutein ........................................................... 9

        E. Resveratrex Is Not Questionable, Over-sweet, Meaningless or 2/3 Additives ............... 9

        F. Mr. Lessman's Statements Were Deliberately Misleading ........................... 10

        G. The Equities Favor Injunctive Relief ......................................................... 12

0124
NYC_795463.1

## TABLE OF AUTHORITIES

**CASES**                                                                        **Page(s)**

Bracco Diagnostics, Inc. v. Amersham Health, Inc.,
   627 F. Supp. 2d 384 (D.N.J. 2009) ...............................................................................5, 10

Castrol, Inc. v. Pennzoil Co.,
   987 F.2d. 939 (3d Cir. 1993)...........................................................................................12

Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,
   269 F.3d 270 (3d Cir. 2001)..........................................................................................5, 8

Citizens Fin. Group Inc. v. Citizens Nat'l Bank,
   383 F.3d 110 (3d Cir. 2004)...........................................................................................10

Cuisinarts, Inc. v. Robot-Coupe, Int'l.,
   No. 81 Civ. 731 CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) .................................7, 9

Highmark, Inc. v. UPMC Health Plan, Inc.,
   276 F.3d 160 (3d Cir. 2001).......................................................................................2, 5, 8

Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,
   19 F.3d 125 (3d Cir. 1994).............................................................................................12

Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,
   129 F. Supp. 2d 578 (3d Cir. 2002) ..............................................................................9, 12

Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare,
   292 F. Supp. 2d 611 (D.N.J. 2003) ..................................................................................9

Pizza Hut, Inc. v. Papa John's Int'l, Inc.,
   227 F.3d 489 (5th Cir. 2000) ...........................................................................................7

Schering-Plough Healthcare Prods. v. Neutrogena Corp.,
   09-CV-268 (SLR) (D.Del. Apr. 8, 2010)..........................................................................4

Scotts Co. v. United Indus. Corp.,
   315 F.3d 264 (4th Cir. 2002) ..........................................................................................2

Time Warner Cable, Inc. v. DIRECTV, Inc.,
   497 F.3d 144 (2d Cir. 2007)............................................................................................7

iii

## I.   PRELIMINARY STATEMENT

Defendants' opposition to QVC's motion identifies no actual defects in QVC's NATURE'S CODE products rendering them "unhealthy", "bad" "inferior", "low quality", "lacking in quality", "ridiculous", "shocking" "appalling" or "alarming". Indeed, while conceding that the Court must view the subject advertising in context, defendants nowhere address Lessman's repeated assertions of product inferiority and danger that are themselves literally false and give color of meaning to all of his other claims.  Such slanderous statements are not mere harmless "opinion."  Moreover, Lessman's own mischaracterization of the parties' contentious relationship in 1996 (and his more recent efforts to rejoin QVC in 2006–2007 and 2009), has led QVC to review the settlement agreement the parties entered in 1997.  It includes an automatic right to injunctive relief if Lessman violates the contract's "non-disparagement" clause, as he has done. (Supp. Yoegel Decl. ¶ 15.[1])  Although QVC concedes its complaint does not allege breach of contract, the equities plainly favor entry of an injunction now to prevent such disparagements.

Defendants never address the real issue in this case concerning hyaluronic acid ("HA"): namely, whether there was any scientific basis for Mr. Lessman, in his own words, to seek to "alarm" potential purchasers of QVC supplements about a supposed "mechanism between HA and cancer, which should preclude its use in vitamins."  He tried but failed to find proof that ingesting HA is a danger.  The only studies he found concern the body's own natural creation of HA in response to cancer (a mechanism he admits he does not understand) not ingesting HA in vitamins, which is safe.  Indeed, HA is found without alarm in foods we consume, such as chicken soup (Supp. Davis Decl. ¶ 3), and the FDA has approved many uses for adding HA to the human body – by ingestion, injection and absorption.  Entirely ignoring the context of his own statements, which were directed to ordinary consumers of nutritional supplements, not

---

[1] Rather than further breach the confidentiality clauses, QVC will submit a motion to file the settlement under seal.

1

academicians or researchers studying HA in the body apart from a specific ingestible product, Mr. Lessman effectively concedes that the only possible meaning – in context – of the "alarm" he raised was that consumers of the one product in issue should be worried about cancer risks from ingesting the product. Yet, discovery confirms he had doubts, but no evidence (now or when he made the claim), that consumers had reason to fear.

Although there is no evidence (and no issue in the case) that QVC's supplements are actually "bad", "inferior" or "low quality" (much less "unhealthy" or carcinogenic), consumers continue to conclude they are – and refuse to purchase these (and other QVC products) as a result (Supp. Yoegel Decl. ¶¶ 9–14; Payne Decl. ¶¶ 2–8), thus demonstrating the irreparable harm QVC continues to suffer.  Although survey evidence is not required for a preliminary injunction, Scotts Co. v. United Indus. Corp., 315 F.3d 264, 276 (4th Cir. 2002); Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001), there can be no clearer evidence that defendants' statements have a tendency to confuse consumers about the safety and efficacy of QVC's products than the extensive comments of actually deceived consumers that continue to accumulate in substantial numbers, and the increase in net rankings in Google searches tied to the slanderous blog postings. (Payne Decl. ¶¶ 2–8; Supp. Yoegel Decl. ¶¶ 9–14).

Most of defendants' evidence is simply irrelevant – seeking improperly to impose on QVC a burden to prove health claims it has not made and which, at any rate, are not in issue in this case or in this motion.  There is, indeed, no claim that QVC's products in issue have any actual defects.  Given the vast evidence that consumers nonetheless have actually been misled by defendants' to believe QVC's products are inferior and a health risk, the only issue the Court need now decide as to the efficacy of QVC's products is whether defendants had any basis for their criticisms causing the confusion.  Plainly they did not.

2

## II.   ARGUMENT

A. <u>Studies Do Not Establish HA As A Cancer Risk</u>

Although defendants urge the Court to review Lessman's statements <u>in context</u> (Br. at 7) they nowhere attempt to explain what meaning his warnings about cancer risks from HA possibly could have had in the context of blogs written and videotaped for consumers of nutritional supplements. Nor do they confront the actual words he wrote and spoke to inflame his audience's fears, including that "credible research points to a relationship and mechanism between HA and cancer, which should preclude its use <u>in vitamins</u>." Defendants do not explain what this means in a discussion of vitamins other than that <u>consuming</u> HA can cause cancer. Likewise, if not to inflame fears from consuming HA, why else would Lessman say: "I would never take HA, so of course I would never put it in my products"? And only that explains why he states "its research relating to cancer is alarming to me." If not a cancer threat, why would consumers of dietary supplements – such as "Shirley" (Supp. Yoegel Decl. Ex D p.4) – have cause for alarm? Defendants never say. Defendants similarly do not address the statement in Lessman's video blog that:

> I looked at hyaluronic acid back then [30 years ago] and I've been looking at it ever since, and fortunately that's the only thing I did is look because the research was never very convincing in terms of benefits but there's a whole line of research that's very concerning that relates to cancer, and in fact you'll see many places that if you have a history of cancer or anything like that don't take hyaluronic acid. I think regardless, you don't take hyaluronic acid.

In simple English: do not consume HA if you have cancer or even if you don't. If there is any such research that people with or without cancer should not consume HA, defendants have not produced it. Rather, Lessman admitted he is aware of none. (Payne Decl. Ex. L ("Lessman Tr.") at pp. 32, 36, 37, 75). Although he had <u>sought</u> "studies involving oral ingestion", he was left only with "concerns", "since this is all so poorly understood and the only thing that puts my

3

mind at rest is the fact it's not well absorbed." (Payne Decl. Ex M.) Defendants argue otherwise

(Br. at 11), but their purported expert nowhere states that <u>consuming</u> HA is a risk.  Lessman also

admitted he never consulted an expert before or after publishing his tirades (Lessman Tr. pp. 25,

73), so even if the proffered expert, the zoologist Nicolosi, is competent to testify as an

oncologist, much less on any of the other wide ranging topics he covers[2] his views never

informed Lessman at any relevant time and have no weight.[3]  As this court ruled in <u>Schering-</u>

<u>Plough Healthcare Prods</u>. v. <u>Neutrogena Corp</u>., 09-CV-268 (SLR) (D.Del. Apr. 8, 2010), "[t]his

type of unsubstantiated 'scientific' claim is precisely what the Lanham Act seeks to prevent."

Slip op. at 21.  Just as in <u>Schering-Plough,</u> an vivo study of one product (or a later in vitro study

of the product in issue) did not support a "studies establish" claim concerning the product in

issue, Lessman's research (however or whenever conducted) about the body's natural production

of HA (even as a marker for some cancers) does not support his "research establishes" claim as

to the alleged mechanism linking cancer to consuming HA in vitamins.

Discovery has also shown the falsity of Mr. Lessman's blog that he had been closely

monitoring HA for thirty years, so as to spread his cancer fears with the authority of an expert.

Mr. Lessman admits he has no such expertise and, in his own words at most "vaguely

remember[ed]" some such research when, on January 17 he began composing his screed against

QVC. (Payne Decl. Ex M.)  Instead, he raised the alarm about consuming HA even though he

---

[2] Without explaining any qualifications, he offers opinions on the following: (i) Mr. Lessman's blog commentary is "important" and "serve[s] the public interest" (¶ 2); (ii) QVC's presentations of its products are misleading (id); (iii) consumers will be misled by QVC's statements of James Rouse's qualifications as a naturopath (¶ 6), which is ironic given his own lack of qualifications as an oncologist or other issues on which he opines; (iv) QVC's product name NATURE'S CODE Hair Skin & Nails is the same as PROCAPS Healthy Hair Skin & Nails (¶ 7); (v) Lessman's criticisms raise "important points" about which consumers "should be informed" of the ingredients of a product and consumers have a preference against additives and artificial colors (¶ 8).

[3] Mr. Lessman also admits his two colleagues at ProCaps who did research for him to flesh out his "vague recollection" of having heard something bad about HA and cancer are not experts and has no idea what scientific qualifications they have. (Lessman Tr. pp.72–73)  Mr. Lessman did not even save the research he conducted before publishing his blogs but instead purports only to have recreated the results by performing a similar Yahoo! Search. (Id. at p.5). However, QVC's own efforts to replicate that search do not match his results. (Payne Decl. ¶¶ 15–19).

NYC_795463.1

0129

had no evidence then (or now) that consuming HA is connected in any way to cancer. (Lessman Tr. pp.32, 36, 37, 75.) Indeed, HA is widely found in foods such as chicken soup, and the FDA has approved numerous uses of HA (including as a treatment for pre-cancerous skin lesions) (Supp. Bradley Decl. ¶ 4; Payne Decl. ¶ 11). As Mr. Lessman concedes, the substance has been shown in some studies (which he deliberately ignores) to help fight cancer (Lessman Tr. at pp.20, 46-47). He, of course, did not save that research (Id. at pp.12, 14, 16; supra n. 2.) Even as to the body's natural creation of HA, Mr. Lessman admits he has no reason to believe it causes cancer  (Id. at pp.18–19, 30) and (as with the zoologist, Nicolosi) is unable to confirm the "mechanism" by which HA contributes to cancer (Id. at pp.22–24, 45, 46, 47) much less by which (to use Lessman's own words) potential consumers of QVC's dietary supplements need be "alarmed" about risks from consuming the tablets.

The mere fact that Lessman qualifies his false and unsubstantiated statements with further (albeit also disparaging and false) statements that the quantities of HA in the QVC product are so low as to be "comical" does not make the false statements true.  In similar cases, courts have held that a party making false statements it contends are ameliorated by other truthful statements (such as disclaimers) bears the burden to show that such statements do indeed neutralize the falsity. Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 464 (D.N.J. 2009).   The substantial evidence of actual confusion confirms his audience overlooked Lessman's disclaimers, understanding just what he meant. See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 291 (3d Cir. 2001) (actual confusion highly probative). Accord, Highmark, 276 F.3d at 173. Tellingly, no one has written to express relief that any cancer risk is abated by the small quantities or unabsorbability! If Lessman genuinely believed the cancer risk from consuming HA was neutralized by its unabsorbability or the

5

"comical" amounts in the NATURE'S CODE product, he had no reason to raise the red flag in the first place.

B. In Context, Defendants' 99% Additives Claim Is a False Product Inferiority Claim

Defendants say their 99% additives claim was merely an innocuous "mathematical" calculation. Forgetting their own plea that such statements be read in their full context (Br. at 7) defendants ignore the actual basis for QVC's complaint: that the number itself is inherently meaningless, but what makes it false by necessary implication is the context in which Mr. Lessman joins that meaningless number with the literally false statements that the tablets are "bad" "appalling" "inferior", "shocking" "lacking quality", etc. (terms rarely found in a mathematics text). Lessman offers no support now for those non-mathematical criticisms and does not even pretend to understand the manufacturing process for tablets. (Lessman Tr. pp.49–51, 55–57.) In truth (which defendants do not dispute) there is no magic number for what is the "right" percentage (Supp. Bradley Decl. ¶ 4), and Lessman admits he has no idea what that percentage might be or if there is any ideal tablet size. (Lessman Tr. 55–57, 69–70).

In fact, the QVC product was designed to be well within the optimal ranges for tablet size (Supp. Bradley Decl. ¶ 5), and the quantities of listed active ingredients were selected because the supplement was made to be consumed with (and consistently is promoted to be consumed with) a multivitamin – either NATURES CODE or a third party's – all of which undermine the literally false claims (which defendants do not even attempt to defend) that the product is "unhealthy", "bad" "inferior", "low quality", "shocking" "appalling" "alarming", etc.

If Lessman had simply expressed a "preference" for capsules, as his brief suggests (Br. p.14), QVC likely would have had no ground for complaint. However, his actual statements attack the basic formatting of tablets without any point of reference, making them false by

6

necessary implication. Cuisinarts, Inc. v. Robot-Coupe, Int'l., No. 81 Civ. 731 CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (baseless comparison to a product Cuisinart did not sell false by necessary implication). Accord Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007). This certainly is the conclusion many consumers have reached (Yoegel Ex. A) and continue to draw (Supp. Yoegel Decl. ¶ 9–14).

Time Warner, which found that the statement "settling for cable would be illogical", necessarily and falsely implied in context "that HD picture quality is inferior", also confirms that Mr. Lessman's caustic accusations of inferiority can not be brushed aside as mere puffery or opinion. So too, Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 498–99 (5th Cir. 2000), on which defendants rely, while finding the slogan "Better Ingredients, Better Pizza", standing alone, to be "nonactionable puffery," went on to hold that "the slogan was transformed as a result of its use in connection with a series of ads" involving specific ingredients into a misleading statement of fact. Id. at 500–02. As in Pizza Hut, Lessman has far exceeded expressing mere opinions or preferences; instead mixing insults and specific fictions about specific product attributes into false assertions of product inferiority and health risks.

Lessman's numbers are also inaccurate. In his haste to lash out at QVC, Lessman never tested the composition of the tablet, so even now he has no idea what is its specific makeup. In fact, the percent by weight of the listed dietary ingredients is 2.24% of the total weight of the tablet. (Supp. Bradley Decl. ¶ 2.) And had QVC elected to declare as active ingredients the phosphorus and calcium from calcium carbonate and dicalcium phosphate in the tablet (which it could have) the actual percent by weight would be 71.9%. Many of defendants' products list calcium carbonate, and at least one is comprised almost exclusively of calcium carbonate and calcium phosphate (Payne Decl. ¶ 12; Supp. Bengivenga Decl. ¶ 8.) The larger issue remains the

7

inherently false comparison between tablets and capsules, but the actual weights make clear that throwing at consumers meaningless percentages wrapped in accusations of an "appalling" "lack of quality" can lead to only one conclusion: the confusion that consumers have in fact shown in large numbers. The literally false claims of product inferiority make the 99% additive claim false by necessary implication or misleading. Defendants have not even suggested what other meaning readers can ascribe to the charges. Even if they are deemed simply misleading, the evidence of ongoing actual confusion more than satisfies QVC's burden of proof. Indeed, Lessman nowhere disputes the specific evidence of actual confusion but merely disputes whether the Communications Decency Act relieves him of direct liability for publishing the statements. Actual confusion is of course highly persuasive proof of a tendency to deceive. Checkpoint Sys., Inc., 269 F.3d at 291; Highmark, 276 F.3d at 173.

C. Studies Do Not Support Lessman's Claims That QVC's Silica is Not Absorbable

Although ProCaps promotes the bio-absorbable properties of the silica in its own products (Yoegel Decl. Ex. C), it has done no research to support its assertions that the silica in the NATURE'S CODE product is as inert as glass or sand and offers no evidence to challenge the declaration of Mr. Bradley that the silica is absorbable. Indeed, defendants again fail to address what Mr. Lessman actually said (e.g. "that's glass, that's quartz, that's sand"), admitting only that he referenced "significant solubility issues." (Br. at 14). Moreover, the very premise of the Nicolosi declaration (¶ 16) is the plainly inconsistent position that silicon is inherently unabsorbable but that ProCaps' silicon somehow is. As Mr. Bradley confirms, Perrigo relied on some of the same research now cited by Nicolosi in formulating QVC's product. Because QVC is not challenging ProCaps advertising claims and agrees that micronized silica should be absorbable, whereas ProCaps is challenging QVC's claims, the burden is on defendants to

8

substantiate their contentions and justify having misled consumers to believe that "in a hard tablet form ... the good ingredients will not be as easily absorbed as if they were in a powder form." (Yoegel Decl. Ex. A). They have not done so except by pointing to research that supports the absorbability of QVC's micronized silica.

D. False Accusations Regarding Lutein

Because QVC never claimed that Lutein will improve the growth of your hair skin and nails, Lessman effectively concedes that attributing this statement to QVC (only then to shoot it down) is false. Cuisinarts, 1982 WL 121559. Indeed, although defendants argue they needed to address QVC's advertising slogan of "three dimensions of support," their extensive counterclaims nowhere even challenge this slogan, which also was of no evident concern to Mr. Lessman when he wrote his blog (see Payne Decl. Ex M).

E. Resveratrex Is Not Questionable, Over-sweet, Meaningless or 2/3 Additives

Defendants again fail to assess their actual statements in context – summed up by accusations of "questionable" quality (i.e., literally "doubtful propriety") of a "large red artificially colored tablet", supposedly "two-thirds additives", with meaningless non-standardized ingredients, or an allegedly over-sweetened drink. Other than a misleading comparison between a one ounce serving of Resveratrex and a 12-ounce can Coca-Cola, they do not attempt to justify any of their baseless criticisms. (Supp. Bengivenga Decl. ¶ 9.) Confused consumers readily understand the false message that QVC is selling "poor products" that "can't come close" to ProCaps. (Yoegel Decl. Ex. A pp.27, 31). The misleading comparisons to show product inferiority support a presumption of irreparable harm. Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, 292 F. Supp. 2d 611, 621 (D.N.J. 2003), quoting Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 129 F.

9

Supp. 2d 578, 367 (3d Cir. 2002).

### F. Mr. Lessman's Statements Were Deliberately Misleading

Mr. Lessman admitted at his deposition that his tirade against QVC was meant to neutralize the appearance of superiority created by the addition of HA to QVC's NATURE'S CODE Hair Skin & Nails and retaliate for QVC's supposed theft of his name. (Lessman Tr. pp.42, 45.)   His initial draft of the blog nowhere mentioned cancer, focusing only on the allegation that the HA in QVC's product would be ineffective. (Payne Decl. Ex. M).  He never found the desired proof regarding oral ingestion, and admitted to his staff he only "vaguely remembered" something about HA and cancer.  Although he did not save his research (and only later sought to recreate it in response to the suit) he never consulted an expert before or after rushing to print (Lessman Tr. pp.25, 73) and falsely built himself up as a 30-year expert simply to unfairly diminish QVC by comparison.  Even now, his brief (at p.3) accuses QVC of "unfairly disadvantaging" him by the statements made to promote its NATURE'S CODE Hair Skin & Nails product and that he needed to respond to some unexplained deception in QVC's promotion of its own product, even though Lessman's own counterclaims in this action do not challenge any of the cited statements regarding the active ingredients in QVC's two products in issue.[4]

Rather than honestly challenge anything QVC actually said, or identify any actual flaws in its products, he instead fabricated a claim of trademark infringement (which he continues to misrepresent to this Court) and rushed to accuse QVC publicly without first alerting it that he considered the name "Hair Skin & Nails" to be proprietary.  In truth, until as recently as 2007,

---

[4] Likewise showing a lack of candor, laying aside that QVC disputes it ever claimed to be certified by the US Pharmacopia, that Lessman's blogs make no mention of the alleged certification show this was not his concern at all.  This is simply a claim conceived by his lawyers months later in response to the complaint. (Moreover, even when QVC does make reference in its advertising to its USP compliance, it is to promote the solubility of its products, not their safety.) Even if there were any basis for these charges, the simple fact that QVC has said nothing critical if defendants products defeats any unclean hands defense, which requires exact parity of behavior. Bracco, 627 F. Supp. at 465 n.240 (citing Citizens Fin. Group Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004)).

10

Mr. Lessman called his product PROCAPS Hair Skin & Nails BENEFITS.  The only apparent use of the phrase he now says is a ten-year-old trademark was as part of descriptive phrases such as the following: "A unique combination of nutrients specifically designed to support and maintain the growth of healthy hair, skin and nails." (Supp. Yoegel Decl. ¶ 6.)  He has never sought to register or otherwise protect the name as a trademark (Payne Decl. ¶ 13), and virtually every competitor in the trade uses the same phrase generically to describe the product category. (Supp. Yoegel Decl. ¶¶ 4, 5.)  The very tenuousness of the claim that his newly adopted generic phrase was a trademark creates the appearance the public accusations (without any sober-minded efforts to resolve the matter directly with QVC) were simply in bad faith.[5]

To justify his false statements, Lessman employs numerous further untruths regarding his relationship with QVC since he left in 1996.  Despite the confidentiality of the parties' 1997 settlement (including a provision prohibiting him from disparaging QVC and entitling QVC to injunctive relief) he falsely and improperly mischaracterizes the settlement. (Supp. Yoegel Decl. ¶ 6; see supra note 1.)  And although it was Mr. Lessman who, with lavish praise of QVC and loud denunciations of HSN (Id. Exs. F, G) sought a possible return to QVC in 2006–2007, he mischaracterizes his own correspondence confirming the impetus was his own desire to leave HSN (not QVC's effort to lure him away).  He does not even mention his further efforts to rejoin QVC in 2009 (Supp. Yoegel Decl. G) but instead falsely asserts that QVC's 2010 launch of its NATURE'S CODE Hair Skin & Nails was somehow related to discussions three years earlier centering around his dissatisfaction with HSN (Id. Ex. F).  Although Lessman applauds his own

---

[5] Although not relevant to this motion, equally baseless is the contention that individuals responding to Mr. Lessman's own blog stirring up anger at QVC is evidence actual confusion. Mr. Lessman fails to note for instance that the first such allegedly confused consumer (who says she was dreaming – not purchasing) had previously posted that she thought QVC's product was "a copy-cat version," i.e. not confused that the products come from different sources. The other three also plainly recognize the competitive relationship of QVC and ProCaps. See Payne Decl. ¶ 9–10. They may have been stirred to anger by Lessman but were not confused as to the source of QVC's products.

11

restraint in not criticizing QVC for "six months" (Lessman Decl. ¶ 22) evidently what changed is that QVC, twice in two years, declined to take him back.  Responding unfairly to a competitive threat, his blogs attacked not only QVC's Hair Skin & Nails product but its Resveratrex product as well (saying nothing about any of the other issues he now raises – such as QVC's compliance with USP standards on disintegration or its "three dimensions of support" advertising slogan).

Lessman's deliberate retaliatory tactics and the egregious nature of his attacks (despite the commitment he made in his 1997 settlement with QVC not to disparage the company) have needlessly damaged QVC's reputation and support an inference that confusion is likely. (Supp. Yoegel Decl. ¶¶ 9–14.) Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc., 19 F.3d 125, 131–32 (3d Cir. 1994) (violation inferred where defendant acts with an "intent to mislead" and there is evidence of "deliberate conduct" of an "egregious nature," using a means that is not common in the industry).

G. The Equities Favor Injunctive Relief

Although QVC has not yet asserted a breach of contract claim, Lessman's own false statements about the parties' 1997 settlement has put in issue the fact that his disparagements are in breach of that agreement and entitle QVC to preliminary injunctive relief. (Supp. Yoegel Decl. ¶ 15)  Instances of actual confusion continue to occur, and internet links to the disparaging Lessman blogs are increasing over time (Payne Decl. ¶ 2–8).  If Lessman believes no one is viewing his blogs any longer (Br. at 23), there is no excuse or reason in equity to keep them up. There is no First Amendment right to engage in false or misleading speech. Castrol, Inc. v. Pennzoil Co., 987 F.2d. 939 (3d Cir. 1993).  Rather, particularly where health claims are in issue, the law condemns such false claims. Novartis, 290 F.3d at 597.

Dated:      May 10, 2010

12

Respectfully submitted,

By: _____*/s/ Joseph Grey*_____

Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

13

# EXHIBIT "F"

0139

Daniel G. Litchfield
Nicholas D. Butovich
LITCHFIELD CAVO LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
312-781-6677
litchfield@litchfieldcavo.com
butovich@litchfieldcavo.com

Craig R. Delk (Nev. Bar No. 002295)
THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
1100 E. Bridger Ave.
P.O. Drawer 2070
Las Vegas, NV 89125
702-366-0622
cdelk@thorndal.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

THE PHOENIX INSURANCE COMPANY and
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

Plaintiffs,

v.

YOUR VITAMINS, INC. d/b/a PROCAPS
LABORATORIES and ANDREW LESSMAN,

Defendants.

_____

YOUR VITAMINS, INC. d/b/a PROCAPS
LABORATORIES and ANDREW LESSMAN,

Counterclaimants,

v.

THE PHOENIX INSURANCE COMPANY and
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

Counterdefendants.

No. 2:12-cv-00564-MMD-RJJ

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' REQUEST FOR
PRODUCTION OF DOCUMENTS**

The Phoenix Insurance Company and Travelers Property Casualty Company of America's (collectively, "Travelers") objects and responds to Your Vitamins, Inc. d/b/a ProCaps Laboratories and Andrew Lessman's (collectively "ProCaps") request for production of documents as follows:

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

1

0140

## GENERAL OBJECTIONS

1.    Travelers objects to ProCaps' "Preliminary Statement, Definitions and Instructions" to the extent that anything contained therein is inconsistent with the Federal Rules of Civil Procedure or any other applicable rule, statute or legal authority.

2.    Travelers objects generally to the extent that the requests for production of documents seek materials that are protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other similar privilege or protection from disclosure.

3.    Travelers objects generally to the extent that the production of documents seek information related to reserves because such information is irrelevant and is of a proprietary business nature.

4.    Travelers objects generally to the extent that the requests for production of documents seek information related to reinsurance to the extent such information is protected by the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any other similar protection from disclosure, and because such information is irrelevant.

5.    Travelers objects generally to the extent that the requests for production of documents seek information related to any insured or purported insured other than ProCaps because such requests are overbroad and unduly burdensome and because such information is irrelevant, is of a proprietary business nature, and to the extent such information is confidential.

6.    Travelers objects generally to the extent that the requests for production of documents seek information outside the applicable time frame.

7.    Travelers objects generally to the extent that the requests for production of documents are irrelevant, overbroad or unduly burdensome.

8.    Travelers objects generally to the extent that the requests for production of documents seek information that is of a proprietary business nature.

9.    Travelers objects to the phrase "apparent authority" because it calls for a legal conclusion.

10. ·   The responses set forth herein are based on information presently known to

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

0141

Travelers. In providing these responses, Travelers reserves the right to amend, modify or supplement its responses and objections.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

1.      Produce all documents relating to the underwriting process concerning Insurance Policy Nos. Y-630-0544L813-TIL [08 through 10] referenced in the Complaint for Declaratory Relief. This request includes, but is not limited to, Plaintiffs' underwriting file, all materials received, reviewed and/or generated by any of Plaintiffs' representatives (including but not limited to employees, attorneys or any other person with actual or apparent authority acting on behalf of Plaintiffs) concerning said policies prior to their issuance.

RESPONSE: Travelers objects to request No. 1 because it seeks information which is irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

2.      Produce all documents relating to the underwriting process concerning Insurance Policy Nos. YFS-EX-0544L813-TIL [08 through 10] referenced in the Complaint for Declaratory Relief This request includes, but is not limited to, Plaintiffs' underwriting file, all materials received, reviewed and/or generated by any of Plaintiffs' representatives (including but not limited to employees, attorneys or any other person with actual or apparent authority acting on behalf of Plaintiffs) concerning said policies prior to their issuance.

RESPONSE: Travelers objects to request No. 2 because it seeks information which is irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

3.      Produce Plaintiffs' claims file concerning Insurance Policy Nos. Y-630¬0544L813-TIL [08 through 10] referenced in the Complaint for Declaratory Relief. This request includes, but is not limited to, any computerized log notes or other entries that in any way pertain to the claims handling process. This request also includes, but is not limited to, all internal correspondence and any other documents relating to claims under the above-referenced policies.

RESPONSE: Travelers objects to request No. 3 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

4.  ·   Produce Plaintiffs' claims file concerning Insurance Policy Nos. YFS-EX¬0544L813-TIL [08 through 10] referenced in the Complaint for Declaratory Relief. This

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

3

0142

request includes, but is not limited to, any computerized log notes or other entries that in any way pertain to the claims handling process. This request also includes, but is not limited to, all internal correspondence and any other documents relating to claims under the above-referenced policies.

RESPONSE: Travelers objects to request No. 4 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

5. Produce all documents relating to any communications between any representative of Plaintiffs (including but not limited to employees, attorneys or any other person with actual or apparent authority acting on behalf of Plaintiffs) and any Defendant.

RESPONSE: Travelers objects to request No. 5 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

6. Produce all documents relating to any communications between any representative of Plaintiffs (including but not limited to employees, attorneys or any other person with actual or apparent authority acting on behalf of Plaintiffs) and any law firms working on behalf of Defendants. Attorneys working on behalf of Defendants include Sidley Austin LLP and any local counsel (i.e. from Philadelphia and/or Delaware).

RESPONSE: Travelers objects to request No. 6 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

7. Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to the handling of insurance claims by a claims adjuster/handler.

RESPONSE: Travelers objects to request No. 7 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information. Without waiving any objection, Travelers states, none.

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

4

8.     Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to the duty of good faith and fair dealing and treatment of an insured.

**RESPONSE:** Travelers objects to request No. 8 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 8 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential documents produced or to be produced, subject to appropriate protective order.

9.     Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to compliance with statutory claims practices acts.

**RESPONSE:** Travelers objects to request No. 9 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 9 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential documents produced or to be produced, subject to appropriate protective order.

10.     Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to how attorneys/law firms are chosen to be selected to Plaintiffs' panel counsel.

**RESPONSE:** Travelers objects to request No. 10 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 10 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information.

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

5

11.   Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to determining what rates are reasonable for a particular matter.

**RESPONSE:** Travelers objects to request No. 11 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Travelers further objects to request No. 11 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information.

12.   Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to the auditing of outside counsels' bills.

**RESPONSE:** Travelers objects to request No. 12 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Travelers further objects to request No. 12 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information.  Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential documents produced or to be produced.

13.   Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to the interpretation of voluntary payment clauses.

**RESPONSE:** Travelers objects to request No. 13 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Travelers further objects to request No. 13 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information.  Without waiving any objection, Travelers states, none.

14.   Produce any claims manual(s), guidelines, bulletins, or other documents that contain provisions applicable to whether pre-notice defense costs will be reimbursable.

**RESPONSE:** Travelers objects to request No. 14 to the extent it seeks information

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

6

0145

protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 14 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information. Without waiving any objection, Travelers states, none.

15.    Produce all documents that relate in any way as to how Plaintiffs determine whether a particular law firm is qualified to act as defense counsel for their insured.

RESPONSE: Travelers objects to request No. 15 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 15 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, unduly burdensome, and involves proprietary business information.

16.    Produce all documents that relate in any way as to how Plaintiffs determine whether a particular law firm is qualified to act as defense counsel for Plaintiffs.

RESPONSE: Travelers objects to request No. 16 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 16 because it seeks information which is overbroad, irrelevant, not likely to lead to the discovery of relevant information, unduly burdensome, and involves proprietary business information.

17.    Produce all documents that relate in any way as to how Plaintiffs determine what a reasonable rate is for a particular matter.

RESPONSE: Travelers objects to request No. 17 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to request No. 17 because it seeks information which is overbroad, unduly burdensome, and involves proprietary business information.

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

0146

18.     Produce all documents that relate in any way as to who, as between Plaintiffs or an insured, gets to decide whether a particular rate is reasonable.

**RESPONSE:** Travelers objects to request No. 18 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Travelers further objects to request No. 18 because it seeks information which is overbroad, unduly burdensome, and involves proprietary business information.

19.     Produce "Travelers' billing guidelines for non-panel defense counsel" as referenced in the Complaint for Declaratory Relief.

**RESPONSE:** Without waiving any objection and for its response to request No. 19, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

20.     Produce Travelers' billing guidelines for panel defense counsel.

**RESPONSE:**  Travelers objects to request No. 20 because it seeks information which is irrelevant and not likely to lead to the discovery of relevant information.

21.     Produce all documents that relate to the contention that "Travelers proffered several qualified law firms to act as defense counsel for ProCaps Laboratories" as alleged in the Complaint for Declaratory Relief. This request includes, but is not limited to, all documents that specifically refer to any of the alleged qualified law firms that were purportedly proffered by Plaintiffs to Defendants.

**RESPONSE:** Without waiving any objection and for its response to request No. 21, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

22.     Produce all documents, if any, which relate to Plaintiffs' efforts to determine whether a particular firm other the [sic] Sidley Austin LLP was qualified to act as defense counsel for Defendants.

**RESPONSE:** Without waiving any objection and for its response to request No. 22, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

8

0147

23.    Produce all documents that relate to the contention that the rates demanded by Sidley "are well in excess of the rates charged by competent counsel offered by Travelers to defend ProCaps" as alleged in the Complaint for Declaratory Relief.

**RESPONSE:** Without waiving any objection and for its response to request No. 23, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

24.    Produce all documents that were used by or available to Plaintiffs to determine whether a particular task, fee, expense or other billing increment or amount submitted to Plaintiffs by a law firm is excessive or within acceptable limits to Plaintiffs.

**RESPONSE:** Travelers objects to request No. 24 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

25.    Produce all documents that were actually referenced by anyone working on behalf of Plaintiff to determine whether a particular task, fee, expense or other billing increment or amount charged by Sidley Austin, LLP/local counsel was excessive or within acceptable limits. This request includes, but is not limited to, any documents referenced by anyone acting on behalf of Plaintiffs to make "adjustments" to Sidley's/local counsel's bills.

**RESPONSE:** Travelers objects to request No. 25 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

26.    Produce all documents that relate to the contention that "[a]ll invoices submitted to Travelers reflect billing rates charged by Sidley that are unreasonable" as alleged in the Complaint for Declaratory Relief.

**RESPONSE:** Without waiving any objection and for its response to request No. 26, Travelers refers ProCaps to the invoices related to the underlying suit which QVC filed against ProCaps.  Further, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

9

0148

27.     Produce all documents that relate to the contention that "[t]he counterclaims asserted by ProCaps Laboratories and Lessman ... were separate and apart from the defenses asserted by ProCaps Laboratories and Lessman to the claims asserted against them by QVC" and/or that the "[c]osts arising from the pursuit of the counterclaims by ProCaps Laboratories and Lessman were not incurred in connection with the investigation or defense of the claim or suit nor have they been incurred with Travelers consent."

**RESPONSE:** Without waiving any objection and for its response to request No. 27, Travelers refers ProCaps to the pleadings and invoices related to the underlying suit which QVC filed against ProCaps.  Further, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

28.     Produce all documents that relate to the contention that ProCaps secured affirmative relief to advance its business interests as alleged in the Complaint for Declaratory Relief.

**RESPONSE:** Without waiving any objection and for its response to request No. 28, Travelers refers ProCaps to the pleadings and invoices related to the underlying suit which QVC filed against ProCaps.  Further, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

29.     Produce all of Plaintiffs' internal documents that comment, in any way, on the capabilities and/or qualifications of Sidley Austin LLP.

**RESPONSE:** Travelers objects to request No. 29 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.   Travelers further objects to request No. 29 because it is unduly burdensome.

30.     Produce all of Plaintiffs' internal documents that comment, in any way, on the contract lawyers used by Sidley Austin LLP in an effort to save costs.

**RESPONSE:** Travelers objects to request No. 30 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.   Without waiving any objection, Travelers refers ProCaps to the

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

10

0149

unprivileged, non-confidential portions of the claim file documents produced or to be produced.

31.     Produce all documents that in any way relate to the auditing of bills of Sidley Austin LLP or any local counsel working on behalf of Defendants. This request encompasses any documents generated by Plaintiffs and any documents generated by third-parties retained by Plaintiffs to perform any audits.

**RESPONSE:** Travelers objects to request No. 31 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.   Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

32.     Produce all documents that reflect the time and monetary cost associated with the review of Sidley invoices as referenced in the Complaint for Declaratory Relief. This request includes, but is not limited, to Plaintiffs' internal documents that relate to this issue and any documents generated by any outside party working on behalf of Plaintiffs to review and/or audit Sidley's invoices.

**RESPONSE:** Travelers objects to request No. 32 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is irrelevant and not likely to lead to the discovery of relevant information.

33.     Produce all documents that relate to: a) the analysis as to whether to file a Complaint against Defendants in or about August, 2011; b) the decision to actually file a Complaint against Defendants in or about August, 2011; and, c) the timing as to when to file suit against Defendants in or about August, 2011.

**RESPONSE:**   Travelers objects to request No. 33 because it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.

34.     Produce all documents that support, refute or otherwise relate to the contention asserted by Plaintiffs that Defendants failed to cooperate with Plaintiffs.

**RESPONSE:** Travelers objects to request No. 34 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

11

0150

similar protection. Without waiving any objection, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

35. For those cases in which Plaintiffs or any related company has been sued where the amount in controversy exceeded $10 million, produce documents reasonably necessary to identify: a) the Complaint at issue; b) the jurisdiction at issue; c) the law firm retained to represent Plaintiffs or their related company; and, d) the hourly rates paid on behalf of Plaintiffs.

**RESPONSE:** Travelers objects to request No. 35 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is overbroad, unduly burdensome, irrelevant, not likely to lead to the discovery of relevant information, vague and ambiguous, unduly burdensome, and involves proprietary business information.

36. Produce all documents reasonably necessary to show all instances in which Plaintiffs or any of their related companies paid an hourly rate exceeding $300 per hour within the last ten (10) years. This requests billing statements, for example, which would reflect these instances and the particular case name in which the rates were paid.

**RESPONSE:** Travelers objects to request No. 36 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is overbroad, unduly burdensome, irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

37. Produce all documents reasonably necessary to show the five (5) highest billing rates paid by Plaintiffs or any of their related companies on behalf of themselves when they have been sued within the last ten (10) years.

**RESPONSE:** Travelers objects to request No. 37 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is overbroad, unduly burdensome, irrelevant, not likely to lead to the discovery of relevant

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

12

information, and involves proprietary business information.

38.   Produce all documents reasonably necessary to show the five (5) highest billing rates paid by Plaintiffs or any of their related companies on behalf of an insured who has been sued within the last ten (10) years.

RESPONSE: Travelers objects to request No. 38 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is overbroad, unduly burdensome, irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

39.   Produce all documents that reflect all instances where, within the last ten (10) years, Plaintiffs or their related companies have reimbursed an insured for legal expenses incurred before notice of a claim was sent to Plaintiffs or their related companies.

RESPONSE: Travelers objects to request No. 39 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Travelers further objects to this request because it seeks information which is overbroad, unduly burdensome, irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

40.   Produce all documents relating to any communications between Plaintiffs and any reinsurer concerning Defendants.

RESPONSE: Travelers objects to request No. 40 to the extent it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, common interest privilege, or other similar protection. Travelers further objects to this request because it seeks information which is irrelevant, not likely to lead to the discovery of relevant information, and involves proprietary business information.

41.   Produce all documents in your possession, custody or control that may be used to support Plaintiffs' claims or defenses.

RESPONSE: Travelers objects to request No. 41 because it is overbroad and

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

13

0152

premature.

42.    Produce all documents in your possession that may be used solely for purposes of impeachment.

**RESPONSE:** Travelers objects to request No. 42 because it is overbroad and premature.

Respectfully submitted,

The Phoenix Insurance Company and
Travelers Property Casualty Company of America

By: _____
One of their Attorneys

Daniel G. Litchfield
Nicholas D. Butovich
LITCHFIELD CAVO LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
312-781-6669 (Litchfield)
312-781-6573 (Butovich)
312-781-6630 (fax)
litchfield@litchfieldcavo.com
butovich@litchfieldcavo.com

Craig R. Delk (Nev. Bar No. 002295)
THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
1100 E. Bridger Ave.
P.O. Drawer 2070
Las Vegas, NV 89125
702-366-0622
702-366-0327 (fax)
cdelk@thorndal.com

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

14

0153

# EXHIBIT "G"

Daniel G. Litchfield
Nicholas D. Butovich
LITCHFIELD CAVO LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
312-781-6677
litchfield@litchfieldcavo.com
butovich@litchfieldcavo.com

Craig R. Delk (Nev. Bar No. 002295)
THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
1100 E. Bridger Ave.
P.O. Drawer 2070
Las Vegas, NV 89125
702-366-0622
cdelk@thorndal.com

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| THE PHOENIX INSURANCE COMPANY and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br> Plaintiffs, <br><br> v. <br><br> YOUR VITAMINS, INC. d/b/a PROCAPS LABORATORIES and ANDREW LESSMAN, <br><br> Defendants. | No. 2:12-cv-00564-MMD-RJJ |
| YOUR VITAMINS, INC. d/b/a PROCAPS LABORATORIES and ANDREW LESSMAN, <br><br> Counterclaimants, <br><br> v. <br><br> THE PHOENIX INSURANCE COMPANY and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br> Counterdefendants. | **PLAINTIFFS' ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

The Phoenix Insurance Company and Travelers Property Casualty Company of America's (collectively, "Travelers") objects to and answers Your Vitamins, Inc. d/b/a ProCaps Laboratories and Andrew Lessman's (collectively "ProCaps") interrogatories as follows:

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

1

0155

## GENERAL OBJECTIONS

1. Travelers objects to ProCaps' "Preliminary Statement, Definitions and Instructions" to the extent that anything contained therein is inconsistent with the Federal Rules of Civil Procedure or any other applicable rule, statute or legal authority.

2. Travelers objects generally to the extent that the interrogatories seek information that is protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other similar protection from disclosure.

3. Travelers objects generally to the extent that the interrogatories seek information related to reserves because such information is irrelevant and is of a proprietary business nature.

4. Travelers objects generally to the extent that the interrogatories seek information related to reinsurance to the extent such information is protected by the attorney-client privilege, attorney work product doctrine, common interest doctrine, or any other similar protection from disclosure, and because such information is irrelevant.

5. Travelers objects generally to the extent that the interrogatories seek information related to any insured or purported insured other than ProCaps because such interrogatories are overbroad and unduly burdensome and because such information is irrelevant, is of a proprietary business nature, and to the extent such information is confidential.

6. Travelers objects generally to the extent that the interrogatories seek information outside the applicable time frame.

7. Travelers objects to the phrase "apparent authority" because it calls for a legal conclusion.

8. The answers set forth herein are based on information presently known to Travelers. In providing these answers, Travelers reserves the right to amend, modify or supplement its responses and objections.

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

1. Set forth the name, job title, address, and telephone number, of any and all

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

2

persons who participated in, assisted, or otherwise were involved in the claims handing [sic] process involving the underlying QVC claim/lawsuit at issue herein.' This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

ANSWER:  Without waiving any objections, Travelers states:

Amy M. Baker                          David B. Kearney
Major Case Specialist                 Sr. Technical Specialist
Business Torts Claim                  The Phoenix Insurance Company
TRAVELERS                             Hunt Valley Claim Service Center
One Tower Square 7MS                  P.O. Box 13576
Hartford, CT 06183                    Baltimore, MD 21298-9371

2.     Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in the decision not to reimburse Defendants for any fees/expenses incurred before notice of the claim was sent to Plaintiffs. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

ANSWER:  Without waiving any objections, Travelers states, Amy M. Baker and David B. Kearney, with the advice and counsel of their attorneys.

3.     Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in the decision to approve Sidley Austin, LLP to act as counsel on behalf of Defendants. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

ANSWER:  Without waiving any objections, Travelers states, Amy M. Baker and David B. Kearney, with the advice and counsel of their attorneys.

4.     Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in the decision to pay Sidley Austin, LLP attorneys at $300 per hour. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

ANSWER:  Without waiving any objections, Travelers states, Amy M. Baker, with the advice and counsel of her attorneys.

5.     Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in determination that the

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

3

0157

rates demanded by Sidley "are well in excess of the rated [sic] charged by competent counsel offered by Travelers to defend ProCaps" as alleged in the Complaint for Declaratory Relief. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

**ANSWER:** Without waiving any objections, Travelers states, Amy M. Baker, with the advice and counsel of her attorneys.

6.      Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in determination that the amounts charged by Sidley Austin, LLP were excessive. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs. This interrogatory also relates, but is not limited to, Plaintiffs' contentions that the Sidley invoices reflect: charges by an excessive number of timekeepers for the same efforts or projects; tasks or services which were not approved by Travelers, and which were unreasonable or unnecessary; and, charges by attorneys or paralegals for work more appropriately performed by administrative or clerical personnel.

**ANSWER:** Without waiving any objections, Travelers states, Amy M. Baker, with the advice and counsel of her attorneys. Travelers further states:

Mari Henry Leigh
Meckler Bulger Tilson Marick & Pearson LLP
123 N. Wacker Dr., Ste. 1800
Chicago, IL 60606

7.      Set forth the names, addresses, and telephone numbers of the "several qualified law firms [that Travelers purportedly proffered] to act as defense counsel for ProCaps Laboratories" as alleged in the Complaint for Declaratory Relief.

**ANSWER:** Without waiving any objections, Travelers refers ProCaps to the unprivileged, non-confidential portions of the claim file documents produced or to be produced.

8.      Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in the decision to file suit against Defendants in or about August 2011 and/or April 2012. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

**ANSWER:** Travelers objects to interrogatory No. 8 to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection. Without waiving any objections, Travelers states, Amy M. Baker, with

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

4

0158

the advice and counsel of her attorneys.

9.    Set forth the name, job title, address, and telephone number, of any and all persons who participated in, assisted, or otherwise were involved in the review/auditing of bills of Sidley Austin LLP or any local counsel working on behalf of Defendants. This interrogatory encompasses employees, attorneys and/or or any other person with actual or apparent authority acting on behalf of Plaintiffs.

ANSWER:    Travelers objects to interrogatory No. 8 to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product doctrine, or other similar protection.  Without waiving any objections, Travelers states, Mari Henry Leigh.

Respectfully submitted,

The Phoenix Insurance Company and
Travelers Property Casualty Company of America

By: _____
One of their Attorneys

Daniel G. Litchfield
Nicholas D. Butovich
LITCHFIELD CAVO LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
312-781-6669 (Litchfield)
312-781-6573 (Butovich)
312-781-6630 (fax)
litchfield@litchfieldcavo.com
butovich@litchfieldcavo.com

Craig R. Delk (Nev. Bar No. 002295)
THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
1100 E. Bridger Ave.
P.O. Drawer 2070
Las Vegas, NV 89125
702-366-0622
702-366-0327 (fax)
cdelk@thorndal.com

Litchfield Cavo LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312-781-6677

5

0159

## VERIFICATION

I, Amy M. Baker, for The Phoenix Insurance Company and Travelers Property Casualty Company of America, being first duly sworn on oath, deposes and states that she is Plaintiff's representative in the above-entitled matter; that she has read the foregoing answers to first set of interrogatories by her subscribed; that she knows the contents thereof, and the same are true to the best of her knowledge and belief.

The Phoenix Insurance Company and
Travelers Property Casualty Company of America

By:    *Amy M. Baker*

Title:    *Director*

SUBSCRIBED and SWORN to before me

this _15th_ day of _August_, 2012.



NOTARY PUBLIC

CORINNE A. LAPOINTE
Notary Public, State of Connecticut
My Commission Expires July 31, 2017

0160

# CD TO BE PROVIDED TO THE COURT AND OPPOSING COUNSEL

# EXHIBIT "H"